## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| **TESSEMAE'S, LLC** | * | |
| 8850 Kelso Drive | | |
| Essex, Maryland 21221, | * | |
| | | |
| Plaintiff, | * | C-03-CV-20-002390 |
| | | |
| v. | * | Case No. _____ |
| | | |
| **MICHAEL S. MCDEVITT** | * | |
| 1674 Chinford Trail | | |
| Annapolis, Maryland 21401, | * | |
| | | |
| and | * | |
| | | |
| **TANDEM LEGAL GROUP, LLC** | * | |
| 829 7th Street, NW #200 | | |
| Washington, D.C. 20001, | * | |
| | | |
| Serve On: CT Corporation System | * | |
| 1015 15th Street, NW | | |
| Suite 1000 | * | |
| Washington, D.C., 20005 | | |
| | * | |
| and | | |
| | * | |
| **TANDEM GROWTH GROUP, LLC** | | |
| 829 7th Street, NW #200 | * | |
| Washington, D.C. 20001, | | |
| | * | |
| Serve On: CT Corporation System | | |
| 1015 15th Street, NW | * | |
| Suite 1000 | | |
| Washington, D.C., 20005 | * | |
| | | |
| and | * | |
| | | |
| **BRENDAN CONNORS** | * | |
| 352 North Drive | | |
| Severna Park, Maryland 21146, | * | |
| | | |
| and | * | |

| | |
|---|---|
| **HERMAN DUNST** | * |
| 3376 Jennings Chapel Road | |
| Woodbine, Maryland 21797, | * |
| | |
| and | * |
| | |
| **PAUL INTLEKOFER** | * |
| 663 Shore Road | |
| Severna Park, Maryland 21146, | * |
| | |
| and | * |
| | |
| **ALEX CHEHANSKY** | * |
| 2192 Chesapeake Harbour Drive | |
| Annapolis, Maryland 21043, | * |
| | |
| Defendants. | * |

\* \* ooo0ooo \* \*

## COMPLAINT AND PRAYER FOR JURY TRIAL

Tessemae's, LLC sues Michael S. McDevitt, Tandem Legal Group, LLC, Tandem

Growth Group, LLC, Brendan Connors, Herman Dunst, Paul Intlekofer, and Alex Chehansky,

and alleges:

1.     Tessemae's LLC is a leading producer of organic salad dressings and other food

products. It was founded in 2009 by three brothers, Greg, Brian, and Matt Vetter. The idea came

to Greg after a friend broke into his house to steal a container of his mother, Tessemae's

homemade dressing from the refrigerator. It occurred to Greg that if his mother's salad dressing

was good enough to steal, it must be good enough to sell. And indeed it was. Greg never

imagined that Michael McDevitt would try to steal, not merely Tessemae's salad dressing, but

the salad dressing company itself, nor did he appreciate the devious and corrupt methods that

McDevitt and his cohorts would employ in attempting to do so.

2

2.      In the fall of 2017, McDevitt brazenly abused his confidential relationship with Tessemae's in a fraudulent scheme to muscle out the Vetter family and gain control of the Company. McDevitt falsely represented that he would assist the Company to raise capital; instead, McDevitt slandered Tessemae's reputation, misled prospective investors in violation of both state and federal securities laws, and along with Tandem Legal Group ("Tandem"), committed legal malpractice, all at the Company's expense.

3.      This was not the first time the Company had been forced to clean up one of McDevitt's messes. Though the cast of supporting characters changed over time, the common denominator remained McDevitt and Tandem Legal Group, LLC, a law firm that non-lawyer McDevitt was able to control by exploiting what he proudly characterized as a "loophole" in the District of Columbia's rules of professional responsibility. While Tandem holds itself out as a legitimate legal practice, it is in fact simply a vehicle that McDevitt uses to serve his and his confederates' corrupt motives. In his capacity as the law firm's CEO, McDevitt engaged in a pattern of racketeering activity to acquire an interest in, and maintain control over, Tessemae's.

4.      Defendants' actions have burdened the Company's resources, stunted its growth, and threatened its existence, resulting in actual damages conservatively calculated to exceed $45.1 million. Tessemae's also seeks treble damages provided for in 18 U.S.C. § 1964(c) (Racketeer Influenced and Corrupt Organizations Act), punitive damages for Defendants' intentional and willful misconduct, attorneys' fees, costs, and injunctive and declaratory relief to protect it from further harm from Defendants.

**PARTIES**

5.    Plaintiff Tessemae's, LLC, is a limited liability company organized under the laws of the State of Maryland, with its principal place of business in Baltimore County. Tessemae's is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Tessemae's activities affect interstate commerce because it sources its raw materials nationally and internationally and distributes its products throughout the United States.

6.    Defendant Michael S. McDevitt is a resident of Anne Arundel County. McDevitt is a "person" within the meaning of 18 U.S.C. § 1961(3), and among other bad acts, he has engaged in a pattern of racketeering activity against Tessemae's, as described below.

7.    Defendant Tandem Legal Group, LLC is a Delaware limited liability company with its principal place of business in the District of Columbia. Tandem itself and through agents regularly transacts and solicits business and provides services in the State of Maryland, and the tortious injuries complained of in this Complaint occurred in the State by acts and omissions in the State. Tandem is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) since its activities affect interstate commerce. At all relevant times, McDevitt was its CEO. McDevitt conducted Tandem's affairs by engaging in a pattern of racketeering activity with the intention of defrauding Tessemae's.

8.    Defendant Tandem Growth Group, LLC ("Tandem Growth") is a Delaware limited liability company with its principal place of business in the District of Columbia. Tandem Growth itself and through agents regularly transacts and solicits business and provides services in the State of Maryland, and the tortious injuries complained of in this Complaint occurred in the State by acts and omissions in the State. Tandem Growth is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) since its activities affect interstate commerce.

Tandem Growth is a vehicle that McDevitt uses to receive equity in Tandem's clients in exchange for Tandem's services. McDevitt conducted Tandem Growth's affairs through a pattern of racketeering activity and used it as his alter ego to facilitate his scheme to defraud Tessemae's; McDevitt transferred equity that he obtained from the Company through fraudulent and illegal means to Tandem Growth without receiving any consideration in return.

9.    Defendant Brendan Connors is a resident of Anne Arundel County.

10.   Defendant Herman Dunst is a resident of Howard County.

11.   Defendant Paul Intlekofer is a resident of Anne Arundel County.

12.   Defendant Alex Chehansky is a resident of Anne Arundel County.

## FACTS COMMON TO ALL COUNTS

13.   Tessemae's was born from humble beginnings in 2009 based on the simple idea that Greg and his brothers could sell their mother's much-loved lemon garlic salad dressing. None of the Vetter brothers were experienced or sophisticated businessmen, but they shared a strong work ethic and the desire to see the Company succeed. Today, Tessemae's has an annual revenue of more than $20 million. It produces more than 70 products including salad dressing, marinades, condiments, salad kits, and grab-to-go fresh food items at its 150,000-square-foot facility in Essex, Maryland. It has become a leading brand in the "clean eating" movement. Tessemae's uses all-natural ingredients in its products, most of which are sugar free, dairy free, and gluten free. Many of its products are compliant with the popular Whole30 program and Keto diet.

14.   Tessemae's faced the typical challenges confronting new businesses as it worked to develop and distribute its product, manage its brand, and capitalize for long-term viability. Those challenges were not made easier by Greg's introduction to Michael McDevitt in 2013 by

5

an individual employed by Tessemae's principal lender, Howard Bank. McDevitt had recently left his position as CEO of Medifast, Inc., a publicly traded company (NYSE: MED) headquartered in Owings Mills, Maryland that sold weight loss products.

15.     At the time of their introduction, McDevitt had moved on from Medifast and was fronting a new venture, Tandem, which he described as a legal services and business advisory firm. The District of Columbia is the only jurisdiction in the country that permits non-lawyers like McDevitt to hold ownership interests in law firms, which McDevitt has publicly and proudly described as a "loophole" in the District of Columbia's rules of professional responsibility that he could exploit. And exploit it he did.

16.     Tandem served as the linchpin of McDevitt's corrupt designs. From his perch as Tandem's CEO, McDevitt insinuated himself into his client-target through the artifice of accepting payment for Tandem's services in the form of equity in the client's business – an insider position that he then leveraged to try to gain control of his victim.

17.     A skilled salesman, McDevitt began his assault on Tessemae's in the summer of 2013 when he pitched Greg on using Tandem's legal and business advisory services. McDevitt told Greg that he and Tandem could help Tessemae's grow its business exponentially and that Tandem had other clients that were operating in the same healthy-eating arena that Tessemae's was growing into, such as the restaurant chain Sweetgreen. McDevitt told Greg that Tandem could leverage its connections to find outlets for Tessemae's to grow, including, for example, by working with Sweetgreen to get them to use Tessemae's dressings in their restaurants. As McDevitt anticipated, Greg was intrigued, but the only relationship that McDevitt was genuinely interested in leveraging was Tandem's attorney-client relationship with Tessemae's.

6

18.     McDevitt understood that his offer to accept payment for Tandem's fees in the form of equity was likely to be attractive to Tessemae's—which like many young businesses, faced cashflow issues—and that Tessemae's would be unlikely to appreciate the inherent and insidious danger posed by such a conflict-laden arrangement.

19.     McDevitt told Greg that Tessemae's could reduce Tandem's legal fees by using McDevitt as the point-person for all of Tandem's work on behalf of the Company—legal and otherwise. According to McDevitt, many issues that companies believe require legal counsel are really business decisions that can be handled without what McDevitt suggested are the needless complexities that result from involving attorneys. He said that Greg should run all of the Company's legal issues past him and that *he* would engage the attorneys at Tandem when *he* determined it was appropriate to do so.

**McDevitt Uses Tandem to Steal Equity in Tessemae's for Himself, Connors, and Dunst**

20.     Tandem began work for Tessemae's in August 2013, proposing a plan McDevitt dubbed "Project 25," purportedly designed to grow Tessemae's sales from $5 million to $25 million by the end of 2014.  McDevitt assured Greg that Tessemae's was protected because, under the equity-for-services arrangement, Tandem would get paid only if it successfully executed on Project 25.

21.     McDevitt also introduced Greg to Brendan Connors and Herman Dunst. McDevitt and Connors are longtime friends and their career paths tracked one another for many years. Connors had been Medifast's CFO when McDevitt was CEO.  Dunst, meanwhile, had been Medifast's Vice President of Procurement during that same period.  By the fall of 2013, McDevitt had gotten his gang back together and he introduced Connors and Dunst as consultants to Tandem, eventually installing both of them in executive positions at Tessemae's, where they

7

stood to gain equity if Project 25 was successful and from which they could (and did) provide McDevitt with inside information about Tessemae's operations in violation of their duty of loyalty to the Company.

22.     In addition, McDevitt referred Greg to an executive coach. Only years later would the Company discover that, rather than acting as a confidential sounding board and offering neutral advice, the coach operated as another mole, sharing with McDevitt the information he learned from Greg about the Company's operations and growing pains.

23.     Shortly after Tandem was retained by Tessemae's, McDevitt advised Greg that Tessemae's needed to amend its Operating Agreement "for tax purposes," and he directed the attorneys at Tandem to draft an Amended and Restated Operating Agreement for the Company.

24.     In fact, McDevitt claim was a lie. His real motivation for wanting the Operating Agreement to be amended was not for "tax purposes," but to create a new class of "Preferred Units" that would facilitate his and his confederates' efforts to acquire control of the Company.

25.     At the time, Tessemae's had two classes of equity units – Class A, which enjoyed voting rights, and Class B, which were reserved for issuance to the Company's employees and did not include voting rights. Unbeknownst to Greg and the Company, rather than soliciting investments for additional Class A units, McDevitt and Connors approached their friends and families about investing in a new, yet-to-be-created, class of Preferred Units. The Preferred Units would have voting rights and could not be diluted until the Company completed a capital raise worth at least $5 million. Until that time, only the Company's other classes of equity would be diluted by additional capital contributions; investors holding Preferred Units would receive additional units at no cost so that their percentage interest in the Company remained the same. The effect of such an arrangement was that as additional money was invested in the Company,

8

the percentage of the Company owned by McDevitt and his allies (the holders of the new class of non-dilutable preferred shares) would increase while the percentage of the Company owned by the owners of (dilutable) Class A shares would decrease at the same rate.

26.    McDevitt and Connors raised $1,325,000 from six new investors, all for Preferred Units, but they refused to allow the Company's existing investors (each of whom had been solicited by Greg and his family) to purchase them.

27.    In addition, both McDevitt and Connors purchased the new Preferred Units themselves. McDevitt invested $500,000 for a ten percent stake in the Company and Connors invested $200,000 for a four percent stake in the Company. At McDevitt's direction, Tandem, which was acting as counsel for the Company, for McDevitt, and for Connors, prepared the paperwork for both transactions.

28.    On or about January 3, 2014, McDevitt and Tandem presented Greg with the Amended and Restated Operating Agreement. In addition to creating the class of Preferred Units, the agreement provided for other changes designed to benefit McDevitt and the individuals he had solicited to invest in the Company. For example, pursuant to the Amended and Restated Operating Agreement, McDevitt joined the Company's Board as the representative of the individuals who had purchased the new Preferred Units.

29.    The Amended and Restated Operating Agreement also incorporated a capitalization table showing an allocation of Preferred Units to McDevitt, Connors, and Dunst as though Project 25 had been successful. When Greg questioned that, since Project 25 was still in its early stages, McDevitt claimed that it would be easier to "claw back" units if Project 25 was not successful, than to grant them after it succeeded. McDevitt advised Greg that such practices

9

were common among businesses like Tessemae's. These representations were false, as Greg
would later discover.

30.     Relying on the fact that it had been prepared by the Company's law firm, as well
as McDevitt's representation that the equity grants to McDevitt, Connors, and Dunst could be
clawed back, Greg signed the Amended and Restated Operating Agreement and encouraged the
Company's other investors to do so as well. On behalf of the Company, Greg also signed
Subscription Agreements stating that Tessemae's was transferring Preferred Units to McDevitt,
Connors, and Dunst, as if Project 25 had been successful. In addition, Greg signed an
Assignment of Shares acknowledging McDevitt's transfer of a portion of his equity (worth four
percent of the Company) to Tandem Growth.

31.     Project 25 was an abject failure. Rather than increasing five-fold from $5 million
to $25 million, Tessemae's sales increased from $5 million to just $5.5 million by the end of
2014. When it became clear that Project 25 would not succeed, Greg asked McDevitt, Connors,
and Dunst to return the equity that McDevitt had assured Greg could easily be clawed back in
such an event. McDevitt, Connors, and Dunst refused.

32.     After being double-crossed by McDevitt, Greg approached the attorney at
Tandem who had been principally responsible for drafting the agreement and the documents
transferring the equity to McDevitt, Connors, and Dunst for help enforcing the claw back
agreement that McDevitt said existed. She told Greg that that the equity could not be clawed
back because there was no written documentation indicating that McDevitt, Connors, and Dunst
had agreed to return their units if Project 25 failed.

10

**McDevitt, Connors, and Dunst Use Tandem to
Steal Tesse's Kitchen – an Ingredient and Recipe Kit Business**

33.     In mid-2014 McDevitt approached Greg about expanding Tessemae's business into the then-growing meal kit market that had been popularized by brands like Blue Apron. McDevitt explained that Tandem had recently been retained by a company called Fresh Realm that had developed backend processes and technology to compete with the industry's bigger players in a more sustainable fashion. Instead of using disposable packaging, Fresh Realm developed a system to reuse its packaging and delivery materials.

34.     Shortly thereafter, McDevitt arranged for a meeting between Fresh Realm and Tessemae's in New York during which those in attendance agreed to form a new business called Tesse's Kitchen. Tessemae's, Fresh Realm, Renaissance Food Group, and McDevitt, Connors, and Dunst, collectively, would each own equal shares of the venture.

35.     In the months that followed, Tessemae's spent thousands of hours developing recipes and brand materials to launch Tesse's Kitchen, all with McDevitt's, Connors', and Dunst's knowledge. Shortly before Tesse's Kitchen was scheduled to launch, however, McDevitt presented a new agreement (prepared by Tandem) outlining the structure of the venture that showed Tessemae's owning just one percent – far less than his, Connors', and Dunst's collective share.

36.     Greg immediately called the attorney at Tandem who had been representing Tessemae's throughout the Tesse's Kitchen project to ask what happened. During the call, the attorney explained that McDevitt was pressuring her to get Greg to sign the agreement at the reduced ownership percentage and she did not think Tandem could provide Tessemae's with unbiased advice on the matter. McDevitt fired that attorney the following day.

11

37.     McDevitt, Connors, and Dunst completed their theft of the Company's opportunity to start Tesse's Kitchen by rebranding the venture as Terra's Kitchen and launching it without providing Tessemae's any ownership interest.

### McDevitt Conspires with Intlekofer, and Chehansky to Attempt to Take Over Tessemae's

38.     Tessemae's was growing in late 2016 when McDevitt saw another opportunity to gain control of the Company through corrupt means. Though the supporting cast of conspirators had changed–the common denominators being McDevitt and Tandem–the scheme was familiar.

39.     By late summer 2017, Tessemae's needed additional capital to expand its production facilities and meet growing demand. It had identified a source of financing, but as a condition to making the loan, the lender demanded that it be granted a first-position lien on the Company's accounts receivable, a position then-held by Howard Bank. Because McDevitt was still among the guarantors of the Company's line of credit with Howard Bank, the Company considered itself obligated to inform him of the status of its negotiations with the bank, which Greg did in August 2017. McDevitt said he had a strong relationship with Howard Bank's president and offered to help.

40.     A few days later, McDevitt called Greg and said he had worked out a deal whereby Howard Bank would extinguish the Company's line of credit (which carried a balance of $2 million) for $1 million. Even better, McDevitt told Greg that he had also identified individuals who were willing to invest that amount by September 1, 2017, as well as an additional $6-7 million by October 1, 2017 (an amount that would meet all of the Company's immediate capital needs) in exchange for promissory notes tied to warrants for an existing class of units in the Company.

12

41.     In fact, McDevitt's representations were a lie. Not only did Howard Bank not agree to extinguish the Company's line of credit for $1 million, but McDevitt had no intention of raising all of the funds he had promised. Instead, he saw Tessemae's need for capital as another opportunity to try to take over the Company through lies and conflicts of interest, this time enlisting Defendants Paul Intlekofer, and Alex Chehansky as his confederates.

42.     Believing McDevitt's representations that Tandem was competent and qualified to do so, Tessemae's agreed to retain Tandem to "paper" the offering as securities counsel for the Company. Pursuant to the agreement between McDevitt and Tessemae's, Tandem prepared the notes and warrants for the offering on the Company's behalf. It also drafted a "side letter" memorializing the Company's agreement to pay McDevitt $100,000 and to amend the Company's Operating Agreement to provide him with additional equity in a new class of units that would carry super-preferred voting rights. Specifically, the side letter described amendments to the Operating Agreement that would give McDevitt veto rights over certain business decisions such as incurring debt over $100,000, hiring, firing, and compensating senior management, and new business or product lines. The amendments would also have provided McDevitt with six votes per unit in connection with the approval of an acquisition or asset sale. Tessemae's Board of Managers approved the terms of the side letter on or about September 1, 2017.

43.     By November, 2017, McDevitt had raised only $1.1 million of the $7-8 million he had (falsely) told the Company he had lined up. Undaunted, in early November he introduced Greg to Alex Chehansky, a financial manager/private equity banker from New York, who McDevitt (falsely) claimed, he had "just met," and who could, McDevitt said, raise $6 million in three weeks. The Company, at McDevitt's urging, hired Chehansky as a financing "consultant."

13

44.     Chehansky was no more successful than McDevitt in raising funds for the Company in the timeframe he and McDevitt had promised despite multiple meetings with possible investors across the Country, most of which were coordinated with McDevitt and Intlekofer, but without the Company's knowledge. During those meetings McDevitt falsely represented to prospective investors that there had been a change of control at the Company, that he held a seat on its board, and that he was in control of the Company's operations, none of which was true.

45.     Meanwhile, Chehansky was pressuring Tessemae's to expedite its amendment of its Operating Agreement as required by the side letter Tandem drafted. When the Company reviewed the amendments (also prepared by Tandem), it discovered that McDevitt, in a ploy that harkened back to his 2014 equity grab, was attempting to grant himself rights that went well beyond what the Company's Board had agreed to in the side letter. Specifically, the amendments, as drafted by Tandem, would have given McDevitt six votes per unit on *all* matters to be voted on, not just those provided for in the side letter. In addition, the amendments would have given McDevitt preemptive rights in connection with additional equity issuances and more power to force a sale of the Company. The amendments would also have required the Company's CEO and CFO to meet with McDevitt on a monthly basis to discuss Company business.

46.     In addition, the Company (by then represented by new counsel) discovered terms in the side letter that grossly violated state and federal securities laws. The Company also learned that in the course of McDevitt's efforts to raise the $1.1 million that it believed had been used to pay off (not simply pay down) the Howard Bank line of credit, McDevitt, Chehansky, and

Intlekofer violated state and federal securities laws by making multiple misrepresentations to participants in that offering, including:

    a. Telling participants in the offering that they had purchased the Howard Bank line of credit and that they sat in a secured first position as a result when, in reality, their investment had simply been used to pay down the line of credit.

    b. Telling participants in the offering that they and their allies were in control of the Company, which was not accurate. Indeed, McDevitt and/or Intlekofer falsely introduced Chehansky to one at least one investor as the Company's CEO.

    c. Telling participants in the offering that McDevitt had participated alongside them in the offering when, in fact, he had contributed nothing.

47. On December 4, 2017, after discovering McDevitt's, Intlekofer's and Chehansky's corrupt and illegal scheme, Greg called Chehansky and terminated his consulting relationship with the Company. Almost immediately following that call, Greg received a call from McDevitt, who left a message saying that he needed to speak with Greg right away. When Greg called McDevitt back, McDevitt admitted that he had been working behind the scenes with Chehansky and claimed that firing Chehansky would ruin all of his "work." Greg agreed to meet with McDevitt for coffee in Annapolis the next day to discuss the matter further. During that meeting, McDevitt admitted that he had made misrepresentations to the individuals who contributed funds to pay down the Howard Bank line of credit and said that the Company would be sued by the noteholders for "false pretenses" if the Company terminated its agreement with Chehansky.

48. Because of McDevitt's, Intlekofer's, and Chehansky's misrepresentations, and Tandem's incompetence in preparing the side letter and "papering" the offering, the Company

had no choice but to make a rescission offering to those who purchased the notes and warrants. As a result, all of the funds were returned, plus interest, and Tessemae's never recognized a single cent from McDevitt's supposed efforts on its behalf. The Company was also forced to expend over a half a million dollars in attorneys and other fees to accomplish the recission.

49.     In addition, the Company was left to pay the balance on its line of credit with Howard Bank, an unexpected burden in light of McDevitt's representations. After McDevitt's, Intlekofer's, and Chehansky's misrepresentations to potential investors, the Company's fundraising efforts were also hamstrung and it was forced to agree to a $3 million loan with Democracy Capital Corporation on extremely unfavorable terms that included, among other things, an interest rate of 15% per annum, and an "exit" fee of $7.5 million.

50.     Despite his fraud, malpractice, and his failure to raise the funds he had promised, McDevitt pocketed his full $100,000 fee, which he has refused to return despite the Company's demand.

**McDevitt and Intlekofer Attempt to Gain a Seat on Tessemae's Board Through Misrepresentations to the Company's Equity Holders**

51.     Unrepentant, in February 2018, McDevitt made a final corrupt attempt to gain control of the Company by removing and replacing a duly elected member of its Board of Managers, again, based on lies.

52.     On or about February 8, 2018, the Company was surprised to receive from Intlekofer signed consents to appoint Robert Geis to the Company's Board. The Company was surprised because the seat for the class of shareholders that Mr. Geis could occupy was not vacant. After receiving the consents, Greg made calls to other Class A shareholders who confirmed they had been contacted by McDevitt or Intlekofer and had been falsely led to believe that the seat Intlekofer and McDevitt were seeking to fill was vacant. When shown the consents

16

that Intlekofer provided, certain shareholders also said that the forms that appeared to contain their signatures were different from the ones they had actually signed, apparently having been altered before they were presented to the Company.

53.     In early February 2018, Greg met with one of the shareholders who had provided a signed consent form to McDevitt or Intlekofer and explained what had occurred. After the meeting, the shareholder withdrew its consent to appoint Mr. Geis to the Board, which was sufficient to thwart McDevitt and Intlekofer's plan.

### Tessemae's Cancels McDevitt's, Connors', and Dunst's Equity Holdings

54.     Subsequently, Tessemae's undertook a review of its capitalization table and identified that it had issued equity to certain individuals improperly based on incompetent advice from McDevitt and Tandem or based on McDevitt's fraud on the Company. As a result, the Company rescinded the following equity holdings for lack of consideration, the holders' failure to fulfill conditions precedent to the grants, or as having been acquired by fraud:

a.     January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Herman Dunst, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;

b.     January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Brendan Connors, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;

c.     January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Brendan Connors, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;

17

d.  January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Michael McDevitt, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;

e.  Michael McDevitt's Class B Units that presently constitute approximately 1.9 percent of the Company.

55.  On June 1, 2020, the Company notified McDevitt, Connors, and Dunst of its action.

**COUNT I**
**RICO – 18 U.S.C. § 1962(b)**
**(Against McDevitt, Tandem Legal Group, and Tandem Growth)**

56.  Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

57.  18 U.S.C. § 1962(b) makes it unlawful for any "person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

58.  McDevitt, Tandem, and Tandem Growth are each a "person" within the meaning of §§ 1961(3) and 1962(b). McDevitt acted through his alter egos, Tandem and Tandem Growth, to carry out his fraudulent and illegal scheme to steal an interest in Tessemae's, with the ultimate goal of gaining control of the Company.

59.  Tessemae's sources raw materials nationally and internationally and distributes its products across the United States. Accordingly, it is an "enterprise," *see* 18 U.S.C. § 1961(4), and its activities affect interstate commerce.

60.  Pursuant to and in furtherance of McDevitt's scheme, on or about January 3, 2014, McDevitt falsely represented to Tessemae's that he, Connors, and Dunst would only

18

receive certain equity holdings if Project 25 were successful and that the company could "claw back" those holdings if Project 25 failed. In fact, McDevitt directed the attorneys at Tandem to prepare an Amended and Restated Operating Agreement for Tessemae's and documents transferring equity to himself, Connors, and Dunst that were not conditioned on the success of Project 25 and that did not provide Tessemae's with the right to "claw back" the equity grants. On the same date that McDevitt received his illegally acquired equity, McDevitt transferred a portion of his interest in Tessemae's to Tandem Growth without receiving any consideration in return.

61.     Later, on or about, September 1, 2017, but with the same goal of gaining control of Tessemae's, McDevitt falsely represented to the Company that he would raise $7-8 million to support it its capital needs. By doing so, McDevitt maintained control of Tessemae's and its relationships with prospective investors. In fact, McDevitt did not raise all of the funds that he had promised. Instead, he used the Company's urgent need for capital to attempt to take over Tessemae's by, *inter alia,* (a) making multiple false representations to the Company's investors, *supra* ¶¶ 46.a – 46.c, and (b) directing the attorneys at Tandem to prepare an amended operating agreement for the Company that contained terms benefitting him but that the Company's Board never agreed to.

62.     McDevitt acquired and maintained his interest in, and control of, Tessemae's through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1962(b) and 1961(5).

63.     McDevitt, through Tandem and Tandem Growth, acted with the intent to defraud Tessemae's and used interstate wires to further his scheme in violation of 18 U.S.C. § 1343. Specifically:

19

a. On or about January 3, 2014, at McDevitt's direction, Tandem e-mailed the Amended and Restated Operating Agreement that included an allocation of Preferred Units to McDevitt, Connors, and Dunst, as if Project 25 had been successful and which, despite McDevitt's representation to the contrary, could not be "clawed back." Tandem sent the Amended and Restated Operating Agreement from its offices in the District of Columbia, to Greg, in Maryland.

b. On or about September 3, 2017, at McDevitt's direction, Tandem e-mailed the "side letter" from its offices in the District of Columbia, to Greg, in Maryland, describing the terms of an agreement by which the Company would pay McDevitt $100,000 and provide him with super-preferred equity units in exchange for his agreement to raising raise $7-8 million in capital. In fact, McDevitt had no intention of honoring his commitments to raise capital and did not have investors lined up to provide the funds as he had represented to Company. Unaware of McDevitt's illegal scheme, the Company wired $100,000 across state lines to McDevitt's bank in Minnesota.

c. On multiple occasions throughout the summer and fall of 2017, McDevitt communicated by telephone from the District of Columbia or Maryland with a prospective investor in Tessemae's in California and made multiple false representations about the Company including that there had been a change in control at the Company, and that he had a seat on the Company's board and was in control of its operations.

64. As a direct and proximate consequence of McDevitt's acquisition of his interest in Tessemae's in violation of 18 U.S.C. § 1962(b), Tessemae's has suffered actual damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million.

65.     The Company seeks compensatory damages, treble damages pursuant to 18 U.S.C. § 1964(c), its reasonable attorneys' fees, and costs.

## COUNT II
### RICO – 18 U.S.C. § 1962(c)
### (Against McDevitt)

66.     Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

67.     18 U.S.C. § 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

68.     McDevitt is a "person" within the meaning of § 1962(b). *See* 18 U.S.C. § 1961(3).

69.     Tandem represents and has represented businesses (including Tessemae's) outside of the District of Columbia where its principal office is located and its clients are engaged in interstate commerce. Tandem Growth is an instrumentality that McDevitt used to facilitate the holding of fraudulently acquired equity in Tessemae's. Tandem and Tandem Growth are both an "enterprise[s]," *see* 18 U.S.C. § 1961(4), that are engaged in activities that affect interstate commerce.

70.     As the CEO of Tandem and Tandem Growth, McDevitt is "employed by or associated with" Tandem and Tandem Growth.

71.     McDevitt conducted or participated in Tandem's and Tandem Growth's affairs through a pattern of racketeering activity as part of his fraudulent and corrupt scheme to steal an interest in Tessemae's, with the ultimate goal of gaining control of the Company.

72.     Pursuant to and in furtherance of his illegal scheme, on or about January 3, 2014, McDevitt, in his capacity as Tandem's CEO, represented to Tessemae's that he, Connors, and

Dunst would only receive certain equity holdings if Project 25 were successful and that the Company could "claw back" those holdings if Project 25 failed. In fact, McDevitt's representation was false. Rather than ensuring that the Company was protected as he claimed it was, McDevitt directed the attorneys at Tandem to prepare an Amended and Restated Operating Agreement for Tessemae's and documents transferring equity to himself, Connors, and Dunst that were not conditioned on the success of Project 25 and that did not provide Tessemae's with the right to "claw back" the equity grants. On the same date that McDevitt received his illegally acquired equity from Tessemae's, he transferred a portion of his holdings to Tandem Growth without receiving any consideration in return.

73.     Later, on or about, September 1, 2017, but with the same goal of gaining control of Tessemae's, McDevitt, in his capacity as Tandem's CEO, falsely represented to the Company that he and Tandem would assist Tessemae's with raising $7-8 million to support it its immediate capital needs. Rather than fulfilling his promise, McDevitt used the Company's urgent need for capital to attempt to take over Tessemae's by, *inter alia*, (a) making multiple false representations about the Company and its leadership to prospective investors, *supra* ¶¶ 46.a – 46.c, and (b) directing the attorneys at Tandem to prepare an amended operating agreement for the Company that contained terms benefitting him but to which the Company's Board never agreed.

74.     Pursuant to and in furtherance of his scheme, McDevitt conducted or participated in Tandem's and Tandem Growth's affairs through a pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1962(b) and 1961(5). McDevitt acted with the intent to defraud Tessemae's and used interstate wires to further his scheme in violation of 18 U.S.C. § 1343. Specifically:

a. On or about January 3, 2014, at McDevitt's direction, Tandem e-mailed the Amended and Restated Operating Agreement that included an allocation of Preferred Units to McDevitt, Connors, and Dunst, as if Project 25 had been successful and which, despite McDevitt's representation to the contrary, could not be "clawed back." Tandem sent the Amended and Restated Operating Agreement from its offices in the District of Columbia, to Greg, in Maryland.

b. On or about September 3, 2017, at McDevitt's direction, Tandem e-mailed the "side letter" from its offices in the District of Columbia, to Greg, in Maryland, describing the terms of an agreement by which the Company would pay McDevitt $100,000 and provide him with super-preferred equity units in exchange for his agreement to raising raise $7-8 million in capital. In fact, McDevitt had no intention of honoring his commitments to raise capital and did not have investors lined up to provide the funds as he had represented to Company. Unaware of McDevitt's illegal scheme, the Company wired $100,000 across state lines to McDevitt's bank in Minnesota.

75. As a direct and proximate consequence of McDevitt's racketeering activity and violation of 18 U.S.C. § 1962(c), Tessemae's has suffered damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million.

76. The Company seeks compensatory damages, treble damages pursuant to 18 U.S.C. § 1964(c), its reasonable attorneys' fees, and costs.

### COUNT III
### Negligence – Legal Malpractice
### (Against McDevitt and Tandem Legal Group)

77. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

78. Tessemae's engaged Tandem as its counsel in 2013 and the attorney-client relationship between Tessemae's and Tandem continued until December 2017.

79. Tandem and McDevitt (Tandem's CEO) owed Tessemae's a reasonable duty of care in handling the Company's affairs. In 2017, they breached that duty in two ways while Tandem was representing Tessemae's.

80. First, Tandem and McDevitt were engaged in the practice of law in Maryland though (a) McDevitt is not a lawyer, (b) none of Tandem's lawyers were licensed to practice in the state, and (c) Tandem's ownership structure violates Maryland law. The unauthorized practice of law is illegal, and negligence *per se*. Md. Code Ann., Bus. Occ. & Prof. § 10-606.

81. Second, Tandem drafted and counseled Tessemae's to sign the side letter with McDevitt, which was void as a matter of law, *see* 15 U.S.C. § 78cc(b), and which placed the Company at risk of being liable for violations of federal and state securities laws had it not promptly acted to mitigate the harm caused by McDevitt and Tandem.

82. As the direct, proximate, and consequential result of Tandem's and McDevitt's negligence, Tessemae's has suffered actual damages in an amount yet to be precisely determined but reasonably believed to be in excess of $10 million.

## COUNT IV
### Fraud
### (Against McDevitt)

83. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

84. In August 2017, McDevitt falsely represented to the Company that he and Tandem would assist Tessemae's with raising $7-8 million to support it its immediate capital needs. Rather than honor his promise, McDevitt used the Company's urgent need for capital to attempt to take over Tessemae's.

85.     McDevitt knew that his representation was false, and he made it with the intent to deceive Tessemae's. McDevitt made the false representation to the Company with the intention of having the Company rely on it.

86.     The Company did, in fact, reasonably rely on McDevitt's false representation and it was damaged as a result. Specifically, McDevitt's conduct damaged Tessemae's reputation among prospective investors. In addition, it was forced to seek alternative sources of capital on significantly less favorable terms.

87.     Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's intentional and malicious conduct, and costs.

## COUNT V
### Constructive Fraud
### (Against McDevitt and Tandem Legal Group)

88.     Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

89.     Tandem and Tessemae's were bound in a confidential, attorney-client relationship from 2013 through 2017. Tessemae's reposed trust in Tandem, and Tandem owed a variety of fiduciary duties to Tessemae's, including a duty of loyalty. Pursuant to those duties, Tandem was required to act in the Company's best interest.

90.     Likewise, as CEO of Tandem and, in addition, by virtue of his promise to advise Tessemae's and to coordinate its fundraising efforts in the fall of 2017, McDevitt was bound in an attorney-client relationship with Tessemae's and he owed a fiduciary duty to the Company. Tessemae's reposed trust and confidence in McDevitt who had control and influence over Tandem's work for the Company and the Company's representations to prospective investors. Among other things, McDevitt's duties required him to ensure that Tandem was acting in the

25

Company's best interest and to refrain from using his position for his own benefit rather than the Company's.

91.    McDevitt and Tandem breached their duties to Tessemae's intentionally, with malice and/or reckless disregard for Tessemae's rights by using their positions of trust and confidence for McDevitt's benefit and not the Company's. Among other things, Tandem and McDevitt advised the Company to sign the side letter notwithstanding the fact that it contained terms that violated both federal and state securities laws. In addition, McDevitt used his position to make multiple false representations to prospective investors about the Company and its leadership for his own benefit.

92.    Tessemae's has been damaged as a direct, proximate, and consequential result of Tandem's and McDevitt's breaches of their duties to the Company. The Company lost profits because it was unable to meet its capital needs on time and its reputation and its relationship with prospective investors was harmed. The Company was also forced to make a rescission offering to individuals who invested money in the Company based on McDevitt's misrepresentations, which caused it to incur attorneys' fees and costs, and which required it to repay the participants in that offering with interest. In addition, Tessemae's was forced to seek alternative sources of capital on significantly less favorable terms than it would have received if McDevitt and Tandem had not breached the duties they owed to the Company.

93.    Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's and Tandem's intentional and malicious conduct, and costs.

26

COUNT VI
Civil Conspiracy
(Against McDevitt, Intlekofer, and Chehansky)

94.    Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

95.    In or about August or September 2017, McDevitt, Intlekofer, and Chehansky entered into an agreement to attempt to seize control of the Company.

96.    Pursuant to the agreement, McDevitt falsely represented to the Company that he would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by October 1, 2017.

97.    Pursuant to the agreement, McDevitt, Intlekofer, and Chehansky falsely represented to the investors that they (McDevitt, Intlekofer, and Chehansky) were in control of the Company including that Chehansky was the Company's CEO. On information and belief, they also falsely represented to the investors that the Company had major accounting issues and that Greg and the Vetter family were stealing from the Company.

98.    In addition, McDevitt falsely represented to the investors that by participating the capital raise they held a secured first position by purchasing the Company's debt, when, in fact, they had simply paid down the Company's line of credit.

99.    Tessemae's has been damaged as a direct, proximate, and consequential result of McDevitt's, Intlekofer's, and Chehansky's conspiracy and unlawful conduct. The Company lost profits because it was unable to meet its capital needs on time and its reputation and its relationship with prospective investors was harmed. In addition, the Company was forced to make a rescission offering to individuals who invested money in the Company based on McDevitt's, Intlekofer's, and Chehansky's misrepresentations, which violated both state and

27

federal securities laws, and which caused Tessemae's to incur attorneys' fees and costs, and which required it to repay the participants in the offering with interest. In addition, Tessemae's was forced to seek alternative sources of capital on significantly less favorable terms than it would have received if McDevitt, Intlekofer, and Chehansky's conspiracy had not harmed its relationships with prospective investors.

100.    Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's, Intlekofer's, and Chehansky's intentional and malicious conduct, and costs.

### COUNT VII
### Tortious Interference with Business Relations
### (Against McDevitt, Intlekofer, and Chehansky)

101.    Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

102.    In or about August or September 2017 McDevitt falsely represented to the Company that he would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by October 1, 2017. Rather than doing so, he used the opportunity to conspire with Intlekofer and Chehansky to attempt to take over the Company.

103.    Throughout the late summer and fall of 2017, McDevitt, Intlekofer, and Chehansky falsely represented to prospective investors that they were in control of the Company and that Chehansky was the Company's CEO.

104.    On information and belief, they also falsely represented to prospective investors that the Company had major accounting issues and that Greg and the Vetter family were stealing from the Company.

105. McDevitt's, Intlekofer's, and Chehansky's conduct was intentional, willful, and calculated to cause damage to Tessemae's lawful business. Their conduct was perpetrated with the intentional and improper purpose of causing damage to Tessemae's and was without justifiable cause.

106. Tessemae's has been damaged as a direct, proximate, and consequential result of McDevitt's, Intlekofer's, and Chehansky's conduct. The Company lost profits because it was unable to meet its capital needs on time and its reputation and its relationship with prospective investors has been harmed. In addition, the Company was forced to make a rescission offering to individuals who invested money in the Company based on McDevitt's, Intlekofer's, and Chehansky's misrepresentations, which violated both state and federal securities laws, and which caused Tessemae's to incur attorneys' fees and costs, and which required it to repay the participants in the offering with interest. In addition, Tessemae's was forced to seek alternative sources of capital on significantly less favorable terms than it would have received if McDevitt, Intlekofer, and Chehansky had not interfered with its relationships with prospective investors.

107. Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's, Intlekofer's, and Chehansky's intentional and malicious conduct, and costs.

### COUNT VIII
### Breach of Contract
### (Against McDevitt)

108. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

109. In or about September 2017, McDevitt falsely represented to the Company that he would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by

29

October 1, 2017. In return for doing so, Tessemae's agreed to issue McDevitt additional equity and to pay him $100,000 for his efforts and expenses.

110. Tessemae's and McDevitt entered into a "side letter" memorializing their agreement.

111. Tessemae's paid McDevitt the $100,000 as agreed. McDevitt, however, breached the agreement by failing to raise the additional $6-7 million by October 1, 2017, as he had promised.

112. In addition, because Mr. McDevitt raised the $1.1 million illegally, based on misrepresentations, the Company had to make a rescission offering and all of the funds were returned to the individuals who paid them, plus interest.

113. Notwithstanding his failure to perform, and despite the Company's demand, McDevitt has not returned the $100,000 he received from Tessemae's.

114. As a direct, proximate, and consequential result of McDevitt's breach, the Company has suffered damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15.1 million.

**COUNT IX**
**Unjust Enrichment**
**(Against McDevitt)**

115. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

116. In or about September 2017, McDevitt falsely represented to the Company that he would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by October 1, 2017.

30

117.     Tessemae's paid McDevitt $100,000 for his efforts and expenses. McDevitt, however, made no effort to raise the additional $6-7 million by October 1, 2017, as he stated he would.

118.     Notwithstanding that fact, and despite the Company's demand, McDevitt refused to return the $100,000 he received.

119.     McDevitt was aware of, and had knowledge of, the benefit he received by having use of the Company's funds. His acceptance and retention of those funds in the face of his false representation to raise capital for the Company is inequitable and Tessemae's has suffered damages in an amount yet to be precisely determined but reasonably believed to be in excess of $100,000.

### COUNT X
### Injunctive Relief – Removal
### Maryland Common Law
### (Against McDevitt, Connors, Dunst, and Intlekofer)

120.     Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

121.     Maryland law permits a limited liability company to remove a member to defend itself from abuse.

122.     McDevitt, Connors, Dunst, and Intlekofer are members of Tessemae's. Each of them has caused substantial harm to the Company by (a) unlawfully stealing equity (in the case of McDevitt, Connors, and Dunst), and (b) making false representations to the Company's investors and prospective investors (in the case of McDevitt and Intlekofer).

123.     To protect itself from further abuse, Tessemae's seeks an Order from this Court removing McDevitt, Connors, Dunst, and Intlekofer as members.

31

## COUNT XI
### Declaratory Judgment
### Md. Code Ann. Cts & Jud. Proc. § 3-409
### (Against McDevitt, Connors, Dunst, and Tandem Growth)

124.    Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

125.    In 2013, Tessemae's agreed to grant McDevitt, Connors, and Dunst equity in the Company based on their successful execution of Project 25.

126.    On January 2, 2014, Tessemae's, relying on McDevitt's advice that the shares could be "clawed back" if Project 25 was unsuccessful, issued the following equity holdings to McDevitt, Connors, and Dunst:

        a.    January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Herman Dunst;

        b.    January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Brendan Connors;

        c.    January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Brendan Connors;

        d.    January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Michael McDevitt.

127.    Because Project 25 was a complete failure McDevitt, Connors, and Dunst failed to fulfill the conditions precedent to the grants.

128.    In addition, the subscription documents for the January 2, 2014, transfers of Preferred Units worth 2 percent of the Company to Dunst, and Preferred Units with 2 percent of the Company to Connors do not reflect any consideration for those grants.

129.    Because McDevitt, Connors, and Dunst failed to fulfill the conditions precedent to the grants and/or because the subscription documents do not reflect any consideration for them, on May 29, 2020, the Company rescinded the grants identified above.

130.    On the same date, the Company also cancelled McDevitt's holding of Class B Units, which the Company never agreed to and for which there is no documentation confirming the transfer or indicating McDevitt's subscription.

131.    The Company provided Dunst, Connors, McDevitt, and Tandem Growth notice of its action on June 1, 2020.

132.    McDevitt, Connors, and Dunst claim that the Company's action was improper and that Tessemae's did not have the authority to cancel the grants made on January 2, 2014. McDevitt further contends that Tessemae's did not have the authority to cancel his holding of Class B Units.

133.    An actual controversy of a justiciable issue exists between Tessemae's and McDevitt, Connors, and Dunst, respectively, within the jurisdiction of this Court, involving the rights and liabilities of the parties.

134.    Antagonistic claims are present between the parties, which indicate imminent and inevitable litigation.

135.    A declaratory judgment by this Court will terminate this controversy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

A.    **With regard to Count I (RICO – 18 U.S.C. § 1962(b)):**

    1.    Declare that McDevitt, Tandem, and Tandem Growth violated 18 U.S.C. § 1962(b) by acquiring and maintaining an interest in Tessemae's and by controlling Tessemae's through a pattern of racketeering activity;

    2.    Award Tessemae's compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, treble damages, and its reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1964(c).

B.    **With regard to Count II (RICO – 18 U.S.C. § 1962(c)):**

    1.    Declare that McDevitt violated 18 U.S.C. § 1962(c) by conducting or participating in the conduct of Tandem's business through a pattern of racketeering activity.

    2.    Award Tessemae's compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, as well as treble damages, and its reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1964(c).

C.    **With regard to Count III (Negligence – Legal Malpractice):**

    1.    Award Plaintiff compensatory damages against Tandem Legal Group and Michael McDevitt, jointly and severally, in an amount yet to be precisely determined but reasonably believed to be in excess of $1 million;

**D.     With regard to Count IV (Fraud):**

    1.     Award Plaintiff compensatory damages against Michael McDevitt, in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million;

    2.     Award Plaintiff punitive damages for Michael McDevitt's intentional and malicious conduct;

**E.     With regard to Count V (Constructive Fraud);**

    1.     Declare that Michael McDevitt and Tandem Legal Group breached the fiduciary duties they owed to Plaintiff;

    2.     Award Plaintiff compensatory damages against Michael McDevitt and Tandem Legal Group, jointly and severally, in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million;

    3.     Award Plaintiff punitive damages for Michael McDevitt's and Tandem Legal Group's intentional, willful, and malicious breach of the fiduciary duties they owed to Plaintiff;

**F.     With regard to Count VI (Civil Conspiracy) and Count VII (Tortious Interference with Prospective Business Relations):**

    1.     Declare that Defendants Michael McDevitt, Paul Intlekofer, and Alex Chehansky conspired to, and did, in fact, tortiously interfere with and damage Plaintiff's lawful business;

    2.     Award Plaintiff compensatory damages against Michael McDevitt, Paul Intlekofer, and Alex Chehansky, jointly and severally, in an amount  yet to be precisely determined but reasonably believed to be in excess of $15 million, for their unlawful

conspiracy and tortious conduct which was designed to, and which did, in fact, interfere with and damage Plaintiff's lawful business;

       3.     Award Plaintiff punitive damages against Michael McDevitt, Paul Intlekofer, and Alex Chehansky for their intentional, willful, and malicious conduct;

**G.**     **With regard to Count VIIII (Breach of Contract) and Count IX (Unjust Enrichment):**

       1.     Declare that Michael McDevitt breached his agreement to raise funds for Tessemae's in September 2017 or, in the alternative, declare that Michael McDevitt was unjustly enriched by continuing to hold the $100,000 Tessemae's paid him notwithstanding his failure to raise funds as he had promised to do;

       2.     Award Plaintiff compensatory damages against Michael McDevitt in an amount yet to be precisely determined but reasonably believed to be in excess of $15.1 million (for breach of contract) or $100,000 (for unjust enrichment);

**H.**     **With regard to Count X (Injunctive Relief – Removal):**

       1.     Enter an Order removing McDevitt, Connors, Dunst, and Intlekofer as members of Tessemae's;

**I.**     **With regard to Count XI (Declaratory Judgment):**

       1.     Determine and adjudicate the rights and liabilities of Plaintiff, on the one hand, and Michael McDevitt, Brendan Connors, Herman Dunst and Tandem Growth, respectively, on the other, regarding Plaintiff's cancellation of certain equity grants made to McDevitt, Connors, and Dunst on January 2, 2014, and a later transfer of Class B Units to Michael McDevitt ;

36

["