IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TESSEMAE'S, LLC,                              *

     Plaintiff,                              *

v.                                            *    Civil Action No. GLR-20-2013

MICHAEL S. MCDEVITT, et al.,                  *

     Defendants.                             *
                              ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Michael S. McDevitt, Tandem Legal Group, LLC, Tandem Growth Group, LLC, Brendan Connors, Herman Dunst, Paul Intlekofer, and Alex Chehansky's (collectively, "Defendants") Partial Motion to Dismiss (ECF No. 19).[1] The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motion in part and deny the Motion in part.

## I.    BACKGROUND[2]

### A.    Parties

Plaintiff Tessemae's, LLC's ("Tessemae's") is a Maryland limited liability company founded in 2009 by Greg, Brian, and Matt Vetter. (First Am. Compl. Prayer Jury

---

[1] Also pending before the Court is Defendants' Consent Motion to Correct Errata (ECF No. 33), which seeks to delete error messages and correct spacing issues that appear in Defendants' Reply in Support of their Partial Motion to Dismiss the First Amended Complaint. This Motion will be granted.

[2] Unless otherwise noted, the Court takes the following facts from Tessemae's Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

Tr. ["Am. Compl."] ¶¶ 1, 5, ECF No. 11). It sells marinades, salad dressings, meal kits, and related items from its headquarters in Essex, Maryland. (Id. ¶ 13). Tessemae's sells its products in Maryland and throughout the United States, thereby affecting interstate commerce. (Id. ¶ 5).

Defendant Michael McDevitt is a non-lawyer owner and chief executive officer ("CEO") of Defendants Tandem Legal Group, LLC ("Tandem Legal") and Tandem Growth Group, LLC ("Tandem Growth") (together, the "Tandem Defendants"). (Id. ¶¶ 7–8). The Tandem Defendants are limited liability companies incorporated in Delaware with their principal places of business in the District of Columbia. (Id.). The Tandem Defendants routinely solicit and conduct business in Maryland. (Id.). Defendants Brendan Connors, Herman Dunst, Paul Intlekofer, and Alex Chehansky are residents of Maryland and business associates of McDevitt who have at various times assisted him in business undertaken by him and the Tandem Defendants. (Id. ¶¶ 9–12, 21, 41).

**B.   Factual Background**

**1.   McDevitt's Acquisition of Equity in Tessemae's**

Greg Vetter ("Greg") first met McDevitt in 2013 through an employee of Howard Bank, Tessemae's primary lender. (Id. ¶ 14). At that time, McDevitt had just formed Tandem Legal. (Id. ¶ 15). Despite not being a lawyer, McDevitt was nonetheless able to acquire an ownership interest in Tandem Legal because of a District of Columbia law permitting such a practice. (Id.).

In the summer of 2013, McDevitt persuaded Tessemae's to hire him and the Tandem Defendants with the promise that he would use Tandem's legal and business services to

help Tessemae's grow. (Id. ¶ 17). McDevitt told Greg that McDevitt would serve as the point of contact for all business dealings between Tessemae's and the Tandem Defendants. (Id. ¶ 19). According to McDevitt, this was because many of the decisions Tessemae's would face were business, rather than legal, decisions, and using McDevitt as the point of contact would help Tessemae's save money on legal fees. (Id.). McDevitt said that Greg and Tessemae's should turn to him with any legal questions. (Id.). McDevitt also said that he would be willing to accept an equity interest in Tessemae's in exchange for the Tandem Defendants' services, in lieu of money payments. (Id. ¶ 18). Greg accepted McDevitt's offer. (See id. ¶ 20).

In August 2013, McDevitt proposed a plan called "Project 25" that he said would help grow Tessemae's business. (Id.). He reassured Greg that, under their payment arrangement, Tessemae's would only have to pay the Tandem Defendants if they were successful. (Id.). McDevitt introduced Connors and Dunst as consultants and arranged for them to become executives at Tessemae's. (Id. ¶ 21).

Around this time, McDevitt also recommended to Greg that Tessemae's amend its operating agreement for tax purposes, and the attorneys at Tandem Legal drafted a new operating agreement on Tessemae's behalf. (Id. ¶ 23). At this time, Tessemae's had two classes of shares: Class A shares, which granted the holders voting rights, and Class B shares, which did not. (Id. ¶ 25). Without consulting anyone at Tessemae's, McDevitt sought investors for a new class of shares he called "Preferred Units." (Id.). These shares would have voting rights and would maintain their value until the company had raised $5 million in capital contributions. (Id.). The other classes of shares would be diluted in value

as Tessemae's continued to raise capital, but the holders of the Preferred Units would continue receiving additional shares so that their equity interests in Tessemae's would remain unchanged. (Id.). McDevitt raised $1,325,000 from the sale of the Preferred Units but did not allow Tessemae's personnel to purchase Preferred Units. (Id. ¶ 26).

In addition to soliciting outside investors to buy the Preferred Units, McDevitt and Connors also purchased Preferred Units, giving themselves additional ownership interests in Tessemae's. (Id. ¶ 27). McDevitt paid $500,000 for a ten percent stake in the company, while Connors paid $200,000 for a four percent stake. (Id.). McDevitt instructed Tandem Legal, acting as counsel for both sides of these transactions, to prepare the paperwork for these transactions, and Tandem Legal did so. (Id.).

Tessemae's did not appear to have knowledge of the Preferred Units until January 3, 2014, when McDevitt presented Tessemae's new operating agreement, which had been prepared by Tandem Legal's attorneys, to Greg. (See id. ¶ 28). In addition to laying out the creation of the Preferred Units, the agreement also stated that McDevitt would join Tessemae's Board of Directors to represent the investors who had purchased the Preferred Units. (Id.).

The agreement also incorporated a capitalization table reflecting an allocation of Preferred Units to McDevitt, Connors, and Dunst as though they had successfully completed Project 25. (Id. ¶ 29). When Greg asked about this apparent premature allocation, McDevitt told him that he could easily "claw back" the Preferred Units if the project was unsuccessful, but that it would be much harder to do so if it did succeed. (Id.). McDevitt told Greg that this was a standard business practice. (Id.). Greg accepted these

assertions and signed the new operating agreement on behalf of Tessemae's. (<u>Id.</u> ¶ 30). He also encouraged the company's other investors to sign. (<u>Id.</u>).

Project 25 ultimately failed, with Tessemae's sales increasing by a mere $500,000 instead of the promised $20 million. (<u>Id.</u> ¶ 31). Greg asked McDevitt to "claw back" the equity taken by McDevitt, Connors, Dunst, and their investors, but McDevitt, Connors, and Dunst refused. (<u>Id.</u>). Greg next turned to one of the attorneys at Tandem Legal to ask for help in retrieving the equity. (<u>Id.</u> ¶ 32). The attorney told Greg that this was impossible because there was no written instrument reflecting an agreement to return the equity to McDevitt, Connors, and Dunst if the project failed. (<u>Id.</u>).

## 2.  McDevitt's Capital Raise and Misrepresentations to Investors

In the summer of 2017, Tessemae's sought additional capital to expand its operations. (<u>Id.</u> ¶ 39). It found a lender that would agree to a loan if Tessemae's gave it a first-position lien on Tessemae's accounts receivable. (<u>Id.</u>). Howard Bank held this position at the time. (<u>Id.</u>). As McDevitt was one of the guarantors on the credit line Tessemae's held with Howard Bank, Tessemae's felt obliged to update McDevitt on this development. (<u>Id.</u>). Greg informed McDevitt of the situation in August 2017 and McDevitt offered to help secure financing. (<u>Id.</u>).

Shortly after this conversation, McDevitt called Greg and told him that McDevitt had arranged a deal that would allow Tessemae's $2 million credit line to be eliminated in exchange for a payment of $1 million. (<u>Id.</u> ¶ 40). McDevitt also said that he could find investors to raise not just the $1 million, but an additional $6 to 7 million. (<u>Id.</u>). McDevitt represented that he would secure the first $1 million by September 1, 2017, and the

5

remainder by October 1, 2017. (<u>Id.</u>). McDevitt said the investors would make these payments in exchange for promissory notes guaranteeing their receipt of an existing class of Tessemae's shares. (<u>Id.</u>). Tessemae's agreed to this arrangement and apparently agreed to allow McDevitt to act as its agent. (<u>See</u> <u>id.</u>).

McDevitt claimed that Tandem Legal was qualified to act as "securities counsel" to "paper" the offering of the shares that Tessemae's would guarantee. (<u>Id.</u> ¶ 42). Tessemae's accepted this position and retained Tandem Legal to make the necessary arrangements. (<u>Id.</u>). Tandem Legal prepared the promissory notes, as well as a side letter laying out the terms of Tessemae's agreement with McDevitt (the "Side Letter"). (<u>Id.</u>). The Side Letter stated that Tessemae's would pay McDevitt $100,000 and amend its operating agreement to give McDevitt a new class of shares granting him additional voting rights in the company's business. (<u>Id.</u>). Specifically, the amendments contained in the Side Letter granted McDevitt the right to vote on various internal business decisions made by Tessemae's, such as hiring and firing personnel, determining compensation of senior management, and deciding whether to incur debts over $100,000. (<u>Id.</u>). McDevitt would also receive six votes per unit any time the company approved an acquisition or sale of assets. (<u>Id.</u>). Tessemae's Board approved these terms on or about September 1, 2017. (<u>Id.</u>).

Despite McDevitt's promises, he had only managed to raise $1.1 million by November 1, 2017. (<u>Id.</u> ¶ 43). That month, McDevitt introduced Greg to Alex Chehansky, who McDevitt said was a financial consultant who could help raise the remaining funds. (<u>Id.</u>). On McDevitt's advice, Tessemae's hired Chehansky in this capacity. (<u>Id.</u>).

Working with McDevitt and Paul Intlekofer, Chehansky coordinated multiple meetings with investors to raise the promised funds. (Id. ¶ 44). At these meetings, McDevitt told the prospective investors that a change had taken place in the control of Tessemae's and that he held a seat on its Board. (Id.). Despite these efforts and misrepresentations, Chehansky was similarly unsuccessful in raising the funds. (Id.).

While these meetings were ongoing, Chehansky pressured Tessemae's to formally amend its operating agreement, purportedly to reflect the terms contained in the previously agreed-upon Side Letter. (Id. ¶ 45). When Tessemae's reviewed the proposed amendments, however, it realized that they went beyond the terms of the Side Letter. (Id.). Specifically, the amendments gave McDevitt six votes per share on all matters on which the company would have to vote. (Id.). McDevitt would also have preemptive rights in acquiring more shares, as well as additional power to force a sale of the company. (Id.). The CEO and CFO of Tessemae's would also have to meet with McDevitt once a month to discuss all business matters. (Id.).

Tessemae's also discovered around this time that McDevitt, Chehansky, and Intlekofer had committed multiple acts of securities fraud during their efforts to raise the promised funds. (Id. ¶ 46). Specifically, McDevitt, Chehansky, and Intlekofer made a number of misrepresentations to potential investors regarding the state of Tessemae's finances and their purported operational control of the company. (Id.). Following these discoveries, on December 4, 2017, Greg called Chehansky and told him that he was terminating their relationship. (Id. ¶ 47). McDevitt asked for a meeting, and Greg agreed. (Id.). At this meeting, McDevitt admitted to Greg that he had made misrepresentations to

the investors who had contributed funds and warned that Tessemae's would be sued for "false pretenses" if it terminated its relationship with Chehansky. (Id.).

As a result of McDevitt's and Chehansky's actions, Tessemae's had to offer a rescission to the purchasers of the promissory notes. (Id. ¶ 48). This meant that Tessemae's was forced to return all the money that had been raised for it, would incur significant attorneys' fees to facilitate the rescission, and would continue being indebted to Howard Bank on its original line of credit. (Id. ¶¶ 48–49). Tessemae's also had no choice but to take on an additional loan of $3 million on extremely unfavorable terms to meet its existing obligations. (Id. ¶ 49). In addition to these financial harms, Tessemae's also lost the $100,000 fee it had agreed to pay McDevitt, who refused to return it. (Id. ¶ 50).

## C.  **Procedural History**

Tessemae's filed this action against McDevitt, the Tandem Defendants, Connors, Dunst, Intlekofer, and Chehansky in the Circuit Court for Baltimore County, Maryland on June 5, 2020. (ECF No. 1-1). On July 8, 2020, Defendants removed the case to this Court. (ECF No. 1). Tessemae's filed an Amended Complaint on July 22, 2020. (ECF No. 11).

In its twelve-count Amended Complaint, Tessemae's alleges: violations of 18 U.S.C. § 1962(b) by McDevitt and the Tandem Defendants (Count I); violations of 18 U.S.C. § 1962(c) by McDevitt (Count II); negligence through legal malpractice by McDevitt and Tandem Legal (Count III); fraud by McDevitt (Count IV); constructive fraud by McDevitt and Tandem Legal (Count V); breach of fiduciary duty by McDevitt and Tandem Legal (Count VI); civil conspiracy by McDevitt, Intlekofer, and Chehansky (Count VII); tortious interference with business relations by McDevitt, Intlekofer, and

Chehansky (Count VIII); breach of contract by McDevitt (Count IX); unjust enrichment by McDevitt (Count X); injunctive relief of "removal" under Maryland common law against McDevitt, Connors, Dunst, and Intlekofer (Count XI); and declaratory judgment under Maryland Code § 3-409 against McDevitt, Connors, and Dunst (Count XII). (See id. ¶¶ 56–141). Tessemae's seeks a declaratory judgment, compensatory damages, liquidated damages, punitive damages, injunctive relief, and attorneys' fees and costs. (Id. at 34–37).

On August 24, 2020, McDevitt, the Tandem Defendants, Connors, Dunst, Intlekofer, and Chehansky moved to dismiss Counts I, II, IV, VII, VIII, X, XI, and XII for failure to state a claim on which relief may be granted. (ECF Nos. 19, 26). Tessemae's filed an Opposition on October 9, 2020. (ECF No. 31). Defendants filed a Reply on November 9, 2020. (ECF No. 32).

## II.    DISCUSSION

### A.    Standard of Review

#### 1.    Rule 12(b)(6) Standard

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of Am., NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### 2.    Rule 9(b) Standard

Tessemae's allegations of fraud implicate the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b).[3] Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618,

---

[3] This heightened pleading standard extends to Tessemae's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., which are premised on allegations of fraud, as well as its claims of civil conspiracy and tortious interference, to the extent those claims are premised on fraud.

629 (4th Cir. 2008). The rule states: "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud[.]" Fed.R.Civ.P. 9(b). Under the rule, a plaintiff alleging claims that sound in fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010) (quoting U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). In other words, "Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (quoting Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011)).

As the Fourth Circuit has explained, Federal Rule of Civil Procedure 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc., 755 F.Supp. 1055, 1056–57 (S.D.Ga. 1990)). By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind. It states, in part: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Moreover, a "court should hesitate to dismiss a complaint

under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

### 3.   Extra-Pleading Materials

A court may not consider extrinsic evidence when resolving a Rule 12(b)(6) motion. See Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC, 794 F.Supp.2d 602, 611 (D.Md. 2011). But this general rule is subject to several exceptions. First, a court may consider documents attached to the complaint, see Fed.R.Civ.P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic, see Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006). Second, a court may consider documents referred to and relied upon in the complaint—"even if the documents are not attached as exhibits." Fare Deals Ltd. v. World Choice Travel.com, Inc., 180 F.Supp.2d 678, 683 (D.Md. 2001); accord New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am., 18 F.3d 1161, 1164 (4th Cir. 1994). Third, a Court may consider matters of public record. Philips v. Pitt Cnty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009). In the event that any of these properly considered extra-pleading materials conflict with the "bare allegations of the complaint," the extra-pleading materials "prevail." Fare Deals, 180 F.Supp.2d at 683; accord RaceRedi Motorsports, LLC v. Dart Mach., Ltd., 640 F.Supp.2d 660, 664 (D.Md. 2009).

Defendants present several emails and documents exchanged by Tandem Legal and Tessemae's for the Court's consideration in resolving this Motion. (Mem. Supp. Defs.' Part. Mot. Dismiss First Am. Compl. ["Defs.' Mem."] at 7–8, ECF No. 26). Although these

emails constitute evidence outside the pleadings, Defendants contend that the Court may consider the emails because they are both integral to the Complaint and authentic. (Id.). Tessemae's, by contrast, argues that the Court should not consider these exhibits because they are not integral to its Complaint. (Pl.'s Mem. Opp'n Defs.' Part. Mot. Dismiss First Am. Compl. ["Opp'n"] at 8–10, ECF No. 31).

With respect to the majority of the documents attached to their Motion, the Court agrees with Defendants. Like the plaintiffs' claims in American Chiropractic Association v. Trigon Healthcare, Inc., 367 F.3d 212 (4th Cir. 2004), Tessemae's claims are premised in part on the emails at issue here. Indeed, Tessemae's explicitly refers to the emails in its Complaint and states that two of the email exchanges comprising the bulk of Defendants' exhibits constitute the use of interstate wires that form the basis of its RICO claims. (See Compl. ¶¶ 63, 74); see also Am. Chiropractic Ass'n, 367 F.3d at 234 ("[Plaintiff] explicitly referred to the Ancillary Professional Provider Agreement, and its mail and wire fraud claims are based on the alleged misrepresentation made in that document."). Thus, Exhibits 3, 5, 6, and 7 to Defendants' Motion were relied upon and integral to Tessemae's Complaint. Moreover, Tessemae's does not dispute the authenticity of these exhibits. Accordingly, the Court will consider these documents in evaluating Defendants' Motion.[4]

The Court also notes that Tessemae's presentation of the "exhibit prevails" rule is mistaken. Under the "exhibit prevails" rule, "[w]hen the plaintiff attaches or incorporates

---

[4] Exhibits 1, 2, and 4, however, are either not integral to or not referenced in the Complaint. Accordingly, the Court will not consider those documents in resolving Defendants' Motion.

a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 167 (4th Cir. 2016). Tessemae's cites Goines for the assertion that the rule only applies to documents a plaintiff attaches to the complaint. (Opp'n at 9 n.2). As set forth in the quoted language above, however, the rule also applies when the complaint "otherwise shows that the plaintiff has adopted the contents of the document," i.e., when the document is integral to and relied on in the Complaint. The Fourth Circuit has repeatedly applied the "exhibit prevails" rule to cases in which defendants attached the conflicting exhibits to their motions to dismiss. See, e.g., Cozzarelli, 549 F.3d at 625–26 (crediting analyst reports referenced in the complaint and attached to defendants' motion that conflicted with plaintiffs' allegations); Am. Chiropractic Ass'n, 367 F.3d at 234–35 (crediting contract referenced in complaint and attached to defendant's motion that conflicted with plaintiff's allegations). Accordingly, to the extent the Court identifies a conflict between Tessemae's allegations and Defendants' Exhibits, the Court will apply the "exhibit prevails" rule.

**B.**    **Analysis**

**1.**    **Count I: RICO—18 U.S.C. § 1962(b)**

Tessemae's asserts a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., against McDevitt and Tandem Growth.[5] (Am. Compl. ¶¶ 56–65). Specifically, Tessemae's alleges that McDevitt and

---

[5] In its First Amended Complaint, Tessemae's asserts Count I against McDevitt, Tandem Growth, and Tandem Legal. However, Tessemae's voluntarily dismissed its

Tandem Growth violated 18 U.S.C. § 1962(b). Such an allegation requires a plaintiff to plead facts showing: "1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity." Swarey v. Desert Capital REIT, Inc., No. DKC-11-3615, 2012 WL 4208057, at *11 (D.Md. Sept. 20, 2012) (quoting Morley v. Cohen, 888 F.2d 1006, 1009 (4th Cir. 1989)). Section 1962(b) of RICO further requires a showing that the defendant: (1) acquired or maintained; (2) through a pattern of racketeering activity; (3) interest in or control of; (4) any enterprise; (5) engaged in interstate commerce. Id. at *11 n.10 (citing 18 U.S.C. § 1962(b)). In addition, the plaintiff must show a connection between the racketeering activity and the defendant's control of a specific enterprise. Id. (citations omitted).

Defendants first argue that Tessemae's has not shown that McDevitt and Tandem Growth acquired an interest in or control of Tessemae's within the time set out in RICO's statute of limitations. (Defs.' Mem. at 9). This argument misapprehends the manner by which courts determine the timeliness of civil RICO claims. As Defendants correctly note, RICO actions are subject to a four-year statute of limitations. Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 266 (4th Cir. 2001). The four-year limitations period begins to run from when the "plaintiff knew or should have known of his injury." Rotella v. Wood, 528 U.S. 549, 553 (2000). Critically, "discovery of the other elements of a claim" is not required before the statute of limitations begins to accrue. Id. at 555; see also Fowler v. Wells Fargo Home Mortg., Inc., No. GJH-15-1084, 2015 WL 2342377, at

---

Count I claim against Tandem Legal in its Opposition to Defendants' Motion. (Opp'n at 10 n.3). Accordingly, the Court will dismiss Count I as to Tandem Legal.

*3 (D.Md. May 13, 2015) ("[I]t is the Plaintiff's knowledge of her own injury that controls the running of the statute of limitations, and not Plaintiff's knowledge of the underlying RICO pattern.") (citing Rotella, 528 U.S. 556–57).

Tessemae's filed the initial Complaint in this action in the Circuit Court for Baltimore County on June 5, 2020. (ECF No. 1-1). Thus, if Tessemae's knew or should have known of the injuries caused by McDevitt and Tandem Growth on or before June 5, 2016, the Complaint is barred by the statute of limitations. In the context of a § 1962(b) claim, the "injuries" refer to the "injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts of racketeering." Kaul v. Christie, 372 F.Supp.3d 206, 247 n.41 (D.N.J. 2019) (citations omitted), appeal dismissed, No. 19-1651, 2019 WL 4733531 (3d Cir. June 20, 2019). To the extent Tessemae's alleges multiple discrete injuries, "the application of the statute of limitations essentially turns on the question of whether, with respect to each alleged injury, [plaintiff] knew or should have known of its injury prior to" the expiration of the statute of limitations. Potomac Elec. Power Co., 262 F.3d at 266.

Here, Tessemae's alleges multiple injuries as part of its RICO claim, including injuries that plausibly arise from McDevitt and Tandem Growth's alleged control of the company. The Court lacks sufficient information at this time regarding the accrual date of those injuries to dismiss on statute of limitations grounds. As set forth above, Defendants' argument that Tessemae's did not "acquire an interest in or control of Tessemae's" within the four-year statute of limitations is irrelevant. The statute of limitations for Tessemae's civil RICO claims is based on the date on which it knew or should have known of the

injuries caused by McDevitt and Tandem Growth; the date on which the remaining elements of Tessemae's claim occurred does not bear on the timeliness of its claim. The Court thus declines to dismiss Tessemae's RICO claims on timeliness grounds.

Defendants next argue that Tessemae's has failed to show that McDevitt and Tandem Growth controlled Tessemae's in any way. (Defs.' Mem. at 12). Defendants cite In re American Honda Motor Company, Inc. Dealerships Relations Litigation, 965 F.Supp. 716, 722 (D.Md. 1997), for the proposition that the term "control" specifically requires either engaging in day-to-day business operations or having power over who sits on the Board of Directors. (Defs.' Mem. at 12). Defendants state that Tessemae's has not only failed to allege that McDevitt and Tandem Growth acquired this level of control, but that Tessemae's alleged the opposite when it described McDevitt's "false" representations to prospective investors that he was in control of the company. (Id.).

Defendants' arguments are rooted in the same misapprehension underlying its statute of limitations argument. Tessemae's has alleged with particularity that McDevitt and Tandem Growth acquired and maintained an interest in Tessemae's through their racketeering activity and their related underlying fraudulent actions. (See Am. Compl. ¶¶ 20–32). That is sufficient to satisfy this element of its RICO claim.

Even if that were not the case, the Court is unpersuaded by Defendants' citation to one decision from this Court providing a narrow definition of control. While the Fourth Circuit has not provided express guidance on the issue, the Court finds that a broad definition of control more effectively achieves the remedial purposes of RICO. See Jackson v. Sedgwick Claims Mgmt. Servs., Inc., 731 F.3d 556, 563 (6th Cir. 2013) (noting that

"Congress . . . directed courts to give [RICO] a liberal construction" and that "courts have frequently rejected arguments that RICO should be given constructions that prevent it from reaching conduct that Congress may not have intended it to reach"); Cottman Transmission Sys., LLC v. Kershner, 536 F.Supp.2d 543, 559–60 (E.D.Pa. 2008) ("RICO makes it unlawful to acquire or maintain control of an enterprise—broadly defined to include virtually any de facto or de jure association—through a pattern of criminal activity[.]") (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 789 (3d Cir. 1984)); T.I. Const. Co. v. Kiewit E. Co., No. CIV. A. 91-2638, 1992 WL 195425, at *5 (E.D.Pa. Aug. 5, 1992) (noting that "the terms interest and control are defined broadly").

Courts have found that the broad definition of control under RICO should include activities such as "direct[ing] the course of plaintiff's business activities and manipulat[ing] its affairs," Nafta v. Feniks Int'l House of Trade (U.S.A.) Inc., 932 F.Supp. 422, 428 (E.D.N.Y. 1996); and "caus[ing] plaintiff to enter into many transactions it would otherwise not have," P.M.F. Servs., Inc. v. Grady, 681 F.Supp. 549, 556 n.16 (N.D.Ill. 1988). Indeed, "[s]everal courts have gone so far as to say that control may include involvement in management and designation as an officer or director." Kaiser v. Stewart, No. CIV. A. 96-6643, 1997 WL 476455, at *2 (E.D.Pa. Aug. 19, 1997) (citing cases). The Court finds these decisions persuasive. Here, Tessemae's has alleged with sufficient particularity that McDevitt and Tandem Growth became involved in the management of the company, manipulated its affairs, and caused it to become involved in transactions it otherwise would not have. (Am. Compl. ¶¶ 38–49). Accordingly, the Court finds that

Tessemae's has adequately alleged that McDevitt and Tandem Growth acquired or maintained an interest or control in the company.

For the reasons stated above, the Court will grant dismiss Count I as to Tandem Legal, but will permit Count I to proceed as to McDevitt and Tandem Growth.

### 2.      Count II: RICO—18 U.S.C. § 1962(c)

Tessemae's next asserts a RICO claim under § 1962(c) against McDevitt. To establish a claim under § 1962(c), plaintiffs must show "1) conduct of or participation in 2) any enterprise 3) through a pattern 4) of racketeering activity." Swarey, 2012 WL 4208057, at *11 n.10 (citing 18 U.S.C. § 1962(c)). Pursuant to the "pattern" requirement, civil RICO plaintiffs must allege at least two related racketeering acts. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14 (1985). In addition, the pattern of racketeering activity must have posed a threat of continued criminal activity at the time the activity occurred, and such continuity may be open-ended (if the conduct is ongoing) or close-ended (if it has ceased). CVLR Performance Horses, Inc. v. Wynne, 524 F.App'x 924, 929 (4th Cir. 2013) (citing H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241 (1989)). As this Court has explained:

> Close-ended continuity "may  be established by  a  'series  of related predicates extending over a substantial period of time.'" [GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 549 (4th Cir. 2001)] (quoting H.J. Inc., 492 U.S. at 242). Conduct that extends only over a few weeks or months "and threatening no future criminal conduct do[es] not satisfy the requirement." Id. (quoting H.J. Inc., 492 U.S. at 242). Open-ended continuity "may be established where, for example, the 'related predicates themselves involve a distinct threat of long-term racketeering activity,' or where the predicate acts 'are part of an ongoing entity's regular way of doing business . . . or of

19

conducting or participating in an ongoing and legitimate RICO enterprise.'" Id. (quoting H.J. Inc., 492 U.S. at 242–43).

Jones v. Specialty Lending Grp., L.L.C., No. RWT 17-CV-1577, 2018 WL 656439, at *7 (D.Md. Feb. 1, 2018). Moreover, a plaintiff may establish open-ended continuity by showing that the "threat of ongoing criminal activity" would have continued but for the plaintiff's efforts to uncover and end the activity. See Pros., Inc. v. Berry, 959 F.2d 231 (table), 1992 WL 64796, at *3 (4th Cir. 1992); see also Cap. Lighting & Supply, LLC v. Wirtz, No. JKB-17-3765, 2018 WL 3970469, at *7 (D.Md. Aug. 20, 2018) (finding that open-ended continuity existed where "[t]here was no clear endpoint to Defendants' various schemes and, had they not been caught, their criminal conduct likely would have continued").

Defendants argue that Tessemae's § 1962(c) claim fails because Tessemae's has not alleged a pattern of racketeering activity. (Defs.' Mem. at 14). Defendants note that Tessemae's most recent allegation of a predicate act dates back to 2017, nearly three years before Tessemae's filed its Complaint, therefore requiring Tessemae's to establish close-ended continuity. (Id.). They further argue that Tessemae's cannot successfully premise its claim of racketeering activity on two emails sent three years apart, particularly where those emails do not themselves contain any unlawful or fraudulent communications. (Id. at 15–16). For these same reasons, Defendants state that Tessemae's has failed to establish any predicate act of wire fraud. (Id. at 16).

The Court disagrees. As an initial matter, Tessemae's has plausibly and with sufficient particularity alleged that McDevitt's attempts to participate in and take control

of the company would have continued had he not been caught. (<u>See, e.g.</u>, Am. Compl. ¶¶ 42–47). Accordingly, Tessemae's has alleged an open-ended pattern of racketeering activity.

Tessemae's has also plausibly and with sufficient particularity alleged that McDevitt engaged in multiple predicate acts of wire fraud. The Complaint alleges that Tandem Legal emailed Tessemae's the amended operating agreement in 2014 at McDevitt's direction, and that this operating agreement formed part of McDevitt's scheme to acquire an interest in and gain control of Tessemae's. (Am. Compl. ¶¶ 20–32, 74). Tessemae's further alleges that Tandem Legal emailed the Side Letter to Tessemae's in 2017, again at McDevitt's direction. (<u>Id.</u> ¶¶ 38–49, 74). Tessemae's alleges that these communications were part of a scheme in which McDevitt made fraudulent misrepresentations to Tessemae's and to prospective investors in an attempt to acquire an interest in and control over the company. (<u>Id.</u> ¶¶ 17–49, 71–73). Moreover, Defendants' arguments that the emails did not themselves contain fraudulent misrepresentations are not dispositive. As Tessemae's correctly notes, the crime of wire fraud requires only that the wires be used "in furtherance of" a fraudulent scheme. <u>United States v. Curry</u>, 461 F.3d 452, 457 (4th Cir. 2006). Thus, "any [wiring] that is incident to an essential part of the scheme satisfies the [wiring] element." <u>Bridge v. Phx. Bond & Indem. Co.</u>, 553 U.S. 639, 647 (2008). Here, Tessemae's has alleged that the emails were an essential part of McDevitt's fraudulent scheme to acquire an interest in and control over the company. That is sufficient to survive a motion to dismiss. Accordingly, the Court will not dismiss Count II.

### 3.   Count IV: Common-Law Fraud[6]

Tessemae's alleges that McDevitt is liable for common-law fraud. (Am. Compl. ¶¶ 83–87). As set forth above, plaintiffs are required under Rule 9(b) to plead claims of fraud with particularity. The "'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Wright & Miller, Federal Practice & Procedure: Civil § 1297, at 590 (2d ed. 1990)).

Defendants argue that Tessemae's has not pled with particularity the requisite facts in support of its claim of common-law fraud. (Defs.' Mem. at 19). According to Defendants, "Plaintiff's assertions cannot overcome the reality of what allegations actually appear under Count [IV] for Common Law Fraud." (Reply Supp. Defs.' Part. Mot. Dismiss First Am. Compl. ["Reply"] at 4, ECF No. 33-1). However, Tessemae's incorporates by reference its entire Amended Complaint into its common-law fraud claim. (Am. Compl. ¶ 83). "In cases in which a fraud count incorporates by reference all of the prior allegations in a complaint, we examine the entire complaint to determine if the pleading requirements of Rule 9(b) are satisfied." Sanford v. Smith, 490 F.App'x 570, 571 (4th Cir. 2012) (citing Adkins v. Crown Auto, Inc., 488 F.3d 225, 232 (4th Cir. 2007)). Accordingly, the Court will not, as Defendants urge, limit its review to the paragraphs contained within Count IV.

---

[6] Because Tessemae's RICO claims survive the Motion, the Court will exercise supplemental jurisdiction over its state law claims. See 28 U.S.C. § 1367(a).

The Court finds that Tessemae's has pleaded its claim of common-law fraud with sufficient particularity to survive Defendants' Motion. Tessemae's identifies McDevitt as the person who made the misrepresentations, (Am. Compl. ¶¶ 40–41, 84); outlines the specific false representations McDevitt made and the context for those misrepresentations, (id. ¶¶ 28–32, 39–45); states that the misrepresentations were made via phone, (id. ¶ 40); and explains that Tessemae's was harmed and McDevitt profited from the misrepresentations, (id. ¶¶ 48–50). Additionally, Tessemae's allegation that the fraudulent representations occurred in "late summer 2017" is sufficient at this stage because "there is no requirement that plaintiff plead the exact date of the misrepresentation but only when the statement generally occurred." Kahn v. Ran, No. 08-CV-14417, 2009 WL 1138504, at *6 (E.D.Mich. Apr. 27, 2009) (citation omitted); see also Burman v. Phx. Worldwide Indus., Inc., 384 F.Supp.2d 316, 328 (D.D.C. 2005) (finding that "approximate dates" for some misrepresentations were sufficient); Livingston v. Shore Slurry Seal, Inc., 98 F.Supp.2d 594, 597–58 (D.N.J. 2000) (noting that "plaintiffs need not plead the exact 'date, place or time' of the fraud" so long as there is some "alternative means of injecting precision" into the complaint); Prager v. FMS Bonds, Inc., No. 09-80775-CIV, 2010 WL 2950065, at *3 (S.D.Fla. July 26, 2010) ("A complaint can allege the circumstances of a fraud in a manner that obviates the need for a precise date, hour, and physical location for each misleading statement or omission."). Accordingly, the Court finds that Tessemae's has pleaded its common-law fraud claim with particularity and will permit Count IV to proceed.

### 4.   Count VII: Civil Conspiracy

Tessemae's alleges a count of civil conspiracy against Defendants McDevitt, Intlekofer, and Chehansky. (Am. Compl. ¶¶ 100–06). Under Maryland law, a civil conspiracy requires: (1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or the use of such means to accomplish an act that is not necessarily illegal; and (3) actual legal damage. Van Royen v. Lacey, 277 A.2d 13, 14 (Md. 1971). In addition, a conspiracy claim cannot stand on its own; rather, it must be based on some underlying tortious action by the defendants. Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc., 665 A.2d 1038, 1044–45 (Md. 1995). Although the Amended Complaint does not expressly state the underlying tort on which the civil conspiracy claim is based, because the factual allegations set forth in Count VII repeatedly refer to "false representations," the Court will construe the claim as a civil conspiracy to commit fraud. (See Am. Compl. ¶¶ 102–04). "Claims of conspiracy to commit fraud must abide by Rule 9(b)'s particularity requirements." Hill v. Brush Engineered Materials, Inc., 383 F.Supp.2d 814, 823 (D.Md. 2005) (citing Adams v. NVR Homes, Inc., 193 F.R.D. 243, 250 (D.Md. 2000)).

Defendants argue that Tessemae's has not pled facts supporting its assertions of a civil conspiracy among McDevitt, Intlekofer, and Chehansky. Specifically, Defendants assert that Tessemae's has not pled any facts that would support the existence of a confederation among McDevitt, Intlekofer, and Chehansky, and that Tessemae's has not alleged the commission of any underlying tortious act. (Defs.' Mem. at 21 n.7 & 22).

The Court agrees with Defendants. The Amended Complaint contains a naked allegation that McDevitt, Intlekofer, and Chehansky "entered into an agreement to attempt to seize control of the Company," (see Am. Compl. ¶ 101), but provides no specific facts to support that conclusion. Even considering paragraphs 44 to 53 of the Amended Complaint, to which Tessemae's refers the Court in its Opposition, the Court cannot conclude that Tessemae's has alleged the existence of an agreement or understanding among McDevitt, Intlekofer, and Chehansky with sufficient specificity to meet the requirements of Rule 8, much less Rule 9(b). See U.S. ex rel. Godfrey v. KBR, Inc., 360 F.App'x 407, 413 (4th Cir. 2010) (affirming district court decision finding that the complaint "failed to provide sufficient facts giving rise to an inference of a meeting of the minds and agreement sufficient to support a claim for conspiracy"). Accordingly, the Court will dismiss Count VII.

### 5. Count VIII: Tortious Interference

Tessemae's alleges a count of tortious interference with business relations against McDevitt, Intlekofer, and Chehansky. (Am. Compl. ¶¶ 107–13). A claim of tortious interference under Maryland law requires a showing that the defendant committed: "1) [i]ntentional and willful acts; 2) calculated to cause damage to the plaintiff in its lawful business; 3) done with the unlawful purpose of causing such damage . . . without right or justifiable cause on the part of the defendants; and 4) actual damage." Willner v. Silverman, 71 A. 962, 964 (Md. 1909). The plaintiff must allege interference through "improper means," which Maryland law limits to violence, intimidation, defamation, or injurious falsehood. Volcjak v. Wash. Cnty. Hosp. Ass'n, 723 A.2d 463, 479 (Md.Ct.Spec.App.

1999). In addition, a plaintiff must allege that the defendants interfered with its "existing or anticipated business relationships." Bagwell v. Peninsula Reg'l Med. Ctr., 665 A.2d 297, 314 (Md.Ct.Spec.App. 1995). To the extent the claim is premised on prospective relationships, "a plaintiff 'must identify a possible future relationship which is likely to occur, absent the interference, with specificity.'" Marinkovic v. Vasquez, No. GLR-14-3069, 2015 WL 3767165, at *11 (D.Md. June 16, 2015) (quoting Mixter v. Farmer, 81 A.3d 631, 638 (Md.Ct.Spec.App. 2013)).

Here, Tessemae's tortious interference claim must fail because Tessemae's has failed to allege the existence of any prospective relationships that would have occurred in the absence of interference by McDevitt, Intlekofer, and Chehansky. Indeed, while all the alleged interference identified in the Amended Complaint relates to efforts by McDevitt, Intlekofer, and Chehansky to raise funds from prospective investors, (see Am. Compl. ¶¶ 108–10), Tessemae's fails to allege that it was aware of any of the prospective investors prior to the attempts by McDevitt, Intlekofer, and Chehansky to secure their contributions. Tessemae's cannot possibly allege with specificity that the relationships were likely to occur absent the interference, as the same actions that comprise the alleged interference were responsible for creating Tessemae's relationship with those parties. For this reason, the Court will dismiss Count VIII.[7]

---

[7] Because there are no surviving counts asserted against Chehansky, the Court will direct the Clerk to terminate him as a Defendant in this case.

### 6.      Count X: Unjust Enrichment

Tessemae's alleges that McDevitt is liable for unjust enrichment. (Am. Compl. ¶¶ 121–25). A claim for "unjust enrichment" is another term for a quantum meruit claim based on a quasi-contract. Mohiuddin v. Drs. Billing & Mgmt. Sols., Inc., 9 A.3d 859, 864 (Md.Ct.Spec.App. 2010). Thus, under Maryland law, a claim for unjust enrichment applies only where no express contract exists on the subject of the litigation. Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc., 747 A.2d 600, 607 (Md. 2000). As a result, if a plaintiff pleads both contractual and unjust enrichment claims, the claim for unjust enrichment will be allowed only if the parties dispute whether a contract exists on the subject at issue. Swedish Civ. Aviation Admin. v. Proj. Mgmt. Enters., Inc., 190 F.Supp.2d 785, 792 (D.Md. 2002).

Defendants argue that Tessemae's unjust enrichment claim is based entirely on the contents of the Side Letter agreement. (Defs.' Mem. at 27). They contend that the Side Letter constitutes an express contract and that Tessemae's is therefore barred from making an unjust enrichment claim. (Id.). Tessemae's does not dispute that the Side Letter is a valid contract, responding to Defendants' arguments only by stating that it is entitled to plead in the alternative. (Opp'n at 39). In reply, Defendants note that throughout the course of this litigation, Tessemae's and Defendants have agreed that the Side Letter is a valid contract but alleged the other side is in breach. (Reply Supp. Defs.' Part. Mot. Dismiss First Am. Compl. ["Defs.' Reply"] at 13, ECF No. 32).

The Court agrees with Defendants. Tessemae's unjust enrichment claim is premised entirely on the $100,000 it paid McDevitt pursuant to the Side Letter. (See Am. Compl.

¶¶ 121–25). Nowhere in the extensive pleadings in this case has either party disputed that the Side Letter is a valid contract. In the absence of such a dispute, the Court is compelled to dismiss Count X.

### 7.   Count XI: Injunctive Relief—Removal

Tessemae's next count seeks injunctive relief in the form of an order removing Defendants McDevitt, Connors, Dunst, and Intlekofer as members of the company. (Am. Compl. ¶¶ 126–29). It asserts that "Maryland law permits a limited liability company to remove a member to defend itself from abuse." (Id. ¶ 127).

Defendants argue that this claim should be dismissed because the remedy is not available under Maryland law. (Defs.' Mem. at 27). They note that they were unable to find any Maryland case law authorizing such a remedy. (Id.). Tessemae's cites two cases in support of its assertion that the remedy of removal exists. (Opp'n at 29). One of those cases, Chisholm v. Hyattstown Volunteer Fire Dep't, Inc., 691 A.2d 776, 782 (Md.Ct.Spec.App. 1997), involves a membership corporation; the other, a trial court decision, involves removing an officer of a limited liability company ("LLC"). See LGB Grp., LLC v. Booty, No. CAE 02-00408, 2004 WL 1058958, at *9 (Md.Cir.Ct. Jan. 28, 2004). Defendants note that both of these cases are distinguishable from the case at bar, where Tessemae's seeks to expel a member from an LLC. (Defs.' Reply at 14–15).

The Court agrees with Defendants. Tessemae's states that it "is a limited liability company organized under the laws of the State of Maryland." (Am. Compl. ¶ 5). Under the Maryland Limited Liability Act ("MLLA"), Md. Code Ann., Corps. & Ass'ns § 4A-101 et seq., a member may be removed "in accordance with the operating agreement." Id. § 4A-

606(2); see also 1899 Holdings, LLC v. 1899 Ltd. Liab. Co., 568 F.App'x 219, 227–28 (4th Cir. 2014) (finding that an LLC's removal of its managing member was justified under the terms of the LLC's operating agreement). Tessemae's, however, does not cite to any removal provision in its operating agreement.

More importantly, Tessemae's has made no attempt to direct the Court to any statutory, constitutional, or other source providing the Court with authority to order such injunctive relief. The MLLA does not authorize such a remedy. In both cases Tessemae's cites, the defendants had already removed the individual at issue—they did not seek a court order mandating such relief. See Chisholm, 691 A.2d at 778; LGB Grp., 2004 WL 1058958, at *2. To the extent Tessemae's seeks injunctive relief under the Court's general equitable powers, it should have notified the Court of the basis for this claim in its Amended Complaint or in its briefing on Defendants' Motion.

The Court also agrees that Tessemae's has not adequately pleaded a claim for injunctive relief. "Injunctive relief is a preventative and protective remedy, aimed at future acts, and is not intended to redress past wrongs." Bey v. Moorish Sci. Temple of Am., 765 A.2d 132, 139 (Md. 2001) (internal quotation marks and citation omitted). Tessemae's alleges that Defendants have caused harm to the company through their past actions, (Am. Compl. ¶ 128), but as to future harm, only vaguely gestures at seeking an injunction "[t]o protect itself from further abuse," (id. ¶ 129). In its Opposition, Tessemae's cites to its allegations describing actions that took place as recently as February 2018, but does not indicate that such actions are recent or ongoing. (See Opp'n at 29; Am. Compl. ¶¶ 51–53). To the extent that Tessemae's bases its claim of future harm on McDevitt's "baseless

counterclaim," (Opp'n at 29–30)—a counterclaim it has not moved to dismiss—the Court is unpersuaded by this argument. The Court will dismiss Count XI.[8]

### 8.    Count XII: Declaratory Judgment

Tessemae's seeks a declaratory judgment from this Court affirming the legality of its May 29, 2020 rescission of equity it had previously granted Defendants McDevitt, Connors, and Dunst. (Am. Compl. ¶¶ 130–41). The equity grants at issue initially took place on January 2, 2014. (Id. ¶ 132).

Defendants argue that Tessemae's request for a declaratory judgment is foreclosed because it is premised on an underlying contract claim which is itself barred by the statute of limitations. (Id.). "To determine when a declaratory judgment action 'accrues' for purposes of applying the Maryland statute of limitations, a court must look to the accrual of the underlying 'coercive' cause of action (such as breach of contract)." Gen. Ins. Co. of Am. v. Walter E. Campbell Co., Inc., 241 F.Supp.3d 578, 595 (D.Md. 2017), aff'd sub nom., Gen. Ins. Co. of Am. v. U.S. Fire Ins. Co., 886 F.3d 346 (4th Cir. 2018). Defendants assert that Tessemae's decision to rescind its grants of equity to McDevitt, Connors, and Dunst was premised on their failure to fulfill the conditions precedent for those grants by the end of 2014. (Defs.' Mem. at 29–30; see Am. Compl. ¶¶ 31, 135). Thus, according to Defendants, because contract claims in Maryland are governed by a three-year statute of limitations, Tessemae's was required to assert its declaratory judgment claim by the end of 2017, which it failed to do. (Defs.' Mem. at 29–30). Tessemae's counters that its

---

[8] Because there are no surviving counts asserted against Intlekofer, the Court will direct the Clerk to terminate him as a Defendant in this case.

declaratory judgment claim is not premised on the actions of McDevitt, Connors, and Dunst in 2014, but rather Tessemae's own May 2020 rescission of Defendants' holdings. (Opp'n at 30–31). For this reason, Tessemae's asserts that its declaratory judgment count is timely.

The Court agrees with Tessemae's. Tessemae's expressly states that the controversy about which it seeks declaratory judgment is its decision to rescind the equity it granted to McDevitt, Connors, and Dunst. (Am. Compl. ¶¶ 135–39). To the extent that the rescission breached a contract between the parties, Tessemae's has alleged that the breach occurred on May 29, 2020. For the purposes of a motion to dismiss under Rule 12(b)(6), the claim is timely. Accordingly, the Court will deny Defendants' Motion as to Count XII.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion as to Counts VII, VIII, X, and XI of the Amended Complaint. The Court will also grant Defendants' Motion to Dismiss Count I as to Tandem Legal. The Court will deny Defendants' Motion to Dismiss Count I as to McDevitt and Tandem Growth. The Court will also deny Defendants' Motion as to Counts II, IV, and XII. A separate Order follows.

Entered this 31st day of March, 2021.


_____/s/_____
George L. Russell, III
United States District Judge