## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### NORTHERN DIVISION

| | |
|---|---|
| **TESSEMAE'S, LLC,** | |
| **Plaintiff,** | **Case No. 1:20-cv-02013-GLR** |
| **v.** | |
| **MICHAEL S. MCDEVITT, *et al*.,** | |
| **Defendants.** | |

### SECOND AMENDED ANSWER AND COUNTERCLAIM

### DEFENDANTS' SECOND AMENDED ANSWER

Defendants Michael McDevitt, Tandem Legal Group, LLC, Tandem Growth Group, LLC, Brendan Connors, and Herman Dunst ("Defendants") respond to Plaintiff's First Amended Complaint (ECF No. 11) as follows:

1.    *Tessemae's LLC is a leading producer of organic salad dressings and other food products. It was founded in 2009 by three brothers, Greg, Brian, and Matt Vetter. The idea came to Greg after a friend broke into his house to steal a container of his mother, Tessemae's homemade dressing from the refrigerator. It occurred to Greg that if his mother's salad dressing was good enough to steal, it must be good enough to sell. And indeed it was. Greg never imagined that Michael McDevitt would try to steal, not merely Tessemae's salad dressing, but the salad dressing company itself, nor did he appreciate the devious and corrupt methods that McDevitt and his cohorts would employ in attempting to do so.*

Denied.  Defendants are without personal knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first five sentences of this Paragraph

and, on that basis, deny such allegations. Defendants deny the allegations in the final sentence of this Paragraph.

2.      *In the fall of 2017, McDevitt brazenly abused his confidential relationship with Tessemae's in a fraudulent scheme to muscle out the Vetter family and gain control of the Company. McDevitt falsely represented that he would assist the Company to raise capital; instead, McDevitt slandered Tessemae's reputation, misled prospective investors in violation of both state and federal securities laws, and along with Tandem Legal Group ("Tandem"), committed legal malpractice, all at the Company's expense.*

Denied. Defendants deny that Tandem Legal has represented Plaintiff after February 2015, when Plaintiff terminated the relationship and instructed Tandem to transfer all of its files to new counsel, namely Nick Giannuzzi of the Giannuzzi Group, as is evident from the following email:

---

**From:** Greg Vetter <oldest@tessemaes.com>
**Date:** February 10, 2015 at 5:43:20 PM EST
**To:** Lauren Laitin <lauren@tndm.com>, Nick Giannuzzi <nick@gglaw.us>
**Subject:** The Gianuzzi Group

Not sure how that sent without me pushing send. Anyway, Nick is going to represent me and Tessemaes moving forward. Please set up a time to connect and transfer all required information. Thank you.

--

Greg Vetter
Oldest Brother
Tessemae's All Natural

---

Defendants further deny that McDevitt made any attempt to gain control of Plaintiff, or that he made any false representation or otherwise misled any investor.

The reality of Plaintiff's situation in 2017 is reflected in an August 23, 2017 e-mail from a member of Plaintiff's Board, Demian Costa, to Greg Vetter. Mr. Costa represents Kevin

Plank and Scott Plank, Plaintiff's two largest investors.  Mr. Costa was reduced to suggesting a "Hail Mary" to attempt to salvage the Planks' investment, an investment which he states the Planks "have written off… as a Zero."  Specifically, Mr. Costa states: "All I can do from this point is leverage my limited personal assets" and "personally guarantee[ ] the $600k pledge to Howard Bank, which is money I don't have, in order to get it back when the factoring capital comes in."  He stresses to Mr. Vetter, "[w]ithout a 100% guarantee that it is coming back, I can't do it.  This is literally everything I have… we must resolve today or its over anyway."  This is evident from the following email:

---

**From:** Demian Costa <dcosta@plankindustries.com>
**Sent:** Wednesday, August 23, 2017 10:38:34 AM
**To:** Greg Vetter
**Subject:** Note to Mike and Howard

Greg – here is where we are on our end.  I think it is relevant to Mike McDevitt and Howard Bank.

Kevin and Scott have written this investment off as a Zero.  All I can do from this point is leverage my limited personal assets to save my friends money as best I can.  I am personally guaranteeing the $600k pledge to Howard, which is money I don't have, in order to get it back when the factoring capital comes in.  Without a 100% guarantee that it is coming back, I can't do it.  This is literally everything I have.  It is a timing issue that we must resolve today or its over anyway.  Hopefully all parties get where we are and make this happen.  We will live to fight another day and potentially long enough to be in a position to get our money back.  This is my Hail Mary.  Cheers



DEMIAN COSTA
Managing Partner

**SAGAMORE VENTURES**

---

3.      *This was not the first time the Company had been forced to clean up one of McDevitt's messes. Though the cast of supporting characters changed over time, the common denominator remained McDevitt and Tandem Legal Group, LLC, a law firm that non-lawyer McDevitt was able to control by exploiting what he proudly characterized as a "loophole" in the District of Columbia's rules of professional responsibility. While Tandem holds itself out as a legitimate legal practice, it is in fact simply a vehicle that McDevitt uses to serve his and his*

*confederates' corrupt motives. In his capacity as the law firm's CEO, McDevitt engaged in a*
*pattern of racketeering activity to acquire an interest in, and maintain control over, Tessemae's.*

Denied.  Defendants deny that McDevitt made any attempt to take over Plaintiff, or that he
has ever acted unlawfully toward Plaintiff. Defendants respond that Tandem Legal is a
legitimate law firm that has complied with the laws and rules governing legal practice in
the District of Columbia at all times.  Defendants further deny that McDevitt has been CEO
or an owner of Tandem Legal since 2016, that Tandem Legal is anything other than a
legitimate legal practice, or that any defendant has engaged in wrongful conduct.

Defendants further deny that Tandem Legal has represented Plaintiff since February 2015,
when, as shown in the response to ¶ 2, Plaintiff terminated the relationship and instructed
Tandem to transfer all of its files to new counsel, namely Nick Giannuzzi of the Giannuzzi
Group.

Defendants further respond that in the 2017 transactions at issue, Tandem Legal
represented McDevitt, while Plaintiff's General Counsel, Ms. Lindsay Thomas,
represented Plaintiff.   Tandem Legal asked Thomas when to expect draft amendments to
the Operating Agreement, and Ms. Thomas responded that she was "under the impression
**your side** would be taking the pen on the amendment" and that, if Plaintiff needed to
handle, "we ask for some additional time to get **our counsel** going on that." (emphasis
added).

| From: | Lindsay Thomas <lindsay@tessemaes.com> |
|---|---|
| Sent: | Tuesday, October 03, 2017 12:05 PM |
| To: | Julia Taylor |
| Cc: | 'Mike McDevitt' |
| Subject: | RE: Operating Agreement Amendment / Escrow |

Julia,

Sure – we will confirm once we see that come in.

On the operating agreement, we were under the impression your side would be taking the pen on the amendment (similar to the other documents). If you would prefer for us to do so, we ask for some additional time to get our counsel going on that.

As Plaintiff admits, the Side Letter Agreement memorialized the agreement between Plaintiff and McDevitt (Compl. ¶ 116), and it was approved by Plaintiff's Board. (Compl. ¶ 42.) Plaintiff's General Counsel reviewed and edited it, and Plaintiff's CEO, Greg Vetter, subsequently executed it. Exhibit A to the Side Letter Agreement identified the estimated expenses that Plaintiff would reimburse, including two entries for "Tandem Legal Group – **Counsel for Michael McDevitt**" (emphasis added).

**EXHIBIT A**

**USES OF ESCROWED FUNDS**

**Loan Amendment Facilitation & Subordination:**

| | | |
|---|---|---|
| Tandem Legal Group | Counsel for Michael McDevitt | $20,000 |
| Citrin Cooperman | Accountants for Michael McDevitt | $ 5,000 |
| Michael McDevitt | Reimbursement of Consulting Fees | $50,000 |
| | **TOTAL LOAN RELATED EXPENSES** | **$75,000** |

**Amendment to Operating Agreement:**

| | | |
|---|---|---|
| Tandem Legal Group | Counsel for Michael McDevitt | $10,000 |
| Citrin Cooperman | Accountants for Michael McDevitt | $5,000 |
| TBD | Appraiser | $6,000 |
| | **TOTAL OPERATING AGREEMENT RELATED EXPENSES** | **$25,000** |
| | **TOTAL ESTIMATED EXPENSES** | **$100,000** |

5

Even Plaintiff's current attorneys, Nemphos Braue, openly acknowledged in 2017 that Tandem Legal represented McDevitt, not Plaintiff:



December 11, 2017

**VIA FedEx and E-Mail**

Ms. Julia V. Taylor
Tandem Legal Group
2000 P Street N.W.
Suite 408
Washington, DC 20036

    Re:   **Michael McDevitt, et al. – _Litigation Hold_**

Dear Ms. Taylor:

    As you know, this firm is outside corporate counsel to Tessemae's LLC ("Tessemae"). On or about September 7, 2016, your client, Michael McDevitt

Finally, on September 1, 2017, Plaintiff's General Counsel Lindsay Thomas sent an email to Julia Taylor (as counsel for McDevitt) and to Michael Nord of Gebhardt & Smith LLP (as counsel for Howard Bank), asking for "sign off" on behalf of their respective clients for changes Ms. Thomas had made to the loan documents.

> **From:** Lindsay Thomas [mailto:lindsay@tessemaes.com]
> **Sent:** Friday, September 01, 2017 3:52 PM
> **To:** Julia Taylor <julia@tndm.com>
> **Cc:** Michael Nord <mnord@gebsmith.com>
> **Subject:** RE: Tessamae Deal
>
> Michael / Julia,
>
> Need to get your sign off on the consolidated comments asap as I need to get that over to Allied. Please confirm.
>
> 

4.      *Defendants' actions have burdened the Company's resources, stunted its growth, and threatened its existence, resulting in actual damages conservatively calculated to exceed $45.1 million.  Tessemae's also seeks treble damages provided for in 18 U.S.C. § 1964(c) (Racketeer Influenced and Corrupt Organizations Act), punitive damages for Defendants' intentional and willful misconduct, attorneys' fees, costs, and injunctive and declaratory relief to protect it from further harm from Defendants.*

Denied.   Defendants deny the factual allegations in this Paragraph, including but not limited to the allegation Plaintiff has been damaged or suffered any cognizable injury.

### PARTIES

5.      *Plaintiff Tessemae's, LLC, is a limited liability company organized under the laws of the State of Maryland, with its principal place of business in Baltimore County. Tessemae's is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Tessemae's activities affect interstate commerce because it sources its raw materials nationally and internationally and distributes its products throughout the United States.*

Defendants admit the first sentence of this Paragraph. The remaining sentences of this Paragraph contain conclusions of law for which no response is required. To the extent that the remaining sentences contain factual allegations, those allegations are denied.

6.     *Defendant Michael S. McDevitt is a resident of Anne Arundel County. McDevitt is a "person" within the meaning of 18 U.S.C. § 1961(3), and among other bad acts, he has engaged in a pattern of racketeering activity against Tessemae's, as described below.*

Defendants admit the first sentence of this Paragraph. Defendants deny the remainder of the Paragraph.

7.     *Defendant Tandem Legal Group, LLC is a Delaware limited liability company with its principal place of business in the District of Columbia. Tandem itself and through agents regularly transacts and solicits business and provides services in the State of Maryland, and the tortious injuries complained of in this Complaint occurred in the State by acts and omissions in the State. Tandem is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) since its activities affect interstate commerce. At all relevant times, McDevitt was its CEO. McDevitt conducted Tandem's affairs by engaging in a pattern of racketeering activity with the intention of defrauding Tessemae's.*

Defendants admit the first sentence of this Paragraph. Defendants deny the remainder of the Paragraph. Defendants deny that Tandem Legal Group, LLC ("Tandem Legal") transacts or solicits business, or provides services, in the State of Maryland. Defendants further deny that McDevitt has been CEO or an owner of Tandem Legal since 2016. The remaining statements of this Paragraph are conclusions of law for which no response is required. To the extent that any remaining statements are factual allegations, those allegations are denied.

8

*8.     Defendant Tandem Growth Group, LLC ("Tandem Growth") is a Delaware limited liability company with its principal place of business in the District of Columbia. Tandem Growth itself and through agents regularly transacts and solicits business and provides services in the State of Maryland, and the tortious injuries complained of in this Complaint occurred in the State by acts and omissions in the State. Tandem Growth is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) since its activities affect interstate commerce. Tandem Growth is a vehicle that McDevitt uses to receive equity in Tandem's clients in exchange for Tandem's services. McDevitt conducted Tandem Growth's affairs through a pattern of racketeering activity and used it as his alter ego to facilitate his scheme to defraud Tessemae's; McDevitt transferred equity that he obtained from the Company through fraudulent and illegal means to Tandem Growth without receiving any consideration in return.*

Defendants admit the first sentence of this Paragraph. Defendants deny the remainder of the Paragraph. Defendants deny that Tandem Growth Group, LLC ("Tandem Growth") transacts or solicits business, or provides services, in the State of Maryland. Defendants further deny that Tandem Growth "is a vehicle that McDevitt uses to receive equity in [Tandem Legal's] clients in exchange for [Tandem Legal's] services."

Tandem Legal never accepted equity from Plaintiff in exchange for services. The equity that McDevitt transferred to Tandem Growth was obtained not "through fraudulent and illegal means," but by purchasing it from Plaintiff for an investment of $500,000. (Compl. ¶ 27.) Defendants further deny all remaining allegations in this Paragraph.

*9.     Defendant Brendan Connors is a resident of Anne Arundel County.*

Admitted.

*10.     Defendant Herman Dunst is a resident of Howard County.*

Admitted.

9

11.     *Defendant Paul Intlekofer is a resident of Anne Arundel County.*

Denied.  Paul Intlekofer was terminated as a defendant in this matter on March 31, 2021.
ECF No. 35, at *2.

12.     *Defendant Alex Chehansky is a resident of Anne Arundel County.*

Denied.  Alex Chehansky was terminated as a defendant in this matter on March 31, 2021.
ECF No. 35, at *2.

### FACTS COMMON TO ALL COUNTS

13.     *Tessemae's was born from humble beginnings in 2009 based on the simple idea
that Greg and his brothers could sell their mother's much-loved lemon garlic salad dressing. None
of the Vetter brothers were experienced or sophisticated businessmen, but they shared a strong
work ethic and the desire to see the Company succeed. Today, Tessemae's has an annual revenue
of more than $20 million. It produces more than 70 products including salad dressing, marinades,
condiments, salad kits, and grab-to-go fresh food items at its 150,000-square-foot facility in Essex,
Maryland. It has become a leading brand in the "clean eating" movement. Tessemae's uses all-
natural ingredients in its products, most of which are sugar free, dairy free, and gluten free. Many
of its products are compliant with the popular Whole30 program and Keto diet.*

Denied.  Defendants are without personal knowledge or information sufficient to form a
belief as to the truth or falsity of the allegations of this Paragraph and, on that basis, deny
such allegations.

14.     *Tessemae's faced the typical challenges confronting new businesses as it worked
to develop and distribute its product, manage its brand, and capitalize for long-term viability.
Those challenges were not made easier by Greg's introduction to Michael McDevitt in 2013 by an
individual employed by Tessemae's principal lender, Howard Bank. McDevitt had recently left his*

10

*position as CEO of Medifast, Inc., a publicly traded company (NYSE: MED) headquartered in*

*Owings Mills, Maryland that sold weight loss products.*

Defendants admit that McDevitt was introduced to Greg Vetter and Tessemae's in 2013 by an individual employed by Howard Bank.  Defendants further admit that McDevitt was CEO of Medifast, Inc. until February 2012, that Medifast is publicly traded on the NYSE under the symbol MED, that Medifast is headquartered in Owings Mills, Maryland, and that Medifast sold weight loss products.  Defendants deny that Plaintiff was facing "typical challenges" in 2013, in that Plaintiff was on the precipice of bankruptcy.  Defendants deny all other allegations in this Paragraph.

15.    *At the time of their introduction, McDevitt had moved on from Medifast and was fronting a new venture, Tandem, which he described as a legal services and business advisory firm. The District of Columbia is the only jurisdiction in the country that permits non-lawyers like McDevitt to hold ownership interests in law firms, which McDevitt has publicly and proudly described as a "loophole" in the District of Columbia's rules of professional responsibility that he could exploit. And exploit it he did.*

Defendants admit that McDevitt was the co-founder of Tandem Legal in 2013 as a legal services and business advisory firm in Washington, DC, and that DC permits non-lawyers to hold ownership interests in law firms under certain circumstances.  Defendants are without sufficient information to either admit or deny that Washington, DC is the only jurisdiction in the US to do so, and on that basis, deny that allegation.  Further, it is a legal conclusions.  Defendants deny that McDevitt described that DC rule as a loophole that he could exploit.  Defendants deny all remaining allegations in this Paragraph.

16.    *Tandem served as the linchpin of McDevitt's corrupt designs. From his perch as Tandem's CEO, McDevitt insinuated himself into his client-target through the artifice of accepting*

11

*payment for Tandem's services in the form of equity in the client's business – an insider position*

*that he then leveraged to try to gain control of his victim.*

Denied.  Tandem Legal did not accept equity for the legal services it provided to Plaintiff. Tandem Legal billed Plaintiff hourly for legal work, from the time Plaintiff engaged Tandem Legal in October 2013 until Plaintiff terminated its relationship with Tandem Legal in February 2015.  Defendants deny that the equity McDevitt received from Plaintiff was in exchange for Tandem's legal services; it was in exchange for McDevitt's cash investment and personal guarantees of Plaintiff's debt.  Defendants further deny that McDevitt "insinuated himself" into Plaintiff (through Tandem Legal or otherwise) or that he possessed "corrupt designs," much less that Tandem Legal served as any sort of linchpin.

*17.    A skilled salesman, McDevitt began his assault on Tessemae's in the summer of 2013 when he pitched Greg on using Tandem's legal and business advisory services. McDevitt told Greg that he and Tandem could help Tessemae's grow its business exponentially and that Tandem had other clients that were operating in the same healthy-eating arena that Tessemae's was growing into, such as the restaurant chain Sweetgreen. McDevitt told Greg that Tandem could leverage its connections to find outlets for Tessemae's to grow, including, for example, by working with Sweetgreen to get them to use Tessemae's dressings in their restaurants. As McDevitt anticipated, Greg was intrigued, but the only relationship that McDevitt was genuinely interested in leveraging was Tandem's attorney-client relationship with Tessemae's.*

Denied.  Defendants deny that McDevitt ever "assault[ed]" Plaintiff or claimed that he could grow Plaintiff's "business exponentially."  Defendants also deny that McDevitt "leveraged" the attorney-client relationship between Tandem Legal and Plaintiff.

Defendants also respond that Tandem Legal did introduce Plaintiff to Sweetgreen, and that the Sweetgreen founders have been investors in Plaintiff since 2014.

18.    *McDevitt understood that his offer to accept payment for Tandem's fees in the form of equity was likely to be attractive to Tessemae's—which like many young businesses, faced cashflow issues—and that Tessemae's would be unlikely to appreciate the inherent and insidious danger posed by such a conflict-laden arrangement.*

Denied.  Tandem Legal did not accept equity for the legal services it provided to Plaintiff. Tandem Legal billed Plaintiff hourly for legal work, from the time Plaintiff engaged Tandem Legal in October 2013 until Plaintiff terminated its relationship with Tandem Legal in February 2015.  Defendants also note that before Plaintiff engaged Tandem, Plaintiff executed a conflict waiver, dated August 15, 2013, which repeatedly urges Plaintiff to seek the advice of independent legal counsel before signing.  Plaintiff signed two days later, waiving the potential conflicts and acknowledging and that it was advised to consult separate independent legal counsel concerning the waivers described in the letter, and that it had done so. Plaintiff was represented by Dickstein Shapiro in 2013.

19.    *McDevitt told Greg that Tessemae's could reduce Tandem's legal fees by using McDevitt as the point-person for all of Tandem's work on behalf of the Company—legal and otherwise. According to McDevitt, many issues that companies believe require legal counsel are really business decisions that can be handled without what McDevitt suggested are the needless complexities that result from involving attorneys. He said that Greg should run all of the Company's legal issues past him and that he would engage the attorneys at Tandem when he determined it was appropriate to do so.*

Denied.   Plaintiff engaged Tandem Legal in October 2013 and terminated that representation in February 2015.  Throughout that entire period, Greg Vetter and other

employees of Plaintiff communicated freely and directly with the Tandem Legal attorneys representing Plaintiff, without interference from McDevitt.

| | |
|---|---|
| **From:** | Sue Wang |
| **Sent:** | Monday, January 06, 2014 12:20 AM |
| **To:** | 'Gregory Vetter'; 'Brendan Connors' |
| **Cc:** | Mike McDevitt; Tracey Watson |
| **Subject:** | RE: Project Clean UP - Action Items |

Team, please don't be alarmed by the 52 docs on the tracker. It's a lot of documents but they're practically identical. I've already done the heavy lifting, so we just have to push through to completion:

Greg
- Review the Operating Agreement and get shareholder buy-in, sooner is better so we can tell Jay Pack that the agreement is done and can't be reopened for negotiations.
- Review the cap table.
- Call Sue to discuss anything and everything.

**McDevitt Uses Tandem To Steal Equity In Tessemae's For Himself, Connors, And Dunst**

20.    *Tandem began work for Tessemae's in August 2013, proposing a plan McDevitt dubbed "Project 25," purportedly designed to grow Tessemae's sales from $5 million to $25 million by the end of 2014.  McDevitt assured Greg that Tessemae's was protected because, under the equity-for-services arrangement, Tandem would get paid only if it successfully executed on Project 25.*

Denied.   Plaintiff was represented by Dickstein Shapiro in August 2013, and that representation continued until November of 2013.  Tandem Legal did not begin working for Plaintiff until October 2013, and initially only represented Plaintiff on litigation matters, while Dickstein Shapiro continued to represent Plaintiff on corporate matters.  In addition, Tandem Legal never accepted equity for services from Plaintiff.  Tandem Legal billed Plaintiff hourly and sent invoices monthly – which Plaintiff paid – from October 2013 through February 2015, when Plaintiff elected to terminate the representation.

21.    *McDevitt also introduced Greg to Brendan Connors and Herman Dunst. McDevitt and Connors are longtime friends and their career paths tracked one another for many years.*

*Connors had been Medifast's CFO when McDevitt was CEO. Dunst, meanwhile, had been*
*Medifast's Vice President of Procurement during that same period. By the fall of 2013, McDevitt*
*had gotten his gang back together and he introduced Connors and Dunst as consultants to*
*Tandem, eventually installing both of them in executive positions at Tessemae's, where they stood*
*to gain equity if Project 25 was successful and from which they could (and did) provide McDevitt*
*with inside information about Tessemae's operations in violation of their duty of loyalty to the*
*Company.*

Defendants admit that McDevitt introduced Plaintiff to Brendan Connors and Herman
Dunst, that the three are longtime friends, that Connors was Medifast's CFO for most of
McDevitt's tenure as CEO, and that Dunst was Medifast's Vice President of Procurement
for much of the same period. Defendants deny the remainder of this Paragraph.
Defendants deny that the three were a "gang," that Connors or Dunst were employed by
Tandem Legal, or that McDevitt "installed" Connors or Dunst at Tessemae's.

Defendants further respond that Plaintiff hired Connors as its CFO and that Connors
accepted Plaintiff's offer of a nominal salary plus equity grant, in lieu of a conventional
salary. Defendants further respond that Plaintiff likewise hired Dunst as its COO and that
Dunst accepted Plaintiff's offer of an equity grant in lieu of a salary. Defendants deny that
Connors or Dunst ever agreed to provide Plaintiff with more than a year of executive
employment for free, retroactively, if Plaintiff failed to quintuple its sales in that year. The
equity grants were not contingent on "Project 25" or anything else. Defendants further
deny that Connors or Dunst ever breached any duty of loyalty to Plaintiff. Defendants
deny all remaining allegations in this Paragraph.

*22.     In addition, McDevitt referred Greg to an executive coach. Only years later would*
*the Company discover that, rather than acting as a confidential sounding board and offering*

*neutral advice, the coach operated as another mole, sharing with McDevitt the information he*
*learned from Greg about the Company's operations and growing pains.*

Defendants admit that McDevitt referred Greg Vetter to an executive coach. Defendants deny the remainder of the allegations in this Paragraph.

23.     *Shortly after Tandem was retained by Tessemae's, McDevitt advised Greg that*
*Tessemae's needed to amend its Operating Agreement "for tax purposes," and he directed the*
*attorneys at Tandem to draft an Amended and Restated Operating Agreement for the Company.*

Denied. Defendants deny that McDevitt advised Greg Vetter on the Operating Agreement, much less on any associated tax implications. Defendants further deny that McDevitt directed the drafting of an Amended and Restated Operating Agreement for Plaintiff. Defendants further respond McDevitt never directed or regulated Tandem's attorneys' professional judgment in rendering legal services, and Defendants deny the insinuation to the contrary.

24.     *In fact, McDevitt claim was a lie. His real motivation for wanting the Operating*
*Agreement to be amended was not for "tax purposes," but create a new class of "Preferred*
*Units" that would facilitate his and his confederates' efforts to acquire control of the Company.*

Denied. Defendants deny that McDevitt advised Greg Vetter on the Operating Agreement, much less on any associated tax implications. Defendants further deny that McDevitt directed the drafting or contents of the Operating Agreement for Plaintiff. Defendants further respond McDevitt never directed or regulated Tandem attorneys' professional judgment in rendering legal services. Defendants further deny that Preferred Units were new or that they were the first investors to receive them from Plaintiff, or even the first investors to receive the exact terms that Defendants received. As an example, the Subscription Agreement for Kelly Bjornerud, drafted in May of 2013 by Dickstein Shapiro,

contained an identical anti-dilution protection as that received by Defendants, simply at a

lower figure ($1.5M vs. $5M), as the following shows:

---

**SUBSCRIPTION AGREEMENT**

Tessemae's, LLC
839 Bestgate Road
Annapolis, MD 21401
Attn: Gregory Vetter, President

Ladies and Gentlemen:

1.    SUBSCRIPTION.  The undersigned (the "Investor") hereby subscribes as of May __, 2013 (the "Closing Date") for [insert percent] Class A Units (the "Percentage Interest") of Tessemae's, LLC, a Maryland limited liability company (the "Company"), under the terms and conditions set forth in this Subscription Agreement.   [The Company represents and warrants to the Investor that the Investor's Percentage Interest will not be diluted by any additional equity raised by the Company unless and until the Company has raised the aggregate sum of $1,500,000 in equity and/or debt [(other than commercial bank debt)], of which amount [$675,000] has been raised immediately prior to the Investor's investment hereunder.] The Investor understands and agrees that the subscription contemplated by this Subscription Agreement and the Company's acceptance thereof is subject to the Investor executing the Company's Limited Liability Company Operating Agreement (the "Operating Agreement") and becoming a Member (as defined therein) of the Company.

---

25.    At the time, Tessemae's had two classes of equity units – Class A, which enjoyed

voting rights, and Class B, which were reserved for issuance to the Company's employees and did

not include voting rights. Unbeknownst to Greg and the Company, rather than soliciting

investments for additional Class A units, McDevitt and Connors approached their friends and

families about investing in a new, yet-to-be-created, class of Preferred Units. The Preferred Units

would have voting rights and could not be diluted until the Company completed a capital raise

worth at least $5 million. Until that time, only the Company's other classes of equity would be

diluted by additional capital contributions; investors holding Preferred Units would receive

additional units at no cost so that their percentage interest in the Company remained the same.

The effect of such an arrangement was that as additional money was invested in the Company, the

percentage of the Company owned by McDevitt and his allies (the holders of the new class of non-

*dilutable preferred shares) would increase while the percentage of the Company owned by the*

*owners of (dilutable) Class A shares would decrease at the same rate.*

Denied.  The first investor to receive the exact Preferred Units that Defendants received was Falling Green Capital, an investor that predated any Defendant's involvement with Plaintiff.  Defendants further deny that McDevitt or Connors approached their friends and families about purchasing Preferred Units.

26.    *McDevitt and Connors raised $1,325,000 from six new investors, all for Preferred Units, but they refused to allow the Company's existing investors (each of whom had been solicited by Greg and his family) to purchase them.*

Denied.  In late 2013, Plaintiff was effectively bankrupt, facing eviction, and unable to even pay their electric bill.  Despite this, when McDevitt and Connors agreed to rescue Plaintiff from bankruptcy by investing a combined $700,000. invested.  The only other significant investor they brought in was SFP Enterprises, which agreed to invest $325,000.  However, because Plaintiff needed the capital urgently, instead of routing all of the capital thru SFP Enterprises, the funds came from four different sources:  SFP Enterprises, the Helen Serini Foundation, Inc., Paul Serini, and Mr. Intlekofer.

The remaining $1,000,000 of Preferred Units were purchased more than one year later by Liberty 2, LLC, *an investor brought in by Plaintiff*.

Defendants further deny that any investors were refused the ability to purchase Preferred Units at the time of McDevitt and Connors' initial investment.  McDevitt and Connors did later bring in numerous additional investors – many of them friends and family – but none of them received Preferred Units.

27.    *In addition, both McDevitt and Connors purchased the new Preferred Units themselves. McDevitt invested $500,000 for a ten percent stake in the Company and Connors invested $200,000 for a four percent stake in the Company. At McDevitt's direction, Tandem, which was acting as counsel for the Company, for McDevitt, and for Connors, prepared the paperwork for both transactions.*

Defendants admit that McDevitt and Connors both invested in Plaintiff, and that McDevitt invested $500,000 for ten percent of the equity and Connors $200,000 for four percent. Defendants admit that Tandem Legal represented McDevitt and Plaintiff but deny that Tandem Legal represented Connors.

28.    *On or about January 3, 2014, McDevitt and Tandem presented Greg with the Amended and Restated Operating Agreement. In addition to creating the class of Preferred Units, the agreement provided for other changes designed to benefit McDevitt and the individuals he had solicited to invest in the Company. For example, pursuant to the Amended and Restated Operating Agreement, McDevitt joined the Company's Board as the representative of the individuals who had purchased the new Preferred Units.*

Denied.  The first investor to receive the Preferred Units at issue was Falling Green Capital, an investor that predated any Defendant's involvement with Plaintiff.  Defendants further deny that McDevitt was involved in the drafting of Plaintiff's Operating Agreement, or that he presented the draft version to Greg Vetter.

Defendants further respond that Greg Vetter was closely involved throughout the process of drafting a new Operating Agreement.  Examples of Tandem Legal's correspondence with Mr. Vetter in late 2013 and early 2014 include:

On November 19, 2013, Greg Vetter emailed Tandem Legal attorney Sue Wang: "send me over the cap table that is close enough for the banks to review." Ms. Wang sent him a number of capitalization tables for the bank to review, including one entitled, "Current Capitalization," which notes: "A further 1.5% of Class A promised to Brendan Connors and 2% Class A promised to Herman Dunst." Ms. Wang's email invited Vetter to call her or McDevitt to go over it.

On December 1, 2013, Ms. Wang emailed Vetter and others an "action list," which included: "Sue to insert the ownership summary after discussing with Greg" and "Everyone to take a look through the documents and send any further edits or questions to Sue by 5pm Monday."

On December 3, 2013, Ms. Wang emailed Vetter, copying McDevitt and Connors: "Greg, here's the ready-to-go term sheet if you want to review it one more time. Let's plan to send it tomorrow at 9 am. I'm also attaching the updated cap table… I added your 10% profits interest… Brendan's 6%, Mike's 9%... Herman's 2%... Is there anything I'm missing?" Ms. Wang did, in fact, attach a table entitled "Tessemae's LLC Capitalization Table," dated December 1, 2013. It reflects Preferred Shares for McDevitt, Connors, Dunst, and others. (Connors is shown to have a 6% "Total Economic %" because his 2% mentioned in Wang's email was in addition to the 4% he had already purchased.)

On December 12, 2013, Ms. Wang emailed Vetter and McDevitt, identifying at least eight separate errors, inconsistencies, or points of confusion in the Company's original operating agreement. She asks Greg Vetter whether and how he would like her to correct the issues she identified.

On January 3, 2014, Ms. Wang emailed Vetter a draft Amended and Restated Operating Agreement, noting that she had "made a cheat sheet for [him]." She urges him,

"I hope you will read this!  It is the new Constitution of Tessemae's and just as important."
Her "cheat sheet" contains highlighted sections with comments and questions for Vetter.

On January 5, 2014, Vetter responded to Ms. Wang about her draft, pointing to
three sections which he asked to "discuss in greater detail for my own understanding."
These areas included non-dilution of certain shares, the "liability of members" section, and
the "power of attorney" section.

That evening, Ms. Wang responded, apologizing that the two had apparently been
unable to connect by phone, and providing written answers to Mr. Vetter's questions,
including, with respect to the non-dilution section, "This section says that until TES raises
$5 million in a single round… the Preferred will maintain their percentages exactly.  This
means that when Jack Pay's 1 mil comes in, Herman's 2% Preferred will still be 2% after
Jack Pay get new shares.  In practical terms, this means that we issue a tiny amount of new
Preferred Units every time anybody gets new shares so Herman's 2% always stays at 2%..."

In responding to Vetter's question about liability of members, Ms. Wang wrote,
"Brendan and Mike also do not pick up any personal liability just for being Members…
Brendan and Mike pick up their 1 mil of personal liability by signing a personal guarantee
for Howard Bank."

On January 6, 2014, Ms. Wang emailed Vetter, directing him to review the
Operating Agreement and capitalization table, and to "Call [her] to discuss anything and
everything."  She also directs Connors to review the capitalization table with Vetter, and
notes that she draft the employment and consulting agreements to support "sweat equity".

On January 6, 2014, Ms. Wang emailed Vetter and others, providing him with the
Amended and Restated Operating Agreement and final capitalization table.  She notes: "I
realized that we should issue the full percentages to Mike & Brendan now, and then if it

doesn't vest, we'll just put it in an unallocated Preferred Pool.  Then nobody's numbers get messed with, and it just goes to the next cap raise." She sent another email on the same chain about an unrelated issue; Mr. Vetter responded to the second email without mentioning Ms. Wang's remark about issuing "the full percentages to Mike & Brendan now" or the capitalization table she had attached reflecting that.

29.      *The Amended and Restated Operating Agreement also incorporated a capitalization table showing an allocation of Preferred Units to McDevitt, Connors, and Dunst as though Project 25 had been successful. When Greg questioned that, since Project 25 was still in its early stages, McDevitt claimed that it would be easier to "claw back" units if Project 25 was not successful, than to grant them after it succeeded. McDevitt advised Greg that such practices were common among businesses like Tessemae's. These representations were false, as Greg would later discover.*

Denied.  The only equity that McDevitt received from Plaintiff was in exchange for his cash investment or for personally guaranteeing Plaintiff's debts, and the equity grants that Connors and Dunst received were compensation for their full-time employment, in lieu of salaries.  Defendants deny that McDevitt, Connors, or Dunst agreed to undertake those actions but walk away with nothing if Plaintiff, a company McDevitt had just saved from bankruptcy, failed to quintuple its sales in a year (vis-à-vis "Project 25"), nor were the grants contingent on anything else.  Defendants deny that Greg Vetter questioned McDevitt about equity being contingent on Project 25.

Defendants deny all remaining allegations.

30.      *Relying on the fact that it had been prepared by the Company's law firm, as well as McDevitt's representation that the equity grants to McDevitt, Connors, and Dunst could be clawed back, Greg signed the Amended and Restated Operating Agreement and encouraged the*

*Company's other investors to do so as well. On behalf of the Company, Greg also signed*
*Subscription Agreements stating that Tessemae's was transferring Preferred Units to McDevitt,*
*Connors, and Dunst, as if Project 25 had been successful. In addition, Greg signed an Assignment*
*of Shares acknowledging McDevitt's transfer of a portion of his equity (worth four percent of the*
*Company) to Tandem Growth.*

Defendants deny that any equity received by McDevitt, Connors, or Dunst was ever
contingent on "Project 25" or anything else, or that McDevitt made any representation to
the contrary to Greg Vetter.  Defendants further deny that any relevant Subscription
Agreement was contingent on Project 25 or anything else.  Defendants admit that Greg
Vetter signed off on McDevitt transferring to Tandem Growth four percent of the ten
percent equity that he had received in exchange for the investment of $500,000.  (Compl.
¶ 27.)  Defendants deny all remaining allegations in this Paragraph.

31.    *Project 25 was an abject failure. Rather than increasing five-fold from $5 million*
*to $25 million, Tessemae's sales increased from $5 million to just $5.5 million by the end of 2014.*
*When it became clear that Project 25 would not succeed, Greg asked McDevitt, Connors, and*
*Dunst to return the equity that McDevitt had assured Greg could easily be clawed back in such an*
*event. McDevitt, Connors, and Dunst refused.*

Denied.  Defendants deny that any equity received by McDevitt, Connors, or Dunst was
ever contingent on "Project 25" or anything else, or that McDevitt made any representation
to the contrary to Greg Vetter.  Defendants are without sufficient information as to the truth
or falsity of the first two sentences in this Paragraph, and on that basis, denies them.
Defendants deny that Greg Vetter asked McDevitt, Connors, or Dunst to return equity, that
there was any basis for Vetter to make such a request, or that McDevitt made any

representation to the contrary to Greg Vetter.  Defendants deny all remaining allegations in this Paragraph.

32.     *After being double-crossed by McDevitt, Greg approached the attorney at Tandem who had been principally responsible for drafting the agreement and the documents transferring the equity to McDevitt, Connors, and Dunst for help enforcing the claw back agreement that McDevitt said existed. She told Greg that that the equity could not be clawed back because there was no written documentation indicating that McDevitt, Connors, and Dunst had agreed to return their units if Project 25 failed.*

Defendants admit that there is no written documentation (or any evidence whatsoever) that any equity grant to McDevitt, Connors, or Dunst was ever contingent on Project 25.

Defendants deny the remaining allegations in this Paragraph.  Defendants deny that McDevitt "double-crossed" Greg Vetter or Plaintiff.  Defendants further deny that any equity received by McDevitt, Connors, or Dunst was ever contingent on "Project 25" or anything else, that there was ever any provision to "claw back" any such equity, or that McDevitt made any representation to the contrary to Greg Vetter.  Defendants are without sufficient information to know whether Greg Vetter approached the former Tandem Legal attorney regarding any equity award, or, if so, how the former Tandem Legal attorney responded, and on that basis deny the allegations.

### McDevitt, Connors, and Dunst Use Tandem to Steal Tesse's Kitchen – an Ingredient and Recipe Kit Business

33.     *In mid-2014 McDevitt approached Greg about expanding Tessemae's business into the then-growing meal kit market that had been popularized by brands like Blue Apron. McDevitt explained that Tandem had recently been retained by a company called Fresh Realm that had developed backend processes and technology to compete with the industry's bigger players in a*

24

*more sustainable fashion. Instead of using disposable packaging, Fresh Realm developed a system to reuse its packaging and delivery materials.*

Admitted.  Defendants further note that Plaintiff and Terra's Kitchen ("TK") entered into a *Settlement Agreement and Mutual Release*, under which TK paid Plaintiff nearly $70,000 for the work that Plaintiff did related to TK.

34.     *Shortly thereafter, McDevitt arranged for a meeting between Fresh Realm and Tessemae's in New York during which those in attendance agreed to form a new business called Tesse's Kitchen. Tessemae's, Fresh Realm, Renaissance Food Group, and McDevitt, Connors, and Dunst, collectively, would each own equal shares of the venture.*

Defendants admit that McDevitt arranged a meeting in New York with FreshRealm and Tessemae's.  Defendants deny that the parties reach any agreement at that meeting, much less that the parties reached any agreement regarding ownership of an entity that had not been formed.

35.     *In the months that followed, Tessemae's spent thousands of hours developing recipes and brand materials to launch Tesse's Kitchen, all with McDevitt's, Connors', and Dunst's knowledge. Shortly before Tesse's Kitchen was scheduled to launch, however, McDevitt presented a new agreement (prepared by Tandem) outlining the structure of the venture that showed Tessemae's owning just one percent – far less than his, Connors', and Dunst's collective share.*

Denied.  Defendants deny that Tessemae's "spent thousands of hours" on the development of what launched as Terra's Kitchen.  More importantly, Defendants respond that Plaintiff and TK entered into a monetary settlement that compensated Plaintiff for the work that it did on the development of Terra's Kitchen.

36.     *Greg immediately called the attorney at Tandem who had been representing Tessemae's throughout the Tesse's Kitchen project to ask what happened. During the call, the*

*attorney explained that McDevitt was pressuring her to get Greg to sign the agreement at the reduced ownership percentage and she did not think Tandem could provide Tessemae's with unbiased advice on the matter. McDevitt fired that attorney the following day.*

Denied. Defendants are without sufficient information to know whether Greg Vetter called the former Tandem Legal attorney who represented Plaintiff regarding the TK project, and on that basis deny the first sentence. Defendants deny that McDevitt pressured the former Tandem Legal attorney to get Greg Vetter to sign any agreement. Defendants further deny that McDevitt fired the attorney, or that Tandem Legal fired the attorney "the following day" after any interaction with Plaintiff. Defendants deny all remaining allegations.

*37.    McDevitt, Connors, and Dunst completed their theft of the Company's opportunity to start Tesse's Kitchen by rebranding the venture as Terra's Kitchen and launching it without providing Tessemae's any ownership interest.*

Denied. Defendants respond that Plaintiff and Terra's Kitchen entered into a *Settlement Agreement and Mutual Release*, under which TK paid Plaintiff nearly $70,000 for the work that Plaintiff did related to TK.

**McDevitt Conspires with Intlekofer, and Chehansky to Attempt to Take Over Tessemae's**

*38.    Tessemae's was growing in late 2016 when McDevitt saw another opportunity to gain control of the Company through corrupt means. Though the supporting cast of conspirators had changed–the common denominators being McDevitt and Tandem–the scheme was familiar.*

Denied.

*39.    By late summer 2017, Tessemae's needed additional capital to expand its production facilities and meet growing demand. It had identified a source of financing, but as a condition to making the loan, the lender demanded that it be granted a first-position lien on the Company's accounts receivable, a position then-held by Howard Bank. Because McDevitt was*

*still among the guarantors of the Company's line of credit with Howard Bank, the Company*

*considered itself obligated to inform him of the status of its negotiations with the bank, which Greg*

*did in August 2017. McDevitt said he had a strong relationship with Howard Bank's president and*

*offered to help.*

> Denied.  In the summer of 2017, Plaintiff was hours away from bankruptcy when Greg
> Vetter asked McDevitt to rescue the Company.  The reality of Plaintiff's situation is
> reflected in an email from Board Member Demian Costa to Greg Vetter on August 23,
> 2017.  As shown in the response to ¶ Costa stated that Plaintiff's two largest investors had
> "written this investment off as a Zero," and was reduced to suggesting what amounted to
> bank fraud.  Specifically, he stated that he would liquidate all of his personal assets to make
> it appear as if Plaintiff were not bankrupt, but that, "[w]ithout a 100% guarantee that it is
> coming back, I can't do it."  Costa stated that "we must resolve today or its over anyway."

**From:** Demian Costa <dcosta@plankindustries.com>
**Sent:** Wednesday, August 23, 2017 10:38:34 AM
**To:** Greg Vetter
**Subject:** Note to Mike and Howard

Greg – here is where we are on our end.  I think it is relevant to Mike McDevitt and Howard Bank.

Kevin and Scott have written this investment off as a Zero.  All I can do from this point is leverage my limited personal assets to save my friends money as best I can.  I am personally guaranteeing the $600k pledge to Howard, which is money I don't have, in order to get it back when the factoring capital comes in.  Without a 100% guarantee that it is coming back, I can't do it.  This is literally everything I have.  It is a timing issue that we must resolve today or its over anyway.  Hopefully all parties get where we are and make this happen.  We will live to fight another day and potentially long enough to be in a position to get our money back.  This is my Hail Mary.  Cheers



**DEMIAN COSTA**
Managing Partner

**SAGAMORE VENTURES**

That same day, August 23, 2017, Plaintiff's General Counsel sent McDevitt a "new proposal for the Howard Bank refinancing to discuss with **your lawyer** tomorrow." (emphasis added).

---

**From:** Lindsay Thomas <lindsay@tessemaes.com>
**Date:** August 23, 2017 at 8:22:29 PM EDT
**To:** Mike McDevitt <mmcdevitt@tk.co>
**Cc:** Greg Vetter <oldest@tessemaes.com>
**Subject: Financing structure - update**

Mike,

New proposal for the Howard Bank refinancing to discuss with your lawyer tomorrow.

You would buy Howard Bank's position in our capital structure through a voluntary sale at par (or hopefully less) and come in as our senior lender. You could then transfer your first lien security interest in our AR to Allied who would then be able to fund the factoring facility. You would keep your first lien on all other assets of Tessemae's.

This keeps Solve Capital as second lien which is advantageous to us all.

The original plan as I understood it would have put Allied in first on AR and Solve in first on all other assets which puts that vulture fund too close to our assets. This plan also allows you to be a secured lender.

Paperwork will be minimal and we can move quickly. Ben Horowicz from Miles will be handling. He is available by email tomorrow during the day and phone late afternoon/early evening.

---

Plaintiff was in default on its loans to Howard Bank and effectively bankrupt when it asked McDevitt to intervene with Howard Bank, work to restructure the debt, and rescue Plaintiff from bankruptcy. McDevitt did so, convincing Howard Bank to restructure Plaintiff's debt and subordinate their lending position, which required McDevitt to agree to renew his Personal Guarantee at far greater risk given the absence of Plaintiff's accounts receivables as security. In return, Plaintiff agreed to issue profit interests with super-voting rights, as reflected in the Side Letter Agreement.

40.    *A few days later, McDevitt called Greg and said he had worked out a deal whereby Howard Bank would extinguish the Company's line of credit (which carried a balance of $2 million) for $1 million. Even better, McDevitt told Greg that he had also identified individuals who were willing to invest that amount by September 1, 2017, as well as an additional $6-7 million by*

*October 1, 2017 (an amount that would meet all of the Company's immediate capital needs) in*
*exchange for promissory notes tied to warrants for an existing class of units in the Company.*
*Pleasantly surprised by the terms McDevitt presented, the Company agreed to allow him to act as*
*its agent in raising the funds he described.*

Denied.  McDevitt never told Greg Vetter that Howard Bank agreed to extinguish the $2
million debt for $1 million or that he had identified individuals willing to invest an
additional $6-7 million, let alone within the next month.  Plaintiff was still effectively
bankrupt and more than $20 million in debt.  Defendants also deny McDevitt ever acted as
the "agent" of Plaintiff.

41.     *In fact, McDevitt's representations were a lie. Not only did Howard Bank not agree*
*to extinguish the Company's line of credit for $1 million, but McDevitt had no intention of raising*
*all of the funds he had promised. Instead, he saw Tessemae's need for capital as another*
*opportunity to try to take over the Company through lies and conflicts of interest, this time enlisting*
*Defendants Paul Intlekofer and Alex Chehansky as his confederates.*

Denied.  Paul Intlekofer and Alex Chehansky were terminated as defendants in this matter
on March 31, 2021.  ECF No. 35, at *2.  Defendants further respond that McDevitt never
told Greg Vetter that Howard Bank agreed to extinguish the $2 million debt for $1 million
or that McDevitt had identified individuals willing to invest an additional $6-7 million.
Defendants further deny that McDevitt ever attempted to "take over the Company," or that
Paul Intlekofer or Alex Chehansky were involved in any attempt to do so.

42.     *Believing McDevitt's representations that Tandem was competent and qualified to*
*do so, Tessemae's agreed to retain Tandem to "paper" the offering as securities counsel for the*
*Company. Pursuant to the agreement between McDevitt and Tessemae's, Tandem prepared the*
*notes and warrants for the offering on the Company's behalf. It also drafted a "side letter"*

*memorializing the Company's agreement to pay McDevitt $100,000 and to amend the Company's*

*Operating Agreement to provide him with additional equity in a new class of units that would carry*

*super-preferred voting rights. Specifically, the side letter described amendments to the Operating*

*Agreement that would give McDevitt veto rights over certain business decisions such as incurring*

*debt over $100,000, hiring, firing, and compensating senior management, and new business or*

*product lines. The amendments would also have provided McDevitt with six votes per unit in*

*connection with the approval of an acquisition or asset sale. Tessemae's Board of Managers*

*approved the terms of the side letter on or about September 1, 2017.*

Defendants admit that Plaintiff's Board approved the Side Letter Agreement on or about September 1, 2017.

Defendants deny that Tandem Legal has represented Plaintiff at any point since February 2015, when Plaintiff terminated the representation:

---

**From:** Greg Vetter <oldest@tessemaes.com>
**Date:** February 10, 2015 at 5:43:20 PM EST
**To:** Lauren Laitin <lauren@tndm.com>, Nick Giannuzzi <nick@gglaw.us>
**Subject:** The Gianuzzi Group

Not sure how that sent without me pushing send. Anyway, Nick is going to represent me and Tessemaes moving forward. Please set up a time to connect and transfer all required information. Thank you.


--

Greg Vetter
Oldest Brother
Tessemae's All Natural

---

Notably, Ms. Laitin replied to Greg Vetter asking for clarification whether The Giannuzzi Group would be Plaintiff's new counsel only for matters related to Terra's Kitchen, or for everything:

From: Greg Vetter <oldest@tessemaes.com>
Date: February 10, 2015 at 5:58:23 PM EST
To: Lauren Laitin <lauren@tndm.com>
Subject: Re: The Gianuzzi Group

everything

On Tue, Feb 10, 2015 at 5:57 PM, Lauren Laitin <lauren@tndm.com> wrote:

Hey Greg,

Just for clarification, will I be sending everything to Nick, or will he just be representing you with respect to TK?

In 2017, Tandem Legal represented McDevitt, not Plaintiff. Plaintiff was represented by in-house General Counsel, Lindsay Thomas. In fact, Tandem Legal asked Thomas when to expect draft amendments to the Operating Agreement, and Thomas said that Plaintiff was expecting "your side" to draft the amendments, and that if Plaintiff would have to handle, "we ask for some additional time to get **our counsel** going on that."

**From:** Lindsay Thomas [mailto:lindsay@tessemaes.com]
**Sent:** Tuesday, October 03, 2017 12:05 PM
**To:** Julia Taylor <julia@tndm.com>
**Cc:** 'Mike McDevitt' <mmcdevitt@tk.co>
**Subject:** RE: Operating Agreement Amendment / Escrow

Julia,

Sure – we will confirm once we see that come in.

On the operating agreement, we were under the impression your side would be taking the pen on the amendment (similar to the other documents). If you would prefer for us to do so, we ask for some additional time to get our counsel going on that.



**TESSEMAE'S**

**Lindsay Thomas**
Chief of Staff
C: 703-795-1015
O: 855.MYTESSE
www.tessemaes.com

The Side Letter Agreement speaks for itself.  As stated in Exhibit A, the $100,000 was not "to pay McDevitt," but to reimburse expenses and fees, including the legal fees for "Tandem Legal Group," which was twice identified as "Counsel for Michael McDevitt."

## EXHIBIT A

### USES OF ESCROWED FUNDS

**Loan Amendment Facilitation & Subordination:**

| | | |
|---|---|---|
| Tandem Legal Group | Counsel for Michael McDevitt | $20,000 |
| Citrin Cooperman | Accountants for Michael McDevitt | $ 5,000 |
| Michael McDevitt | Reimbursement of Consulting Fees | $50,000 |
| | **TOTAL LOAN RELATED EXPENSES** | **$75,000** |

**Amendment to Operating Agreement:**

| | | |
|---|---|---|
| Tandem Legal Group | Counsel for Michael McDevitt | $10,000 |
| Citrin Cooperman | Accountants for Michael McDevitt | $5,000 |
| TBD | Appraiser | $6,000 |
| | **TOTAL OPERATING AGREEMENT RELATED EXPENSES** | **$25,000** |
| | **TOTAL ESTIMATED EXPENSES** | **$100,000** |

43.     *By November, 2017, McDevitt had raised only $1.1 million of the $7-8 million he had (falsely) told the Company he had lined up. Undaunted, in early November he introduced Greg to Alex Chehansky, a financial manager/private equity banker from New York, who McDevitt (falsely) claimed, he had "just met," and who could, McDevitt said, raise $6 million in three weeks. The Company, at McDevitt's urging, hired Chehansky as a financing "consultant."*

Denied.  Defendants deny that McDevitt claimed that he had identified individuals willing to invest $7-8 million.  Defendants further deny that McDevitt claimed that Chehansky could raise $6 million in any amount of time, let alone three weeks, for an entity that was still effectively bankrupt and, staggeringly, indebted by more than three times that amount. Defendants deny that McDevitt and Chehansky previously knew each other.

44.     *Chehansky was no more successful than McDevitt in raising funds for the Company in the timeframe he and McDevitt had promised despite multiple meetings with possible investors across the Country, most of which were coordinated with McDevitt and Intlekofer, but without the Company's knowledge. During those meetings McDevitt falsely represented to prospective investors that there had been a change of control at the Company, that he held a seat on its board, and that he was in control of the Company's operations, none of which was true.*

Denied.  Defendants deny that McDevitt claimed that Chehansky could raise $6 million in any amount of time, let alone three weeks.  Plaintiff was still effectively bankrupt and staggeringly indebted.  Defendants further deny that McDevitt made any false representations to prospective investors.

45.     *Meanwhile, Chehansky was pressuring Tessemae's to expedite its amendment of its Operating Agreement as required by the side letter Tandem drafted. When the Company reviewed the amendments (also prepared by Tandem), it discovered that McDevitt, in a ploy that harkened back to his 2014 equity grab, was attempting to grant himself rights that went well beyond what*

*the Company's Board had agreed to in the side letter. Specifically, the amendments, as drafted by Tandem, would have given McDevitt six votes per unit on all matters to be voted on, not just those provided for in the side letter. In addition, the amendments would have given McDevitt preemptive rights in connection with additional equity issuances and more power to force a sale of the Company. The amendments would also have required the Company's CEO and CFO to meet with McDevitt on a monthly basis to discuss Company business.*

Defendants admit that the Plaintiff's Board agreed to the terms of the Side Letter Agreement, including but not limited to the agreement that McDevitt would receive super-voting rights as described in the Side Letter Agreement.  Defendants further admit that the Side Letter Agreement "required" amendment of Plaintiff's Operating Agreement.

Defendants deny that Chehansky had involvement in the Side Letter Agreement or that he pressured Plaintiff to "expedite its amendment of its Operating Agreement."  Defendants further deny Plaintiff's characterization of the amendments to the Operating Agreement. On October 3, 2017, Tandem Legal asked Plaintiff's in-house counsel and Chief of Staff, Lindsay Thomas, when to expect the draft Operating Agreement.  Thomas deferred and expressly requested that Tandem Legal handle the drafting:

**From:** Lindsay Thomas [mailto:lindsay@tessemaes.com]
**Sent:** Tuesday, October 03, 2017 12:05 PM
**To:** Julia Taylor <julia@tndm.com>
**Cc:** 'Mike McDevitt' <mmcdevitt@tk.co>
**Subject:** RE: Operating Agreement Amendment / Escrow

Julia,

Sure – we will confirm once we see that come in.

On the operating agreement, we were under the impression your side would be taking the pen on the amendment (similar to the other documents). If you would prefer for us to do so, we ask for some additional time to get our counsel going on that.



**Lindsay Thomas**
Chief of Staff
C: 703-795-1036
O: 855.MYTESSE
www.tessemaes.com

Defendants further deny all remaining allegations in this Paragraph.

46.     In addition, the Company (by then represented by new counsel) discovered terms in the side letter that grossly violated state and federal securities laws. The Company also learned that in the course of McDevitt's efforts to raise the $1.1 million that it believed had been used to pay off (not simply pay down) the Howard Bank line of credit, McDevitt, Chehansky, and Intlekofer violated state and federal securities laws by making multiple misrepresentations to participants in that offering that were calculated to facilitate their scheme to gain control of Tessemae's, including:

            a.    Telling participants in the offering that they had purchased the Howard Bank line of credit and that they sat in a secured first position as a result when, in reality, their investment had simply been used to pay down the line of credit.

35

b.  *Telling participants in the offering that they and their allies were in control of the Company, which was not accurate. Indeed, McDevitt and/or Intlekofer falsely introduced Chehansky to one at least one investor as the Company's CEO.*

c.  *Telling participants in the offering that McDevitt had participated alongside them in the offering when, in fact, he had contributed nothing.*

Denied.  Defendants deny that the Side Letter Agreement violated any state or federal securities law.  Defendants further deny that the funds raised were to "pay off (not simply pay down) the Howard Bank line of credit."  Defendants further deny that McDevitt, Chehansky or Intlekofer violated any federal or state securities laws, that any of them ever made any misrepresentation to any participants in the offering, or that any of them had a "scheme to gain control of Tessemae's".

47.    *On December 4, 2017, after discovering McDevitt's, Intlekofer's and Chehansky's corrupt and illegal scheme, Greg called Chehansky and terminated his consulting relationship with the Company. Almost immediately following that call, Greg received a call from McDevitt, who left a message saying that he needed to speak with Greg right away. When Greg called McDevitt back, McDevitt admitted that he had been working behind the scenes with Chehansky and claimed that firing Chehansky would ruin all of his "work." Greg agreed to meet with McDevitt for coffee in Annapolis the next day to discuss the matter further. During that meeting, McDevitt admitted that he had made misrepresentations to the individuals who contributed funds to pay down the Howard Bank line of credit and said that the Company would be sued by the noteholders for "false pretenses" if the Company terminated its agreement with Chehansky.*

Denied.  Defendants deny that McDevitt, Intlekofer and Chehansky were involved in any "scheme," much less a corrupt and illegal one.  Defendants further deny that McDevitt made any such admission or claim to Greg Vetter on the phone or in person.

36

48.     Because of McDevitt's, Intlekofer's, and Chehansky's misrepresentations, and
Tandem's incompetence in preparing the side letter and "papering" the offering, the Company
had no choice but to make a rescission offering to those who purchased the notes and warrants.
As a result, all of the funds were returned, plus interest, and Tessemae's never recognized a single
cent from McDevitt's supposed efforts on its behalf. The Company was also forced to expend over
a half a million dollars in attorneys and other fees to accomplish the rescission.

Denied.   Defendants deny that McDevitt, Intlekofer and Chehansky made any
misrepresentation, or that Tandem Legal acted with "incompetence" in negotiating the Side
Letter Agreement with Plaintiff or in connection with the capital raise.  Defendants further
deny that Plaintiff was obligated to make a rescission offering.  Defendants further deny
that Plaintiff did not benefit from McDevitt's work, which rescued Plaintiff from
bankruptcy, in addition to his renewal of the $1 million personal guarantee.  Defendants
are without sufficient information to either admit or deny the final sentence, and on that
basis, deny the allegations therein.

49.     In addition, the Company was left to pay the balance on its line of credit with
Howard Bank, an unexpected burden in light of McDevitt's representations. After McDevitt's,
Intlekofer's, and Chehansky's misrepresentations to potential investors, the Company's
fundraising efforts were also hamstrung and it was forced to agree to a $3 million loan with
Democracy Capital Corporation on extremely unfavorable terms that included, among other
things, an interest rate of 15% per annum, and an "exit" fee of $7.5 million.

Denied.   Defendants deny that McDevitt, Intlekofer or Chehansky made any
misrepresentations to any prospective investors, or that it was necessary to conduct the
rescission offering.  Defendants further respond that Plaintiff alone is responsible for its
more than $20 million in outstanding debt, including its debt to Howard Bank, for having

to repay its debt to Howard Bank, and for only being able to secure additional capital on "extremely unfavorable" terms, and Defendants deny any insinuation to the contrary.

50.     *Despite his fraud, malpractice, and his failure to raise the funds he had promised, McDevitt pocketed his full $100,000 fee, which he has refused to return despite the Company's demand.*

Denied.  Defendants deny that McDevitt retained any portion of the $100,000, or that the $100,000 was a "fee."  As stated in the Side Letter, the $100,000 was provided to reimburse McDevitt for legal, accounting, and other professional fees.

**McDevitt and Intlekofer Attempt to Gain a Seat on Tessemae's Board Through Misrepresentations to the Company's Equity Holders**

51.     *Unrepentant, in February 2018, McDevitt made a final corrupt attempt to gain control of the Company by removing and replacing a duly elected member of its Board of Managers, again, based on lies.*

Denied.  Defendants deny that McDevitt every made any "corrupt attempt to gain control of the Company."  Defendants further deny that the third member of the Board was ever "elected."  In February 2018, McDevitt attempted to secure the votes of sufficient Members to appoint an actual "independent" Board member.  Defendants deny that McDevitt made any misrepresentation to any Member.

52.     *On or about February 8, 2018, the Company was surprised to receive from Intlekofer signed consents to appoint Robert Geis to the Company's Board. The Company was surprised because the seat for the class of shareholders that Mr. Geis could occupy was not vacant. After receiving the consents, Greg made calls to other Class A shareholders who confirmed they had been contacted by McDevitt or Intlekofer and had been falsely led to believe that the seat Intlekofer and McDevitt were seeking to fill was vacant. When shown the consents that Intlekofer*

*provided, certain shareholders also said that the forms that appeared to contain their signatures were different from the ones they had actually signed, apparently having been altered before they were presented to the Company.*

Defendants deny that McDevitt or Intlekofer told any other Member that the third Board seat was "vacant."  In reality, the third Board seat was intended to be an "Independent" Member, but it was in fact occupied by a family friend of Greg Vetter who had manifestly failed in his duties to protect the Members.  Indeed, the Board of Greg Vetter, Demian Costa, and Robert McDermott, Jr. had allowed Plaintiff to amass more than $20 million in debt, and had been hours away from bankruptcy, with Costa recommending to Vetter that they essentially commit bank fraud as "[his] Hail Mary," because Plaintiff needed capital "today or its over anyway."

From: Demian Costa <dcosta@plankindustries.com>
Sent: Wednesday, August 23, 2017 10:38:34 AM
To: Greg Vetter
Subject: Note to Mike and Howard

Greg – here is where we are on our end. I think it is relevant to Mike McDevitt and Howard Bank.

Kevin and Scott have written this investment off as a Zero. All I can do from this point is leverage my limited personal assets to save my friends money as best I can. I am personally guaranteeing the $600k pledge to Howard, which is money I don't have, in order to get it back when the factoring capital comes in. Without a 100% guarantee that it is coming back, I can't do it. This is literally everything I have. It is a timing issue that we must resolve today or its over anyway. Hopefully all parties get where we are and make this happen. We will live to fight another day and potentially long enough to be in a position to get our money back. This is my Hail Mary. Cheers



DEMIAN COSTA
Managing Partner

**SAGAMORE VENTURES**

53.     *In early February 2018, Greg met with one of the shareholders who had provided a signed consent form to McDevitt or Intlekofer and explained what had occurred. After the meeting, the shareholder withdrew its consent to appoint Mr. Geis to the Board, which was sufficient to thwart McDevitt and Intlekofer's plan.*

Defendants are without sufficient information to know how Greg Vetter convinced the "shareholder" to withdraw her vote to appoint an independent Board Member, and on that basis deny.  Defendants further deny that McDevitt or Intlekofer had any "plan" beyond the appointment of a genuinely independent — and competent — Board member as provided for in Plaintiff's Operating Agreement.

### Tessemae's Cancels McDevitt's, Connors', and Dunst's Equity Holdings

54.     *Subsequently, Tessemae's undertook a review of its capitalization table and identified that it had issued equity to certain individuals improperly based on incompetent advice from McDevitt and Tandem or based on McDevitt's fraud on the Company. As a result, the Company rescinded the following equity holdings for lack of consideration, the holders' failure to fulfill conditions precedent to the grants, or as having been acquired by fraud:*

a.     *January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Herman Dunst, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;*

b.     *January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Brendan Connors, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;*

c.     *January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Brendan Connors, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;*

*d.   January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Michael McDevitt, and follow up transfers made in accordance with the anti-dilution provisions of the Company's 2014 Operating Agreement;*

*e.   Michael McDevitt's Class B Units that presently constitute approximately 1.9 percent of the Company.*

> Denied.   Defendants deny that Plaintiff received incompetent advice from either McDevitt or Tandem Legal, or that McDevitt committed fraud on Plaintiff.   Defendants further respond that Plaintiff's belief that it has rescinded the equity grants has no legal effect, and Defendants deny any insinuation to the contrary.

55.   *On June 1, 2020, the Company notified McDevitt, Connors, and Dunst of its action.*

> Defendants admit that Plaintiff sent a letter dated June 1, 2020, stating its belief that it had revoked the equity grants.   Defendants further respond that the letter has no legal effect, and Defendants deny any insinuation to the contrary.

## COUNT I:  RICO – 18 U.S.C. § 1962(B)

## (Against McDevitt, Tandem Legal Group, and Tandem Growth)

56.   *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

> Defendants incorporate their answers to the preceding Paragraphs.

57.   *18 U.S.C. § 1962(b) makes it unlawful for any "person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."*

> This Paragraph contains only legal conclusions to which no response is required.  To the extent that there are determined to be factual allegations in this Paragraph, Defendants deny those allegations.

58.     *McDevitt, Tandem, and Tandem Growth are each a "person" within the meaning of §§ 1961(3) and 1962(b). McDevitt acted through his alter egos, Tandem and Tandem Growth, to carry out his fraudulent and illegal scheme to steal an interest in Tessemae's, with the ultimate goal of gaining control of the Company.*

Denied.   The first sentence contains only legal conclusions to which no response is required.  Defendants deny the allegations in the second sentence, because neither Tandem Legal nor Tandem Growth are 'alter egos' of McDevitt, there was no fraudulent and illegal scheme to steal an interest in Plaintiff, and there was never any attempt to gain control of Plaintiff.

59.     *Tessemae's sources raw materials nationally and internationally and distributes its products across the United States. Accordingly, it is an "enterprise," see 18 U.S.C. § 1961(4), and its activities affect interstate commerce.*

Defendants admit that Plaintiff sources raw materials nationally and distributes its products across the United States.   The second sentence of this Paragraph contains only legal conclusions to which no response is required.

60.     *Pursuant to and in furtherance of McDevitt's scheme, on or about January 3, 2014, McDevitt falsely represented to Tessemae's that he, Connors, and Dunst would only receive certain equity holdings if Project 25 were successful and that the company could "claw back" those holdings if Project 25 failed. In fact, McDevitt directed the attorneys at Tandem to prepare an Amended and Restated Operating Agreement for Tessemae's and documents transferring equity to himself, Connors, and Dunst that were not conditioned on the success of Project 25 and that did not provide Tessemae's with the right to "claw back" the equity grants. On the same date that McDevitt received his illegally acquired equity, McDevitt transferred a portion of his interest in Tessemae's to Tandem Growth without receiving any consideration in return.*

Denied.  McDevitt never represented to Plaintiff that any equity grant would be contingent, and he did not direct the drafting of Plaintiff's 2014 Operating Agreement.  McDevitt also never received "illegally acquired equity."  McDevitt transferred 4% of the 10% equity stake that he received in exchange for investing $500,000, as admitted by Plaintiff in Paragraph 27.

61.    *Later, on or about, September 1, 2017, but with the same goal of gaining control of Tessemae's, McDevitt falsely represented to the Company that he would raise $7-8 million to support it its capital needs. By doing so, McDevitt maintained control of Tessemae's and its relationships with prospective investors. In fact, McDevitt did not raise all of the funds that he had promised. Instead, he used the Company's urgent need for capital to attempt to take over Tessemae's by, inter alia, (a) making multiple false representations to the Company's investors, supra ¶¶ 46.a – 46.c, and (b) directing the attorneys at Tandem to prepare an amended operating agreement for the Company that contained terms benefitting him but that the Company's Board never agreed to.*

Denied.  McDevitt never attempted to gain control of Plaintiff, never claimed that he had identified individuals willing to invest $7-8 million or entered an agreement to raise that amount, and never "maintained control" of Plaintiff nor its relationship with investors. McDevitt also never made any false representation to any actual or potential investor.  The second section of the final sentence in this Paragraph would be protected by attorney-client privilege, and it is accordingly denied.

62.    *McDevitt acquired and maintained his interest in, and control of, Tessemae's through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1962(b) and 1961(5).*

Denied.  McDevitt never acquired nor maintained control of Plaintiff, let alone through any "racketeering activity."  The only equity interests in Plaintiff that McDevitt received were for investing capital or providing personal guarantees for Plaintiff's debt.

63.    *McDevitt, through Tandem and Tandem Growth, acted with the intent to defraud Tessemae's and used interstate wires to further his scheme in violation of 18 U.S.C. § 1343. Specifically:*

*a.   On or about January 3, 2014, at McDevitt's direction, Tandem e-mailed the Amended and Restated Operating Agreement that included an allocation of Preferred Units to McDevitt, Connors, and Dunst, as if Project 25 had been successful and which, despite McDevitt's representation to the contrary, could not be "clawed back." Tandem sent the Amended and Restated Operating Agreement from its offices in the District of Columbia, to Greg, in Maryland.*

*b.   On or about September 3, 2017, at McDevitt's direction, Tandem e-mailed the "side letter" from its offices in the District of Columbia, to Greg, in Maryland, describing the terms of an agreement by which the Company would pay McDevitt $100,000 and provide him with super-preferred equity units in exchange for his agreement to raising raise $7-8 million in capital. In fact, McDevitt had no intention of honoring his commitments to raise capital and did not have investors lined up to provide the funds as he had represented to Company. Unaware of McDevitt's illegal scheme, the Company wired $100,000 across state lines to McDevitt's bank in Minnesota.*

*c.   On multiple occasions throughout the summer and fall of 2017, McDevitt communicated by telephone from the District of Columbia or Maryland with a prospective investor in Tessemae's in California and made multiple false representations about the Company including that there had been a change in control at the Company, and that he had a seat on the Company's board and was in control of its operations.*

Defendants deny the parent Paragraph.

Defendants deny the first sentence of (a).  Defendants admit that Tandem Legal sent the 2014 Operating Agreement from its office in DC to Greg Vetter in Maryland.

Defendants deny (b) because Tandem Legal initially sent the draft Side Letter Agreement to Plaintiff's General Counsel, Lindsay Thomas, on September 1, 2017, and not to Greg Vetter.

| | |
|---|---|
| **From:** | Julia Taylor |
| **Sent:** | Friday, September 01, 2017 2:58 PM |
| **To:** | Lindsay Thomas |
| **Cc:** | 'Mike McDevitt' |
| **Subject:** | Tessemae Lender Docs |
| **Attachments:** | MM Tessemae Investor Promissory Note FORM_23407_3.DOCX; MM Tessemae Side Letter Agreement_23408_2.DOCX; MM Tessemae Warrant FORM_23409_1.DOCX |

Lindsay

Attached are the following docs:

1. Form of Commercial Promissory Note
2. Form of Warrant
3. Side Letter Agreement between Tessemae and M McDevitt

Once the note and warrant are finalized, we will prepare individual notes and warrant agreements for each of the new lenders.  The total loans are $1.1m.

The side letter formalizes the deal between Tessemae and M McDevitt re: the new units and related matters.

Not sure whom else on your side should be receiving docs.  Feel free to forward.

Defendants further respond that subparagraph (b) falsely describes the Side Letter Agreement, which speaks for itself, and had nothing to do with raising capital.  The Side Letter Agreement was for McDevitt facilitating the loan amendment with Howard Bank:

> RE:   Facilitation of Loan Amendment
>
> Dear Mike:
>
> Over the past several weeks, you have worked tirelessly on the behalf of Tessemae's LLC, a Maryland limited liability company ("**Tessemae**"), in connection with the closing of an amendment to Tessemae's loan documents with Howard Bank as well as securing Howard Bank's agreement to be subordinated on the accounts receivable in order to facilitate a new factoring facility for Tessemae.  In appreciation of your efforts in bringing about the loan amendment and subordination, Tessemae hereby agrees to issue to you, or your designees, 5,779,557 of a new class of units representing membership interests in Tessemae to be called Class C units (the "**Class C Common Units**").

Defendants deny the remaining allegations in this Subparagraph.

64.     *As a direct and proximate consequence of McDevitt's acquisition of his interest in Tessemae's in violation of 18 U.S.C. § 1962(b), Tessemae's has suffered actual damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

65.     *The Company seeks compensatory damages, treble damages pursuant to 18 U.S.C. § 1964(c), its reasonable attorneys' fees, and costs.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

## COUNT II:  RICO – 18 U.S.C. § 1962(C)

### (Against McDevitt)

66.     *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

67.     *18 U.S.C. § 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."*

This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

68.    *McDevitt is a "person" within the meaning of § 1962(b). See 18 U.S.C. § 1961(3).* This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

69.    *Tandem represents and has represented businesses (including Tessemae's) outside of the District of Columbia where its principal office is located and its clients are engaged in interstate commerce. Tandem Growth is an instrumentality that McDevitt used to facilitate the holding of fraudulently acquired equity in Tessemae's. Tandem and Tandem Growth are both an "enterprise[s]," see 18 U.S.C. § 1961(4), that are engaged in activities that affect interstate commerce.*

Denied.  Defendants deny that Tandem Legal has operated outside of the District of Columbia.  Defendants further deny that Tandem Growth has held "fraudulently acquired equity" in Plaintiff.  McDevitt transferred 4% of the 10% equity stake that he received in exchange for investing $500,000, as admitted by Plaintiff in Paragraph 27.  The final sentence of this Paragraph contains only legal conclusions to which no response is required.

70.    *As the CEO of Tandem and Tandem Growth, McDevitt is "employed by or associated with" Tandem and Tandem Growth.*

Denied.  McDevitt is not currently the CEO of Tandem Legal, and Tandem Growth is simply a holding company that does not have any operations or officers.

71.    *McDevitt conducted or participated in Tandem's and Tandem Growth's affairs through a pattern of racketeering activity as part of his fraudulent and corrupt scheme to steal an interest in Tessemae's, with the ultimate goal of gaining control of the Company.*

Denied.  Defendants deny that McDevitt or either Tandem entity engaged in any wrongful conduct, let alone "racketeering activity," and further deny that there was any "scheme to steal an interest" in Plaintiff or gain control of Plaintiff.

72.     *Pursuant to and in furtherance of his illegal scheme, on or about January 3, 2014, McDevitt, in his capacity as Tandem's CEO, represented to Tessemae's that he, Connors, and Dunst would only receive certain equity holdings if Project 25 were successful and that the Company could "claw back" those holdings if Project 25 failed. In fact, McDevitt's representation was false. Rather than ensuring that the Company was protected as he claimed it was, McDevitt directed the attorneys at Tandem to prepare an Amended and Restated Operating Agreement for Tessemae's and documents transferring equity to himself, Connors, and Dunst that were not conditioned on the success of Project 25 and that did not provide Tessemae's with the right to "claw back" the equity grants. On the same date that McDevitt received his illegally acquired equity from Tessemae's, he transferred a portion of his holdings to Tandem Growth without receiving any consideration in return.*

Denied.  Defendants deny that any equity received by McDevitt, Connors, or Dunst was ever contingent on "Project 25," and deny that McDevitt represented otherwise to Plaintiff. Defendants further deny that McDevitt directed the drafting of an amended Operating Agreement for Plaintiff.  Defendants also deny that McDevitt transferred equity to Tandem Growth on the same day that he purchased the equity from Plaintiff.

73.     *Later, on or about, September 1, 2017, but with the same goal of gaining control of Tessemae's, McDevitt, in his capacity as Tandem's CEO, falsely represented to the Company that he and Tandem would assist Tessemae's with raising $7-8 million to support it its immediate capital needs. Rather than fulfilling his promise, McDevitt used the Company's urgent need for capital to attempt to take over Tessemae's by, inter alia, (a) making multiple false representations*

*about the Company and its leadership to prospective investors, supra ¶¶ 46.a – 46.c, and (b)*
*directing the attorneys at Tandem to prepare an amended operating agreement for the Company*
*that contained terms benefitting him but to which the Company's Board never agreed.*

Denied.  Defendants deny that McDevitt was the CEO of Tandem Legal in 2017, that he
ever had a "goal of gaining control" of Plaintiff, that he made any false representation to
Plaintiff, or that he made any false representations to any actual or potential investor.  The
second section of the final sentence in this Paragraph would be protected by attorney-client
privilege, and it is accordingly denied.

*74.     Pursuant to and in furtherance of his scheme, McDevitt conducted or participated*
*in Tandem's and Tandem Growth's affairs through a pattern of racketeering activity," within the*
*meaning of 18 U.S.C. §§ 1962(b) and 1961(5). McDevitt acted with the intent to defraud*
*Tessemae's and used interstate wires to further his scheme in violation of 18 U.S.C. § 1343.*
*Specifically:*

*a.   On or about January 3, 2014, at McDevitt's direction, Tandem e-mailed the*
*Amended and Restated Operating Agreement that included an allocation of Preferred Units to*
*McDevitt, Connors, and Dunst, as if Project 25 had been successful and which, despite McDevitt's*
*representation to the contrary, could not be "clawed back." Tandem sent the Amended and*
*Restated Operating Agreement from its offices in the District of Columbia, to Greg, in Maryland.*

*b.   On or about September 3, 2017, at McDevitt's direction, Tandem e-mailed the*
*"side letter" from its offices in the District of Columbia, to Greg, in Maryland, describing the*
*terms of an agreement by which the Company would pay McDevitt $100,000 and provide him with*
*super-preferred equity units in exchange for his agreement to raising raise $7-8 million in capital.*
*In fact, McDevitt had no intention of honoring his commitments to raise capital and did not have*

*investors lined up to provide the funds as he had represented to Company. Unaware of McDevitt's illegal scheme, the Company wired $100,000 across state lines to McDevitt's bank in Minnesota.*

Defendants deny the parent Paragraph.

Defendants deny the first sentence of (a).  Defendants admit that Tandem Legal sent the 2014 Operating Agreement from its office in DC to Greg Vetter in Maryland.

Defendants deny (b) because Tandem Legal initially sent the draft Side Letter Agreement to Plaintiff's General Counsel, Lindsay Thomas, on September 1, 2017, and not to Greg Vetter.

| | |
|---|---|
| From: | Julia Taylor |
| Sent: | Friday, September 01, 2017 2:58 PM |
| To: | Lindsay Thomas |
| Cc: | 'Mike McDevitt' |
| Subject: | Tessemae Lender Docs |
| Attachments: | MM Tessemae Investor Promissory Note FORM_23407_3.DOCX; MM Tessemae Side Letter Agreement_23408_2.DOCX; MM Tessemae Warrant FORM_23409_1.DOCX |

Lindsay

Attached are the following docs:

1. Form of Commercial Promissory Note
2. Form of Warrant
3. Side Letter Agreement between Tessemae and M McDevitt

Once the note and warrant are finalized, we will prepare individual notes and warrant agreements for each of the new lenders.  The total loans are $1.1m.

The side letter formalizes the deal between Tessemae and M McDevitt re: the new units and related matters.

Not sure whom else on your side should be receiving docs.  Feel free to forward.

Defendants further respond that subparagraph (b) falsely describes the Side Letter Agreement, which speaks for itself, and had nothing to do with raising capital.  The Side Letter Agreement was for McDevitt facilitating the loan amendment with Howard Bank:

RE:   Facilitation of Loan Amendment

Dear Mike:

    Over the past several weeks, you have worked tirelessly on the behalf of Tessemae's LLC, a Maryland limited liability company ("**Tessemae**"), in connection with the closing of an amendment to Tessemae's loan documents with Howard Bank as well as securing Howard Bank's agreement to be subordinated on the accounts receivable in order to facilitate a new factoring facility for Tessemae.  In appreciation of your efforts in bringing about the loan amendment and subordination, Tessemae hereby agrees to issue to you, or your designees, 5,779,557 of a new class of units representing membership interests in Tessemae to be called Class C units (the "**Class C Common Units**").

Defendants deny the remaining allegations in this Subparagraph.

*75.*    *As a direct and proximate consequence of McDevitt's racketeering activity and violation of 18 U.S.C. § 1962(c), Tessemae's has suffered damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million.*

Denied.  Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

*76.*    *The Company seeks compensatory damages, treble damages pursuant to 18 U.S.C. § 1964(c), its reasonable attorneys' fees, and costs.*

Denied.  Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

## COUNT III:  NEGLIGENCE – LEGAL MALPRACTICE

### (Against McDevitt and Tandem Legal Group)

*77.*    *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

*78.*    *Tessemae's engaged Tandem as its counsel in 2013 and the attorney-client relationship between Tessemae's and Tandem continued until December 2017.*

Denied.  Plaintiff engaged Tandem Legal as its counsel in October 2013, but Plaintiff elected to terminate that representation in February 2015.

51

79.    *Tandem and McDevitt (Tandem's CEO) owed Tessemae's a reasonable duty of care in handling the Company's affairs. In 2017, they breached that duty in two ways while Tandem was representing Tessemae's.*

Denied.   Tandem Legal has not represented Plaintiff since February 2015.   In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue.

80.    *First, Tandem and McDevitt were engaged in the practice of law in Maryland though (a) McDevitt is not a lawyer, (b) none of Tandem's lawyers were licensed to practice in the state, and (c) Tandem's ownership structure violates Maryland law. The unauthorized practice of law is illegal, and negligence per se. Md. Code Ann., Bus. Occ. & Prof. § 10-606.*

Denied.  Defendants deny that Tandem Legal has ever operated outside of the District of Columbia.   Defendants further deny that Tandem Legal has represented Plaintiff since February 2015.  Defendants further deny that McDevitt was CEO of Tandem Legal in 2017.

81.    *Second, Tandem drafted and counseled Tessemae's to sign the side letter with McDevitt, which was void as a matter of law, see 15 U.S.C. § 78cc(b), and which placed the Company at risk of being liable for violations of federal and state securities laws had it not promptly acted to mitigate the harm caused by McDevitt and Tandem.*

Denied.  Defendants deny that Tandem Legal represented Plaintiff since February 2015. In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue.  Defendants further deny that Tandem Legal counseled Plaintiff on the Side Letter Agreement, which was sent to Plaintiff's General Counsel, who edited the document, put it on Plaintiff's letterhead, and sent the revised version back to Tandem Legal.  Defendants further deny that the Side Letter Agreement is void, or that it had

52

anything to do with raising capital.   The Side Letter Agreement was for McDevitt
facilitating the loan amendment with Howard Bank:

RE:   Facilitation of Loan Amendment

Dear Mike:

   Over the past several weeks, you have worked tirelessly on the behalf of Tessemae's LLC, a Maryland limited liability company ("*Tessemae*"), in connection with the closing of an amendment to Tessemae's loan documents with Howard Bank as well as securing Howard Bank's agreement to be subordinated on the accounts receivable in order to facilitate a new factoring facility for Tessemae.   In appreciation of your efforts in bringing about the loan amendment and subordination, Tessemae hereby agrees to issue to you, or your designees, 5,779,557 of a new class of units representing membership interests in Tessemae to be called Class C units (the "*Class C Common Units*").

82.      *As the direct, proximate, and consequential result of Tandem's and McDevitt's negligence, Tessemae's has suffered actual damages in an amount yet to be precisely determined but reasonably believed to be in excess of $10 million.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

## COUNT IV:  FRAUD

### (Against McDevitt)

83.      *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

84.      *In August 2017, McDevitt falsely represented to the Company that he and Tandem would assist Tessemae's with raising $7-8 million to support it its immediate capital needs. Rather than honor his promise, McDevitt used the Company's urgent need for capital to attempt to take over Tessemae's.*

Denied.  Defendants deny that McDevitt ever attempted to take over Plaintiff, and further deny that McDevitt entered any agreement to raise capital for Plaintiff (let alone $7-8 million).

53

85. *McDevitt knew that his representation was false, and he made it with the intent to deceive Tessemae's. McDevitt made the false representation to the Company with the intention of having the Company rely on it.*

Denied.  Defendants deny that McDevitt ever attempted to take over Plaintiff, and further deny that McDevitt entered any agreement to raise capital for Plaintiff (let alone $7-8 million).

86. *The Company did, in fact, reasonably rely on McDevitt's false representation and it was damaged as a result. Specifically, McDevitt's conduct damaged Tessemae's reputation among prospective investors. In addition, it was forced to seek alternative sources of capital on significantly less favorable terms.*

Denied.  Defendants deny that McDevitt ever attempted to take over Plaintiff, and further deny that McDevitt entered any agreement to raise capital for Plaintiff (let alone $7-8 million).

87. *Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's intentional and malicious conduct, and costs.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

### COUNT V:  CONSTRUCTIVE FRAUD

### (Against McDevitt and Tandem Legal Group)

88. *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

89. *Tandem and Tessemae's were bound in a confidential, attorney-client relationship from 2013 through 2017. Tessemae's reposed trust in Tandem, and Tandem owed a variety of*

*fiduciary duties to Tessemae's, including a duty of loyalty. Pursuant to those duties, Tandem was required to act in the Company's best interest.*

Denied.  Plaintiff engaged Tandem Legal as its counsel in October 2013, but Plaintiff elected to terminate that representation in February 2015, and Tandem Legal has not represented or had any relationship with Plaintiff since that time.  In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue.

90.    *McDevitt also owed Tessemae's a fiduciary duty, both individually and in his capacity as an officer of Tandem, Tessemae's attorneys.  As CEO of Tandem, McDevitt was bound in an attorney client relationship with Tessemae's.  In addition, by virtue of the Company's authorization to allow him to coordinate its fundraising efforts in the fall of 2017, McDevitt owed a fiduciary duty and a duty of loyalty to Tessemae's as its agent.  Tessemae's reposed trust and confidence in McDevitt who had control and influence over Tandem's work for the Company and the Company's representations to prospective investors. Among other things, McDevitt's duties required him to ensure that he and Tandem were acting in the Company's best interest and to refrain from using his positions for his own benefit rather than the Company's.*

Denied.  Plaintiff engaged Tandem Legal as its counsel in October 2013, but Plaintiff elected to terminate that representation in February 2015, and Tandem Legal has not represented or had any relationship with Plaintiff since that time.  In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue. Defendants further deny that McDevitt was the "agent" of Plaintiff in 2017, or that he owed any duty to Plaintiff.

91.    *McDevitt and Tandem breached their duties to Tessemae's intentionally, with malice and/or reckless disregard for Tessemae's rights by using their positions of trust and confidence for McDevitt's benefit and not the Company's. Among other things, Tandem and*

*McDevitt advised the Company to sign the side letter notwithstanding the fact that it contained terms that violated both federal and state securities laws. In addition, McDevitt used his position to make multiple false representations to prospective investors about the Company and its leadership for his own benefit and in furtherance of his scheme to gain control of Tessemae's.*

Denied.  Plaintiff engaged Tandem Legal as its counsel in October 2013, but Plaintiff elected to terminate that representation in February 2015, and Tandem Legal has not represented or had any relationship with Plaintiff since that time.  In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue. Defendants further deny that McDevitt was the "agent" of Plaintiff in 2017, or that he owed any duty to Plaintiff.  Neither Tandem Legal nor McDevitt "advised" Plaintiff to enter into the Side Letter Agreement; Tandem Legal sent the draft side letter to Plaintiff's General Counsel, Lindsay Thomas.  Defendants further deny that McDevitt made any false representation to any actual or potential investor, or that there was any "scheme to gain control" of Plaintiff.

92.    *Tessemae's has been damaged as a direct, proximate, and consequential result of Tandem's and McDevitt's breaches of their duties to the Company. The Company lost profits because it was unable to meet its capital needs on time and its reputation and its relationship with prospective investors was harmed. The Company was also forced to make a rescission offering to individuals who invested money in the Company based on McDevitt's misrepresentations, which caused it to incur attorneys' fees and costs, and which required it to repay the participants in that offering with interest. In addition, Tessemae's was forced to seek alternative sources of capital on significantly less favorable terms than it would have received if McDevitt and Tandem had not breached the duties they owed to the Company.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

93.   *Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's and Tandem's intentional and malicious conduct, and costs.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

## COUNT VI:  BREACH OF FIDUCIARY DUTY

## (Against McDevitt and Tandem Legal Group)

94.   *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*
Defendants incorporate their answers to the preceding Paragraphs.

95.   *Tandem and Tessemae's were bound in a confidential, attorney-client relationship from 2013 through 2017. Tessemae's reposed trust in Tandem, and Tandem owed a variety of fiduciary duties to Tessemae's, including a duty of loyalty. Pursuant to those duties, Tandem was required to act in the Company's best interest.*

Denied.  Plaintiff engaged Tandem Legal as its counsel in October 2013, but Plaintiff elected to terminate that representation in February 2015, and Tandem Legal has not represented or had any relationship with Plaintiff since that time.  In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue.

96.   *McDevitt also owed Tessemae's a fiduciary duty, both individually and in his capacity as an officer of Tandem, Tessemae's attorneys. As CEO of Tandem, McDevitt was bound in an attorney-client relationship with Tessemae's. In addition, by virtue of the Company's authorization to allow him to coordinate its fundraising efforts in the fall of 2017, McDevitt owed a fiduciary duty and a duty of loyalty to Tessemae's as its agent. Tessemae's reposed trust and*

*confidence in McDevitt who had control and influence over Tandem's work for the Company and the Company's representations to prospective investors. Among other things, McDevitt's duties required him to ensure that he and Tandem were acting in the Company's best interest and to refrain from using his positions for his own benefit rather than the Company's.*

Denied.  Plaintiff engaged Tandem Legal as its counsel in October 2013, but Plaintiff elected to terminate that representation in February 2015, and Tandem Legal has not represented or had any relationship with Plaintiff since that time.  In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue. Defendants further deny that McDevitt was the "agent" of Plaintiff in 2017, or that he owed any duty to Plaintiff.  The remainder of this paragraph is denied.

97.    *McDevitt and Tandem breached their duties to Tessemae's intentionally, with malice and/or reckless disregard for Tessemae's rights by using their positions of trust and confidence for McDevitt's benefit and not the Company's. Among other things, Tandem and McDevitt advised the Company to sign the side letter notwithstanding the fact that it contained terms that violated both federal and state securities laws. In addition, McDevitt used his position to make multiple false representations to prospective investors about the Company and its leadership for his own benefit and in furtherance of his scheme to gain control of Tessemae's.*

Denied.  Plaintiff engaged Tandem Legal as its counsel in October 2013, but Plaintiff elected to terminate that representation in February 2015, and Tandem Legal has not represented or had any relationship with Plaintiff since that time.  In 2017, Plaintiff was represented by its General Counsel, Lindsay Thomas, and later by Nemphos Braue. Defendants further deny that McDevitt was the "agent" of Plaintiff in 2017, or that he owed any duty to Plaintiff.  Neither Tandem Legal nor McDevitt "advised" Plaintiff to enter into the Side Letter Agreement; Tandem Legal sent the draft side letter to Plaintiff's General

58

Counsel, Lindsay Thomas.   Defendants further deny that McDevitt made any false representation to any actual or potential investor, or that there was any "scheme to gain control" of Plaintiff.

98.      *Tessemae's has been damaged as a direct, proximate, and consequential result of Tandem's and McDevitt's breaches of their duties to the Company. The Company lost profits because it was unable to meet its capital needs on time and its reputation and its relationship with prospective investors was harmed. The Company was also forced to make a rescission offering to individuals who invested money in the Company based on McDevitt's misrepresentations, which caused it to incur attorneys' fees and costs, and which required it to repay the participants in that offering with interest. In addition, Tessemae's was forced to seek alternative sources of capital on significantly less favorable terms than it would have received if McDevitt and Tandem had not breached the duties they owed to the Company.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

99.      *Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's and Tandem's intentional and malicious conduct, and costs.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

## COUNT VII:  Civil Conspiracy

## (Against McDevitt, Intlekofer, and Chehansky)

100.      *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

101.    *In or about August or September 2017, McDevitt, Intlekofer, and Chehansky*
*entered into an agreement to attempt to seize control of the Company.*

Denied.  There was no agreement between McDevitt, Intlekofer, and Chehansky to attempt
to seize control of Plaintiff.

In the summer of 2017, Plaintiff was hours away from bankruptcy when Greg Vetter asked
McDevitt to rescue the Company.  The reality of Plaintiff's situation is reflected in an email
from Board Member Demian Costa to Greg Vetter on August 23, 2017.  Costa stated that
Plaintiff's two largest investors had "written this investment off as a Zero," and was
reduced to suggesting what amounted to bank fraud.  Specifically, he stated that he would
liquidate all of his personal assets to make it appear as if Plaintiff were not bankrupt, but
that, "[w]ithout a 100% guarantee that it is coming back, I can't do it."  Costa stated that
"we must resolve today or its over anyway."

Plaintiff was in default on its loans to Howard Bank and was effectively bankrupt.
McDevitt was initially contacted by Howard Bank, not Greg Vetter, and Howard Bank
informed McDevitt that Plaintiff was in default and that Howard Bank was going to
exercise McDevitt's $1 million Personal Guarantee.  It was at that point that McDevitt
contacted Greg Vetter, who asked McDevitt to intervene and rescue Plaintiff from
imminent bankruptcy.  McDevitt did so, working with Howard Bank to restructure
Plaintiff's debt and subordinate their lending position, and also agreeing to renew his
Personal Guarantee at far greater risk given the absence of Plaintiff's accounts receivables
as security.

102.    *Pursuant to the agreement, McDevitt falsely represented to the Company that he*
*would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented*

*that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by October 1, 2017.*

Denied.  There was no agreement between McDevitt, Intlekofer, and Chehansky to attempt to seize control of Plaintiff.  There was also no agreement by McDevitt to raise capital for Plaintiff.  The Side Letter Agreement was to obtain a loan modification.

*103.   Pursuant to the agreement, McDevitt, Intlekofer, and Chehansky falsely represented to the investors that they (McDevitt, Intlekofer, and Chehansky) were in control of the Company including that Chehansky was the Company's CEO. On information and belief, they also falsely represented to the investors that the Company had major accounting issues and that Greg and the Vetter family were stealing from the Company.*

Denied.  There was no agreement between McDevitt, Intlekofer, and Chehansky to attempt to seize control of Plaintiff.  Defendants also deny that any of McDevitt, Intlekofer or Chehansky made any false representation to any actual or potential investor.

Defendants alerted Plaintiff to a number of financial irregularities that had been identified by a potential investor during due diligence, *inter alia*: (i) that Plaintiff was spending $123,000 *per month* on an accounting firm in 2017; (ii) that Greg Vetter had taken an unsecured loan from Plaintiff for roughly $500,000; and (iii) that Plaintiff was paying Greg Vetter's father a salary of $150,000 for a charity that did not exist.

(i) the outstanding debt was roughly double what Plaintiff had disclosed in its financial statements and to Defendants;

(ii) that Plaintiff was spending $123,000 *per month* on an accounting firm in 2017;

(iii) that Greg Vetter had taken an unsecured loan from Plaintiff for roughly $500,000; and

(iv) that Plaintiff was paying Greg Vetter's father a salary of $150,000 for a charity that did not exist.

104.    *In addition, McDevitt falsely represented to the investors that by participating in the capital raise they held a secured first position by purchasing the Company's debt, when, in fact, they had simply paid down the Company's line of credit.*

Denied.  Defendants deny that McDevitt made any false representation to any actual or potential investor.

105.    *Tessemae's has been damaged as a direct, proximate, and consequential result of McDevitt's, Intlekofer's, and Chehansky's conspiracy and unlawful conduct. The Company lost profits because it was unable to meet its capital needs on time and its reputation and its relationship with prospective investors was harmed. In addition, the Company was forced to make a rescission offering to individuals who invested money in the Company based on McDevitt's, Intlekofer's, and Chehansky's misrepresentations, which violated both state and federal securities laws, and which caused Tessemae's to incur attorneys' fees and costs, and which required it to repay the participants in the offering with interest. In addition, Tessemae's was forced to seek alternative sources of capital on significantly less favorable terms than it would have received if McDevitt, Intlekofer, and Chehansky's conspiracy had not harmed its relationships with prospective investors.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

106.    *Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's, Intlekofer's, and Chehansky's intentional and malicious conduct, and costs.*

Denied. Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

**COUNT VIII**: **TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

**(Against McDevitt, Intlekofer, and Chehansky)**

*107.    Plaintiff incorporates each of the foregoing allegations as if fully restated herein.* Defendants incorporate their answers to the preceding Paragraphs.

*108.    In or about August or September 2017 McDevitt falsely represented to the Company that he would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by October 1, 2017. Rather than doing so, he used the opportunity to conspire with Intlekofer and Chehansky to attempt to take over the Company.*

Denied. There was no agreement between McDevitt, Intlekofer, and Chehansky to attempt to seize control of Plaintiff. McDevitt also never entered into any agreement to raise capital for Plaintiff.

*109.    Throughout the late summer and fall of 2017, McDevitt, Intlekofer, and Chehansky falsely represented to prospective investors that they were in control of the Company and that Chehansky was the Company's CEO.*

Denied. There was no agreement between McDevitt, Intlekofer, and Chehansky to attempt to seize control of Plaintiff. Defendants also deny that any of McDevitt, Intlekofer or Chehansky made any false representation to any actual or potential investor.

*110.    On information and belief, they also falsely represented to prospective investors that the Company had major accounting issues and that Greg and the Vetter family were stealing from the Company.*

Denied. There was no agreement between McDevitt, Intlekofer, and Chehansky to attempt to seize control of Plaintiff. Defendants also deny that any of McDevitt, Intlekofer or Chehansky made any false representation to any actual or potential investor.

Defendants alerted Plaintiff to a number of financial irregularities that had been identified by a potential investor during due diligence, *inter alia*:

> (i) the outstanding debt was roughly double what Plaintiff had disclosed in its financial statements and to Defendants;
>
> (ii) that Plaintiff was spending $123,000 *per month* on an accounting firm in 2017;
>
> (iii) that Greg Vetter had taken an unsecured loan from Plaintiff for roughly $500,000; and
>
> (iv) that Plaintiff was paying Greg Vetter's father a salary of $150,000 for a charity that did not exist.

*111. McDevitt's, Intlekofer's, and Chehansky's conduct was intentional, willful, and calculated to cause damage to Tessemae's lawful business. Their conduct was perpetrated with the intentional and improper purpose of causing damage to Tessemae's and was without justifiable cause.*

This Paragraph contain only conclusions of law for which no response is required. To the extent that Paragraph contains factual allegations, those allegations are denied.

*112. Tessemae's has been damaged as a direct, proximate, and consequential result of McDevitt's, Intlekofer's, and Chehansky's conduct. The Company lost profits because it was unable to meet its capital needs on time and its reputation and its relationship with prospective investors has been harmed. In addition, the Company was forced to make a rescission offering to individuals who invested money in the Company based on McDevitt's, Intlekofer's, and Chehansky's misrepresentations, which violated both state and federal securities laws, and which*

*caused Tessemae's to incur attorneys' fees and costs, and which required it to repay the participants in the offering with interest. In addition, Tessemae's was forced to seek alternative sources of capital on significantly less favorable terms than it would have received if McDevitt, Intlekofer, and Chehansky had not interfered with its relationships with prospective investors.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

*113.   Tessemae's seeks compensatory damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15 million, punitive damages for McDevitt's, Intlekofer's, and Chehansky's intentional and malicious conduct, and costs.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

## COUNT IX:  BREACH OF CONTRACT

## (Against McDevitt)

*114.   Plaintiff incorporates each of the foregoing allegations as if fully restated herein.* Defendants incorporate their answers to the preceding Paragraphs.

*115.   In or about September 2017, McDevitt falsely represented to the Company that he would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by October 1, 2017. In return for doing so, Tessemae's agreed to issue McDevitt additional equity and to pay him $100,000 for his efforts and expenses.*

Denied.   There was no agreement for McDevitt to raise capital for Plaintiff, much less to raise $7-8 million in a matter of weeks for a company that was bankrupt and more than $20 million in debt.  Defendants also deny that Plaintiff agreed to issue equity to McDevitt or pay him for raising capital.

As memorialized in the Side Letter Agreement, Plaintiff agreed to issue profit interests to McDevitt for working with Howard Bank to restructure Plaintiff's debt and subordinate their lending position, which required him to renew his $1,000,000 Personal Guarantee at far greater risk given the absence of Plaintiff's accounts receivables as security.

RE:   Facilitation of Loan Amendment

Dear Mike:

   Over the past several weeks, you have worked tirelessly on the behalf of Tessemae's LLC, a Maryland limited liability company ("*Tessemae*"), in connection with the closing of an amendment to Tessemae's loan documents with Howard Bank as well as securing Howard Bank's agreement to be subordinated on the accounts receivable in order to facilitate a new factoring facility for Tessemae.  In appreciation of your efforts in bringing about the loan amendment and subordination, Tessemae hereby agrees to issue to you, or your designees, 5,779,557 of a new class of units representing membership interests in Tessemae to be called Class C units (the "*Class C Common Units*").

Plaintiff also agreed to reimburse McDevitt for the legal, accounting, and other associated costs, which was estimated at $100,000, none of which McDevitt retained.

*116.    Tessemae's and McDevitt entered into a "side letter" memorializing their agreement.*

Admitted.

*117.    Tessemae's paid McDevitt the $100,000 as agreed. McDevitt, however, breached the agreement by failing to raise the additional $6-7 million by October 1, 2017, as he had promised.*

Denied.  There was no agreement for McDevitt to raise capital for Plaintiff, much less to raise $7-8 million in a matter of weeks for a company that was bankrupt and more than $20 million in debt.  Defendants also deny that Plaintiff agreed to issue equity to McDevitt or pay him for raising capital.

As memorialized in the Side Letter Agreement, Plaintiff agreed to issue profit interests to McDevitt for working with Howard Bank to restructure Plaintiff's debt and subordinate

their lending position, and also for agreeing to renew his $1,000,000 Personal Guarantee at far greater risk given the absence of Plaintiff's accounts receivables as security. Plaintiff also agreed to reimburse McDevitt for the legal, accounting, and other associated costs, which was estimated at $100,000, none of which McDevitt retained.

118.    *In addition, because Mr. McDevitt raised the $1.1 million illegally, based on misrepresentations, the Company had to make a rescission offering and all of the funds were returned to the individuals who paid them, plus interest.*

Denied.  Defendants deny that McDevitt ever made any false representation to any actual or potential investor.  Defendants further deny that "McDevitt raised the $1.1 million illegally," or that there was any justification for Plaintiff to make a rescission offering.

119.    *Notwithstanding his failure to perform, and despite the Company's demand, McDevitt has not returned the $100,000 he received from Tessemae's.*

Denied.  McDevitt fully performed his obligations under the Side Letter Agreement.

As memorialized in the Side Letter Agreement, Plaintiff agreed to issue profit interests to McDevitt for working with Howard Bank to restructure Plaintiff's debt and subordinate their lending position, and also for agreeing to renew his $1,000,000 Personal Guarantee at far greater risk given the absence of Plaintiff's accounts receivables as security. Plaintiff also agreed to reimburse McDevitt for the legal, accounting, and other associated costs, which was estimated at $100,000, none of which McDevitt retained.

120.    *As a direct, proximate, and consequential result of McDevitt's breach, the Company has suffered damages in an amount yet to be precisely determined but reasonably believed to be in excess of $15.1 million.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

## COUNT X:  UNJUST ENRICHMENT

### (Against McDevitt)

121.    *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

122.    *In or about September 2017, McDevitt falsely represented to the Company that he would raise money to help Tessemae's meet its capital needs. Specifically, McDevitt represented that he would raise $1.1 million by September 1, 2017, and an additional $6-7 million by October 1, 2017.*

Denied.  There was no agreement for McDevitt to raise capital for Plaintiff, much less to raise $7-8 million in a matter of weeks for a company that was bankrupt and more than $20 million in debt.  Defendants also deny that Plaintiff agreed to issue equity to McDevitt or pay him for raising capital.

As memorialized in the Side Letter Agreement, Plaintiff agreed to issue profit interests to McDevitt for working with Howard Bank to restructure Plaintiff's debt and subordinate their lending position, and also for agreeing to renew his $1,000,000 Personal Guarantee at far greater risk given the absence of Plaintiff's accounts receivables as security. Plaintiff also agreed to reimburse McDevitt for the legal, accounting, and other associated costs, which was estimated at $100,000, none of which McDevitt retained.

123.    *Tessemae's paid McDevitt $100,000 for his efforts and expenses. McDevitt, however, made no effort to raise the additional $6-7 million by October 1, 2017, as he stated he would.*

Denied.  There was no agreement for McDevitt to raise capital for Plaintiff, much less to raise $7-8 million in a matter of weeks for a company that was bankrupt and more than $20

million in debt.  Defendants also deny that Plaintiff agreed to issue equity to McDevitt or

pay him for raising capital.

As memorialized in the Side Letter Agreement, Plaintiff agreed to issue profit interests to

McDevitt for working with Howard Bank to restructure Plaintiff's debt and subordinate

their lending position, which required him to renew his $1,000,000 Personal Guarantee at

far greater risk given the absence of Plaintiff's accounts receivables as security. Plaintiff

also agreed to reimburse McDevitt for the legal, accounting, and other associated costs,

which was estimated at $100,000, none of which McDevitt retained.

*124.    Notwithstanding that fact, and despite the Company's demand, McDevitt refused*

*to return the $100,000 he received.*

Denied.  As memorialized in the Side Letter Agreement, Plaintiff agreed to reimburse

McDevitt for the legal, accounting, and other associated costs, which was estimated at

$100,000, none of which McDevitt retained.

*125.    McDevitt was aware of, and had knowledge of, the benefit he received by having*

*use of the Company's funds. His acceptance and retention of those funds in the face of his false*

*representation to raise capital for the Company is inequitable and Tessemae's has suffered*

*damages in an amount yet to be precisely determined but reasonably believed to be in excess of*

*$100,000.*

Denied.   Defendants deny that Plaintiff has been damaged or suffered any legally

cognizable injury, or that Plaintiff is entitled to any legal or equitable remedy.

### COUNT XI:  INJUNCTIVE RELIEF – REMOVAL

**Maryland Common Law**
**(Against McDevitt, Connors, Dunst, and Intlekofer)**

*126.    Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

127.    *Maryland law permits a limited liability company to remove a member to defend itself from abuse.*

This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

128.    *McDevitt, Connors, Dunst, and Intlekofer are members of Tessemae's. Each of them has caused substantial harm to the Company by (a) unlawfully stealing equity (in the case of McDevitt, Connors, and Dunst), and (b) making false representations to the Company's investors and prospective investors (in the case of McDevitt and Intlekofer).*

Defendants admit that McDevitt, Connors, Dunst, and Intlekofer are members of Plaintiff. Defendants deny that any of them has caused harm to Plaintiff, stolen equity, or made any false representation to any actual or potential investor.

Defendants further respond that Connors and Dunst received equity in lieu of salary and worked for Plaintiff full time.  Connors received additional equity for investing $200,000, and for providing a personal guarantee for Plaintiff's $1,000,000 line of credit.

Defendants further respond that Intlekofer received equity in exchange for investing $75,000.

Finally, Defendants respond that McDevitt received equity for investing $500,000, for providing a personal guarantee for Plaintiff's $1,000,000 line of credit, and for providing additional personal guarantees for Plaintiff's debts.

129.    *To protect itself from further abuse, Tessemae's seeks an Order from this Court removing McDevitt, Connors, Dunst, and Intlekofer as members.*

This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

## COUNT XII:  DECLARATORY JUDGMENT

### Md. Code Ann. Cts & Jud. Proc. § 3-409
### (Against McDevitt, Connors, and Dunst)

130.    *Plaintiff incorporates each of the foregoing allegations as if fully restated herein.*

Defendants incorporate their answers to the preceding Paragraphs.

131.    *In 2013, Tessemae's agreed to grant McDevitt, Connors, and Dunst equity in the Company based on their successful execution of Project 25.*

Denied.  Defendants deny that any equity received by McDevitt, Connors, or Dunst was ever contingent on "Project 25" or anything else.

132.    *On January 2, 2014, Tessemae's, relying on McDevitt's advice that the shares could be "clawed back" if Project 25 was unsuccessful, issued the following equity holdings to McDevitt, Connors, and Dunst:*

    *a.    January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Herman Dunst;*

    *b.    January 2, 2014, transfer of Preferred Units worth 2 percent of the Company to Brendan Connors;*

    *c.    January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Brendan Connors;*

    *d.    January 2, 2014, transfer of Preferred Units worth 2.5 percent of the Company to Michael McDevitt.*

Denied.  Defendants deny that any equity received by McDevitt, Connors, or Dunst was ever contingent on "Project 25" or anything else, and deny that McDevitt represented otherwise to Plaintiff.

The 2 percent equity grants to Dunst and Connors were in lieu of salary of $200,000 for each.

The 2.5 percent equity grants to Connors and McDevitt had nothing whatsoever to do with Plaintiff's performance.  They were compensation for the initial Personal Guarantee of $1,000,000 by Connors and McDevitt.

*133.    Because Project 25 was a complete failure McDevitt, Connors, and Dunst failed to fulfill the conditions precedent to the grants.*

Denied.  Defendants deny that any equity received by McDevitt, Connors, or Dunst was ever contingent on "Project 25" or anything else, and deny that McDevitt represented otherwise to Plaintiff.

The 2 percent equity grants to Dunst and Connors were in lieu of salary of $200,000 for each.

The 2.5 percent equity grants to Connors and McDevitt had nothing whatsoever to do with Plaintiff's performance.  They were compensation for the initial Personal Guarantee of $1,000,000.

*134.    In addition, the subscription documents for the January 2, 2014, transfers of Preferred Units worth 2 percent of the Company to Dunst, and Preferred Units with 2 percent of the Company to Connors do not reflect any consideration for those grants.*

This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

*135.    Because McDevitt, Connors, and Dunst failed to fulfill the conditions precedent to the grants and/or because the subscription documents do not reflect any consideration for them, on May 29, 2020, the Company rescinded the grants identified above.*

Denied.  Defendants deny Plaintiff had either the authority or justification to rescind any equity grants, much less equity grants from January 2014.  Defendants further deny that any equity received by McDevitt, Connors, or Dunst was ever contingent on "Project 25" or anything else, and deny that McDevitt represented otherwise to Plaintiff.

The 2 percent equity grants to Dunst and Connors were in lieu of salary of $200,000 for each.

The 2.5 percent equity grants to Connors and McDevitt had nothing whatsoever to do with Plaintiff's performance.  They were compensation for the initial Personal Guarantee of $1,000,000.

136.     *On the same date, the Company also cancelled McDevitt's holding of Class B Units, which the Company never agreed to and for which there is no documentation confirming the transfer or indicating McDevitt's subscription.*

Denied.  Defendants deny Plaintiff had either the authority or justification to rescind any equity grants, much less equity grants from January 2014.  Defendants further deny that Plaintiff never agreed to grant McDevitt Class B units, and also deny that there is no documentation for those grants.  Plaintiff provided that Class B equity to McDevitt in exchange for providing an additional $500,000 Personal Guarantee.

137.     *The Company provided Dunst, Connors, and McDevitt notice of its action on June 1, 2020.*

Denied.

138.     *McDevitt, Connors, and Dunst claim that the Company's action was improper and that Tessemae's did not have the authority to cancel the grants made on January 2, 2014. McDevitt further contends that Tessemae's did not have the authority to cancel his holding of Class B Units.*

Denied.  Defendants have had no communications with Plaintiff or its counsel regarding Plaintiff's purported actions regarding Defendants' respective equity holdings.

*139.   An actual controversy of a justiciable issue exists between Tessemae's and McDevitt, Connors, and Dunst, respectively, within the jurisdiction of this Court, involving the rights and liabilities of the parties.*

This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

*140.   Antagonistic claims are present between the parties, which indicate imminent and inevitable litigation.*

This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

*141.   A declaratory judgment by this Court will terminate this controversy.*

This Paragraph contain only conclusions of law for which no response is required.  To the extent that Paragraph contains factual allegations, those allegations are denied.

## AFFIRMATIVE DEFENSES

Defendants' affirmative defenses to Plaintiff's First Amended Complaint are set forth below.  By setting forth the following allegations and defenses, however, Defendants do not assume the burden of proof on matters and issues other than those on which they have the burden of proof as a matter of law.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The asserted claims are barred, in whole or in part, to the extent that there is no legal injury.

### THIRD AFFIRMATIVE DEFENSE

The claims are time-barred, in whole or in part, under the applicable statutes of limitations, statutes of repose and/or by the doctrines of waiver, estoppel and/or laches.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff may be barred, in whole or in part, from recovery because they have made statements or taken actions which estop them from asserting their claims.

### FIFTH AFFIRMATIVE DEFENSE

The claims are barred, in whole or in part, to the extent any injury sustained by Plaintiff was caused by their own conduct, whether negligent or otherwise.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff may not seek equitable relief because they have an adequate remedy at law.

### SEVENTH AFFIRMATIVE DEFENSE

The claims are barred, in whole or in part, to the extent Plaintiff has failed to mitigate damages and/or has caused some or all of the alleged damage of which they now complain.

### EIGHTH AFFIRMATIVE DEFENSE

The claims are barred, in whole or in part, to the extent that Plaintiff engaged in unlawful, inequitable or improper conduct.

## NINTH AFFIRMATIVE DEFENSE

The claims are barred, in whole or in part, by the doctrine of unclean hands.

## TENTH AFFIRMATIVE DEFENSE

The claims are barred, in whole or in part, because the damages alleged are speculative and are therefore barred.

## ELEVENTH AFFIRMATIVE DEFENSE

The claims are barred, in whole or in part, because Plaintiff lacks standing.

## TWELVTH AFFIRMATIVE DEFENSE

The claims are not properly before this Court based on forum selection and dispute resolution clauses in relevant contracts.

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiff's First Amended Complaint with prejudice and:

1.      Enter judgement in the above-captioned matter in favor of Defendants on each of Plaintiff's claims.

2.      Order Plaintiff to pay Defendants their attorneys' fees, costs and expenses incurred in defending this matter pursuant to Plaintiff's Operating Agreement.

3.      Award Defendants any further relief as this Court deems just and proper.

### COUNTERCLAIM AND JURY DEMAND BY MICHAEL MCDEVITT FOR BREACH OF CONTRACT AND SPECIFIC PERFORMANCE

1.   Counter-Defendant Tessemae's, LLC ("Tessemae's" or the "Company") is a Maryland limited liability company that manufactures salad dressing.  Tessemae's is headquartered in Anne Arundel County in the State of Maryland, with its principal place of business at 8805 Kelso Dr, Essex, Maryland.

2.   This action arises from a fully executed contract (the "Side Letter Agreement"), attached as Exhibit 1, under which Tessemae's agreed to issue certain profit sharing units in consideration to McDevitt for working to restructure Tessemae's debt, and for agreeing to accept additional risk on a personal guarantee for a portion of the Tessemae's outstanding debt.

3.   The Side Letter Agreement addressed to McDevitt begins by stating: "Over the past several weeks, **you have worked tirelessly on behalf of Tessemae's** . . . in connection with the closing of an amendment to Tessemae's loan documents with Howard Bank."   (Exhibit 1 (emphasis added).)  It then provides that, as consideration, "Tessemae's hereby agrees to issue to you, or your designees, 5,779,557 of a new class of units representing membership interests in Tessemae's."

4.   As stated by Tessemae's, McDevitt did in fact "work tirelessly" to rescue Tessemae's from the brink of bankruptcy.  McDevitt was able to convince Howard Bank to restructure the Company's debt and subordinate their lending position.  Further, that agreement by Howard Bank was made possible by McDevitt agreeing to accept additional risk on his personal guarantee.

5.   Importantly, McDevitt was only willing to accept that increased risk because the Side Letter Agreement granted McDevitt additional oversight, control, and veto rights over certain corporate decisions.  Specifically, McDevitt insisted upon and was granted veto rights over, *inter alia,* distributions to members, "compensation of senior management, including the CEO," and any "changes in accountants and/or accounting practices."  (Exhibit 1, at 2.)

6.   Tessemae's accepted and has retained the benefits of McDevitt's performance and imposed the costs on McDevitt of accepting the additional risk from the personal guarantee.  Tessemae's, however, has utterly and completely breached its agreement, flatly refusing to issue the promised units to McDevitt.

7.   McDevitt is seeking Specific Performance of the Side Letter Agreement, because a damages award cannot address the additional voting rights and oversight.  Those rights are of critical importance because the Company's Board of Managers has failed to correct Tessemae's unsustainable financial trajectory.

8.   In 2017 alone, the Company's debt nearly doubled to more than $20,000,000, which is more than the annual revenue.  Specific performance is required to provide McDevitt with the ability to mitigate the increasing risk of foreclosure on his personal guarantee.

## Statement of Facts

### Origin of the Parties' Relationship

9.   Tessemae's is a salad dressing company founded in 2009 by CEO and Board Member Gregory Vetter ("Mr. Vetter").

10. McDevitt is one of the largest shareholders of Tessemae's, having first invested in Tessemae's in 2013.

11. McDevitt has invested additional funds since 2013.

12. McDevitt has served as an adviser to the Company.

13. McDevitt has provided multiple personal guarantees for Tessemae's loan obligations to Howard Bank.

14. In 2013, Tessemae's was on the verge of bankruptcy.

15. Its principal lender, Howard Bank, decided to connect Tessemae's with someone who had a proven track record in the diet/weight loss market.

16. McDevitt is the former CEO of Medifast, Inc.

17. A Howard Bank employee introduced Tessemae's to McDevitt in 2013.

18. Tessemae's sales increased in 2014 compared to 2013.

19. In 2014, two federal judgment liens were entered against Tessemae's and Mr. Vetter in Maryland state court.

20. In 2015, a state tax lien was entered against Tessemae's in Maryland state court.

21. In 2013, McDevitt was affiliated with Tandem Legal Group, LLC ("Tandem Legal").

22. A document dated August 15, 2013 is attached as Exhibit 2.

23. A portion of Exhibit 2, at 1, is reproduced here:



August 15, 2013

**VIA E-MAIL**

Tessemae's LLC
839 Bestgate Road
Annapolis, MD 21401
Attn: Greg Vetter, CEO
oldest@tessemaes.com

Re:     Conflict Waiver

Dear Greg:

TANDEM Legal Group LLC.
829 7th St. NW
DC 20001

O 202.969.0100
F 202.969.0099

24. A portion of Exhibit 2, at 3, is reproduced here:

**ACKNOWLEDGMENT AND CONSENT**

    The undersigned acknowledges that he has read this letter on behalf of the Company, confirms his understanding of the information included in this letter, and agrees, on behalf of the Company, to waive any potential conflicts of interest and to continue to have the Firm render legal services on the Company's behalf and any investment by the Firm in the Company. The undersigned further acknowledges being advised to consult separate independent legal counsel concerning the waivers set forth above and has done so prior to executing this document.

Tessemae's LLC, a Maryland limited liability company

By: _____
Name: Greg Vetter
Title:   Manager

Dated as of: August 15, 2013

25. Tandem Legal billed Tessemae's for its services on an hourly basis.

26. Tessemae's paid the invoices it received from Tandem Legal.

27. The documents attached as Exhibit 3 are the cover pages for the seventeen invoices that Tandem Legal sent to Tessemae's.

28. Invoice # 01007.0001.0001 is the earliest invoice, dated October 31, 2013.

29. Invoice #01007.0001.0017 is the latest invoice, dated February 28, 2015.

30. The final time entry by any attorney or paralegal is by paralegal Tracey Watson, on February 12, 2015, for 0.5 hours, with the description "Prepare client files for transfer to new counsel."

31. An email chain, dated February 10, 2015, appears as Exhibit 4.

32. A portion of Exhibit 4 is reproduced here:



> **From:** Greg Vetter [mailto:oldest@tessemaes.com]
> **Sent:** Tuesday, February 10, 2015 5:43 PM
> **To:** Lauren Laitin; Nick Giannuzzi
> **Subject:** The Gianuzzi Group
>
> Not sure how that sent without me pushing send. Anyway, Nick is going to represent me and Tessemaes moving forward. Please set up a time to connect and transfer all required information. Thank you.
>
> --
>
> Greg Vetter
> Oldest Brother
> Tessemae's All Natural

33. A second portion of Exhibit 4 is reproduced here:

> On Tue, Feb 10, 2015 at 5:57 PM, Lauren Laitin <lauren@tndm.com> wrote:
>
> Hey Greg,
>
> Just for clarification, will I be sending everything to Nick, or will he just be representing you with respect to TK?
>
> Lauren

34. A third portion of Exhibit 4 is reproduced here:

**From:** Greg Vetter <oldest@tessemaes.com>
**Date:** February 10, 2015 at 5:58:23 PM EST
**To:** Lauren Laitin <lauren@tndm.com>
**Subject: Re: The Gianuzzi Group**

everything

35. Tandem sent Tessemae's client file to The Giannuzzi Group, LLP.

36. By the end of 2015, Tessemae's was also represented by law firm Offit Kurman.

37. From early 2017 to 2019, Lindsay Thomas served as General Counsel for Tessemae's.

38. Ms. Thomas graduated from Cornell Law School in 2011.

39. Between 2011 and 2017, Ms. Thomas practiced at Simpson Thacher & Bartlett, LLP, and Kirkland & Ellis, LLP.

40. An email chain dated November 6-8, 2017 is attached as Exhibit 5.

41. A portion of Exhibit 5 is reproduced here:

**From:** Lindsay Thomas [mailto:lindsay@tessemaes.com]
**Sent:** Monday, November 6, 2017 1:40 PM
**To:** Julia Taylor <julia@tndm.com>; Greg Vetter <oldest@tessemaes.com>
**Cc:** Mike McDevitt <mmcdevitt@tk.co>; George J Nemphos <GJNemphos@NemphosBraue.com>
**Subject:** RE: Status Update

Thanks for following up, Julia.

As mentioned on our call last week, I've copied George Nemphos – our outside corporate counsel who is up to speed and in the midst of preparing a markup to discuss with you. George and I will circle back with you soon.

<image003.png>
**Lindsay Thomas**
Chief of Staff
C: 703-795-1035
O: 855.MYTESSE
www.tessemaes.com

42. Another portion of Exhibit 5 is reproduced here:

On Nov 8, 2017, at 5:31 PM, George J Nemphos <GJNemphos@NemphosBraue.com> wrote:

Julia,

I am going through the operating agreement and will send you comments late in the day tomorrow.

Thanks

**GEORGE J. NEMPHOS**

<image002.png>

100 West Pennsylvania Ave Suite 101 G
Baltimore, Maryland 21204
O: 410.321.8200 | Fax 410.616.0244
M: 443.794.4214 | Vcard

**Tessemae's Was Facing Imminent Bankruptcy and Asked McDevitt to Rescue It**

43. An email dated August 23, 2017 is attached as Exhibit 6.

44. Exhibit 6 is reproduced below:

**From:** Demian Costa <dcosta@plankindustries.com>
**Sent:** Wednesday, August 23, 2017 10:38:34 AM
**To:** Greg Vetter
**Subject:** Note to Mike and Howard

Greg – here is where we are on our end. I think it is relevant to Mike McDevitt and Howard Bank.

Kevin and Scott have written this investment off as a Zero. All I can do from this point is leverage my limited personal assets to save my friends money as best I can. I am personally guaranteeing the $600k pledge to Howard, which is money I don't have, in order to get it back when the factoring capital comes in. Without a 100% guarantee that it is coming back, I can't do it. This is literally everything I have. It is a timing issue that we must resolve today or its over anyway. Hopefully all parties get where we are and make this happen. We will live to fight another day and potentially long enough to be in a position to get our money back. This is my Hail Mary. Cheers



DEMIAN COSTA
Managing Partner

**SAGAMORE VENTURES**

45. In August 2017, McDevitt received a phone call from Howard Bank regarding Tessemae's outstanding loans and McDevitt's personal guarantee.

46. Howard Bank informed McDevitt that Tessemae's had defaulted on its loans, that it intended to foreclose on Tessemae's debts, that Tessemae's was facing bankruptcy, and that it would no longer attempt to continue working with Mr. Vetter.

47. In or before August of 2017, Tessemae's Howard Bank loan or loans.

48. McDevitt convinced Howard Bank to temporarily refrain from foreclosing on the defaulted loans, providing McDevitt with a brief window of time to attempt to repair the situation.

49. Howard Bank did not foreclose on Tessemae's loans in August of 2017.

50. McDevitt contacted Mr. Vetter, who confirmed that the Company was facing imminent bankruptcy.

51. McDevitt agreed to conduct a call with Tessemae's Board to discuss whether an agreement could be reached for McDevitt to endeavor to help Tessemae's.

52. McDevitt conducted a conference call with the Board of Managers to discuss the situation.

53. McDevitt informed the Board that he would attempt to work with Howard Bank and convince them to restructure the loans, in exchange for increased profit interests with heightened voting rights.

54. The heightened voting rights would provide McDevitt increased oversight over the Company.

55. McDevitt sought additional oversight so that he, Howard Bank, and any potential investors could have confidence that the situation would not reoccur.

56. The Board of Managers informed McDevitt that they wanted to discuss his offer.

57. The Board then met separately to discuss McDevitt's offer.  It then rejoined McDevitt on the conference call.

58. The Board informed McDevitt that they accepted his offer.

59. The Board informed McDevitt that it had approved the terms of the agreement by Board vote.

60. The Parties agreed that the agreement would be memorialized in a written agreement.

61. Another email dated August 23, 2017 is attached as Exhibit 7.

62. A portion of Exhibit 7 is reproduced here:

**From:** Lindsay Thomas <lindsay@tessemaes.com>
**Date:** August 23, 2017 at 8:22:29 PM EDT
**To:** Mike McDevitt <mmcdevitt@tk.co>
**Cc:** Greg Vetter <oldest@tessemaes.com>
**Subject: Financing structure - update**

Mike,

New proposal for the Howard Bank refinancing to discuss with your lawyer tomorrow.

63. An email dated September 1, 2017 is attached as Exhibit 8.

64. A portion of Exhibit 8 is reproduced here:

| From: | Julia Taylor |
| --- | --- |
| Sent: | Friday, September 01, 2017 2:58 PM |
| To: | Lindsay Thomas |
| Cc: | 'Mike McDevitt' |
| Subject: | Tessemae Lender Docs |
| Attachments: | MM Tessemae Investor Promissory Note FORM_23407_3.DOCX; MM Tessemae Side Letter Agreement_23408_2.DOCX; MM Tessemae Warrant FORM_23409_1.DOCX |

Lindsay

Attached are the following docs:

1. Form of Commercial Promissory Note
2. Form of Warrant
3. Side Letter Agreement between Tessemae and M McDevitt

65. Another email dated September 1, 2017 is attached as Exhibit 9.

66. A portion of Exhibit 9 is reproduced here:

**From:** Lindsay Thomas [mailto:lindsay@tessemaes.com]
**Sent:** Friday, September 01, 2017 3:52 PM
**To:** Julia Taylor <julia@tndm.com>
**Cc:** Michael Nord <mnord@gebsmith.com>
**Subject:** RE: Tessamae Deal

Michael / Julia,

Need to get your sign off on the consolidated comments asap as I need to get that over to Allied. Please confirm. Thanks.



**Lindsay Thomas**
Chief of Staff
C: 703-795-1035
O: 855.MYTESSE
www.tessemaes.com

67. An email dated October 3, 2017 is attached as Exhibit 10.

68. A portion of Exhibit 10 is reproduced here:

| | |
|---|---|
| **From:** | Lindsay Thomas <lindsay@tessemaes.com> |
| **Sent:** | Tuesday, October 03, 2017 12:05 PM |
| **To:** | Julia Taylor |
| **Cc:** | 'Mike McDevitt' |
| **Subject:** | RE: Operating Agreement Amendment / Escrow |

Julia,

Sure – we will confirm once we see that come in.

On the operating agreement, we were under the impression your side would be taking the pen on the amendment (similar to the other documents). If you would prefer for us to do so, we ask for some additional time to get our counsel going on that.

## **Terms and Purpose of The Side Letter Agreement**

69. The Parties entered into the Side Letter Agreement on September 7, 2017, attached as Exhibit 1.

70. The Side Letter Agreement is the written agreement that memorialized the August 2017 agreement between McDevitt and Tessemae's.

71. The Side Letter Agreement's subject line is "RE:  Facilitation of Loan Amendment."

72. The opening paragraph of the Side Letter Agreement states, "Over the past several weeks, you have worked tirelessly on the behalf of Tessemae's LLC, a Maryland limited liability company ('Tessemae's), in connection with the closing of an amendment to Tessemae's loan documents with Howard Bank as well as securing Howard Bank's agreement to be subordinated on the accounts receivable in order to facilitate a new factoring facility for Tessemae's."

73. The Side Letter Agreement then states, "In appreciation of your efforts in bringing about the loan amendment and subordination, Tessemae's hereby agrees to issue to you, or your designees, 5,779,557 of a new class of units representing membership interests in Tessemae's to be called Class C units (the "Class C Common Units")."

74. This paragraph is the substance of the binding contract between the Parties, and reflects the terms that the entire Board discussed and agreed to, in order to induce McDevitt to undertake significant work and take on significant risk.

75. The remainder of the Side Letter Agreement provides additional detail.  First, it notes that, because the existing Operating Agreement did not provide for the class of equity being issued, "In order to issue to you the Class C Common Units, Tessemae's must amend its Amended & Restated Operating Agreement of Tessemae's LLC, dated January 2, 2014 (the 'Operating Agreement'), which amendment shall be in effect no later than October 7, 2017."

76. The Side Letter Agreement then provides explicit and detailed requirements that the Company agreed to make part of the amended Operating Agreement.

77. Specifically, the Side Letter Agreement provides that, "[a]s part of the amendment, the Company will create the Class C Common Units with the following characteristics:

    a.  The Class C Common Units shall be Voting Units, entitled to 1 vote per Class C Common Unit, voting as a separate class, however, with respect to any vote on an Acquisition or Asset Sale, each Class C Common shall be entitled to 6 votes per Unit;

b.  The Class C Common Units shall be "profits interests" within the definition contained in Internal Revenue Service Revenue Procedure 93-27 and Revenue Procedure 2001-43;

c.  The Class C Common Units shall participate in distributions under the Operating Agreement as other holders of Participating Units;

d.  The distribution threshold for the Class C Common Units upon issuance shall equal the current value of Tessemae's assets in order to ensure that you (or your designees) do not recognize any income upon receipt of the Class C Common Units;

e.  The Class C Common Units upon issuance shall be fully vested and not subject to forfeiture; and

f.  The holder of the Class C Common Units will have veto rights on various business decisions, including (a) distributions to Members (other than tax distributions), (b) purchase or redemption of any outstanding units, (c) liquidation or dissolution of Tessemae, (d) merger or consolidation with another company, (e) sale of all or substantially all of Tessemae's assets, (f) creation of any new class of units, (g) amendment of the Articles of Organization or Operating Agreement, (h) change in the nature of the business, (i) incurrence of new debt over $150,000, (j) hiring, firing, selection and compensating of senior management, including the CEO and CFO, (k) changes to employee compensation and benefit plans, including grants of Class B Common Units, (l) adoption of, or material changes to, financial budgets, (m) transactions with management or affiliates, (n) new businesses or product lines, (o)

capital expenditures in excess of amount in agreed to budget, and (p) change in accountants and/or accounting practices.

78.   The Side Letter Agreement continues, "In addition to the creation of the Class C Common Units as described above, Tessemae's will further amend the Operating Agreement by removing separate class voting requirements contained in Sections 6(a)(ii) & (iii) and 6(b)(v) with respect to an Acquisition and Asset Sale so that all Voting Units vote together as a single class."

79. The final two obligations of the Side Letter Agreement required Tessemae's to obtain an independent valuation of the Company and to provide an advance of $100,000 for reimbursement of fees and expenses.

80. Regarding the valuation, the Side Letter Agreement provided: "In order to ensure that the distribution threshold for the Class C Common Units is equal to the current value of Tessemae's assets at time of grant, Tessemae's hereby agrees to obtain, at its sole cost and expense, a valuation of its assets by an independent third-party appraiser, which appraiser to be approved by you. Such appraisal will be started no later than [one week] from the date of this letter."

81. Finally, regarding reimbursement, the Side Letter Agreement provided that "Tessemae's is aware that you have incurred fees and expenses in connection with structuring the loan amendment and obtaining the subordination, and will incur other fees in connection with the amendment to the Operating Agreement.  In order to facilitate payment of your consulting, accounting and legal fees and expenses incurred thus far and in connection with the appraisal and amendment to the Operating Agreement, Tessemae's hereby agrees to remit to you $100,000 ("Escrowed Funds") to be disbursed by you in accordance with the attached Exhibit A.  As many of the fees and expenses are not yet finalized, the amounts set forth on Exhibit A are estimates, and you are authorized to

pay the actual amount invoiced with the Escrowed Funds.  To the extent that the relevant fees are more or less than the Escrow Funds, Tessemae's will pay such difference directly upon receipt of an invoice from the relevant service provider or shall be entitled to a refund from you."

82. Exhibit A to the Side Letter Agreement estimates, *inter alia*, $30,000 for Tandem Legal as "Counsel for Mr. McDevitt".

### **McDevitt's Performance Rescued Tessemae's and Prevented Bankruptcy**

83. After the Parties reached agreement on the conference call, McDevitt began working in earnest with Howard Bank to avoid foreclosure, and to enable the Company to access additional funding to continue operations.

84. McDevitt's work continued while the Side Letter Agreement was being negotiated, and after it was signed.

85. Specifically, McDevitt convinced Howard Bank to release a lien that it held on Tessemae's accounts receivables, as security for the loans which McDevitt had also personally guaranteed.

86. Howard Bank could not release its lien without McDevitt's agreement.

87. McDevitt's agreement was required because releasing the lien increased the risk to Howard Bank and to McDevitt.

88. If Tessemae's defaulted on the loan, Howard Bank could no longer look to Tessemae's accounts receivables for satisfaction.

89. Instead, Howard Bank would look to McDevitt's personal guarantee for satisfaction.

90. For Tessemae, it was necessary for Howard Bank to release the lien so that Tessemae's could access additional capital in the form of short-term debt secured by the receivables, known as a "factoring agreement."

91. As a result of McDevitt's efforts, Tessemae's obtained the loan amendment from Howard Bank, avoided bankruptcy, and secured additional funding via a factoring agreement.

92. While the amendment to Tessemae's Operating Agreement was being negotiated in accordance with the terms of the Side Letter Agreement, however, McDevitt began to learn that the Company's financial condition was far worse than had been disclosed to that point.

93. In 2015, when McDevitt served as an advisor to Tessemae, the Company had less than $3 million in debt.

94. In January 2017, the Company's debt burden had grown to $12 million.

95. In October 2017 — only ten months later — the Company's debt burden had nearly doubled, increasing to more than $21 million.

96. The Company's debt burden is now larger than its annual gross revenue.

97. The Company has continued to take on additional debt, and to add to its already unsustainable monthly payroll expense in excess of $500,000.

98. The Company's Board of Managers has contributed to this exploding debt burden.  In one example, CEO Vetter withdrew nearly $500,000 from the Company as an unsecured personal loan, later described as a "Founder's Draw."

99. McDevitt has also learned that the Company has been spending inordinate amounts on professional fees. Specifically, the Company was spending nearly $125,000 per month in accounting fees in 2017. Despite that incredible expense, the Company failed to even complete its tax returns on time, a failure that forced the entire Tessemae's investor body to file for extensions for their own personal returns.

100.     All of these issues, and many others, significantly increase the risk to McDevitt on account of his personal guarantee of a portion of Tessemae's debt.

101.     McDevitt raised a number of these issues with Tessemae, with the intent that they could be explained and resolved prior to seeking additional funding from new investors.

102.     Rather than providing an explanation of these issues to McDevitt, Tessemae's cut off communication and refused to issue the Class C Units McDevitt, as required by the Letter Agreement.

103.     Tessemae's refusal to issue the Class C Units required by the Side Letter Agreement is continuing.

## COUNT I:  BREACH OF CONTRACT

104.     McDevitt repeats and realleges each and every allegation contained all proceeding Paragraphs as if set forth herein in full.

105.     Tessemae, through its Board of Managers, entered into a contractual agreement with McDevitt.

106.     Tessemae's Board voted to approve the terms of the agreement.

107.     That contractual agreement was memorialized in the September 7, 2017 Side Letter Agreement.

108.     CEO Vetter was authorized to execute the Side Letter Agreement on behalf of Tessemae's.

109.     Tessemae, through CEO Vetter, executed the September 7, 2017 Side Letter Agreement with McDevitt.

110.     CEO Vetter's signature appears on the copy of the Side Letter Agreement (Exhibit 1, at 3).

111.     The Side Letter Agreement is a valid, unambiguous, and enforceable contract.

112.     McDevitt has performed all of his obligations under the terms and conditions of the Side Letter Agreement, including by, *inter alia,* facilitating "the closing of an amendment to Tessemae's loan documents with Howard Bank as well as securing Howard Bank's agreement to be subordinated on the accounts receivable in order to facilitate a new factoring facility for Tessemae."

113.     The Side Letter Agreement obligates Tessemae's to issue to McDevitt 5,779,557 Class C Units, with the agreed-upon voting rights and other conditions.

114.     By refusing to issue to McDevitt the Class C Units, Tessemae's materially breached the Side Letter Agreement and is continuing to breach by the continued refusal to do so.

115.     The agreed-upon Class C Units are a unique good.

116.    The nature of the Side Letter Agreement, including but not limited to the voting rights, makes specific performance equitable and practical in that the Court need only order Tessemae's to issue the Class C Units with the agreed-upon Terms & Conditions.

117.    McDevitt has suffered injury as a result of Tessemae's breach, including by being prevented from exercising any degree of oversight of Tessemae's operations, despite taking on additional risk to the personal guarantee.

118.    McDevitt's injury cannot be remedied through an award of damages.

119.    Because McDevitt has no adequate remedy at law, McDevitt requests that the Court order specific performance of the Side Letter Agreement.  Unless specific performance is granted, McDevitt will be irreparably harmed in a manner not compensable by money damages.

120.    In the alternative, as a result of Tessemae's breach and continuing breach, McDevitt has been injured, irreparably and otherwise, as to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff respectfully prays that this Honorable Court:

A.  Enter a judgment that Tessemae's is liable for breach of the Side Letter Agreement.

B.  Order Tessemae's to issue to McDevitt 5,779,557 Class C Common Units representing membership interests in Tessemae's LLC, with the following characteristics:

    i.   The Class C Common Units shall be Voting Units, entitled to 1 vote per Class C Common Unit, voting as a separate class, however, with respect to any vote on an Acquisition or Asset Sale, each Class C Common shall be entitled to 6 votes per Unit;

    ii.  The Class C Common Units shall be "profits interests" within the definition contained in Internal Revenue Service Revenue Procedure 93-27 and Revenue Procedure 2001-43;

  iii. The Class C Common Units shall participate in distributions under the Operating Agreement as other holders of Participating Units;

  iv. The distribution threshold for the Class C Common Units upon issuance shall equal the current value of Tessemae's assets in order to ensure that you (or your designees) do not recognize any income upon receipt of the Class C Common Units;

  v. The Class C Common Units upon issuance shall be fully vested and not subject to forfeiture; and

  vi. The holder of the Class C Common Units will have veto rights on various business decisions, including (a) distributions to Members (other than tax distributions), (b) purchase or redemption of any outstanding units, (c) liquidation or dissolution of Tessemae, (d) merger or consolidation with another company, (e) sale of all or substantially all of Tessemae's assets, (f) creation of any new class of units, (g) amendment of the Articles of Organization or Operating Agreement, (h) change in the nature of the business, (i) incurrence of new debt over $150,000, (j) hiring, firing, selection and compensating of senior management, including the CEO and CFO, (k) changes to employee compensation and benefit plans, including grants of Class B Common Units, (l) adoption of, or material changes to, financial budgets, (m) transactions with management or affiliates, (n) new businesses or product lines, (o) capital expenditures in excess of amount in agreed to budget, and (p) change in accountants and/or accounting practices.

C. Further Order Tessemae's to amend the Tessemae's, LLC Operating Agreement by removing separate class voting requirements contained in Sections 6(a)(ii) & (iii) and 6(b)(v) with respect to an Acquisition and Asset Sale so that all Voting Units vote together as a single class.

D. Further Order Tessemae's to pay McDevitt's attorney fees incurred in connection with the Side Letter Agreement, as required by its terms.

E. Further Order Tessemae's to perform all other duties and obligations of the Side Letter Agreement.

F. Further Order Tessemae's to pay McDevitt's reasonable costs, including attorneys' fees, incurred in this action.

G. Award such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Defendants and Counterclaim Plaintiff Michael McDevitt hereby demand a trial by jury

of all issues so triable, with respect to the complaint and counterclaim, pursuant to Fed. R. Civ.

P. 38.

Date:   April 14, 2021                              Respectfully submitted,


                                   /s/ Barry Coburn
                                   Barry Coburn
                                   MD Bar No. 07910
                                   COBURN AND GREENBAUM, PLLC
                                   1710 Rhode Island Ave., NW
                                   Second floor
                                   Washington, D.C. 20036
                                   Tel. (202) 643-9472
                                   Fax (866) 561-9712
                                   barry@coburngreenbaum.com
                                   *Attorney for Defendants/Counterclaim Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of April, 2021, a true and correct copy of the

original version of the foregoing was sent via ECF to:


BROWN GOLDSTEIN LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, MD 21202

Andrew D. Levy, Esq.
adl@browngold.com

Kevin D. Docherty, Esq.
kdocherty@browngold.com

Jamie Strawbridge, Esq.
jstrawbridge@browngold.com

*Attorneys for Plaintiff*

/s/ Barry Coburn          
Barry Coburn
